1

```
1                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3    UNITED STATES OF AMERICA,        )
                                      )    Docket No. 23 CR 28
4                     Plaintiff,      )
                                      )    Chicago, Illinois
5           v.                        )    June 12, 2023
                                      )    1:01 p.m.
6    JEFF McGRAW,                     )
                                      )
7                     Defendant.      )

8      TRANSCRIPT OF TELEPHONIC PROCEEDINGS - Emergency Motion for
                        Revocation of Release Order
9            BEFORE THE HONORABLE THOMAS M. DURKIN

10
     APPEARANCES:
11
     For the Government:     MR. BRANDON D. STONE
12                           Assistant U.S. Attorney
                             219 South Dearborn Street, 5th Floor
13                           Chicago, Illinois  60604

14
     For the Defendant:      MR. JOHN L. McNAMARA
15                           JOHN L. McNAMARA, P.C.
                             650 North Dearborn Street, Suite 750
16                           Chicago, Illinois  60654

17
     Also present:           MS. JUDITH LESCH [Pretrial Services]
18
                             MR. JEFF McGRAW
19

20

21

22   Court Reporter:         ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
                             Official Court Reporter
23                           United States District Court
                             219 South Dearborn Street, Room 1432
24                           Chicago, Illinois 60604
                             312.408.7782
25                           Elia_Carrion@ilnd.uscourts.gov
```

1     (Proceedings heard telephonically.)

2          THE COURT:  All right.  Emily, please call the case.

3          THE CLERK:  All right.  This is Case No. 23 CR 28,

4     United States v. Jeff McGraw.

5          May I please have the attorney present on behalf of

6     the United States state their name.

7          MR. STONE:  Yes.  This is Brandon Stone on behalf of

8     the United States.

9          THE CLERK:  And on behalf of Mr. McGraw.

10          MR. McNAMARA:  Good afternoon.  John McNamara on

11     behalf of Mr. McGraw.

12          THE CLERK:  And is Mr. McGraw on the line?

13          THE DEFENDANT:  Yes.

14          THE CLERK:  And on behalf of pretrial services.

15          PRETRIAL SERVICES:  Good afternoon.  Judith Lesch

16     with pretrial services.

17          THE COURT:  All right.  Good afternoon, everyone.

18          We are here on an appeal by the government of the

19     finding of Judge Kim that the defendant could be released to

20     home incarceration with conditions of release.  The government

21     filed an appeal.  Judge Kim's order allowed for a stay of the

22     effect of his order until noon on Friday.  I asked for more

23     materials from the government relating to both the incident

24     and also -- both the incident that occasioned the arrest and

25     also the incident out of Kankakee, the jail.  And because it

1    took some time to get all that, I entered a stay of the

2    release until I heard the case or Judge Chang heard the case.

3    This case was assigned to Judge Chang.  I'm the emergency

4    judge.  Judge Chang is not available, so it's being heard by

5    me as the emergency judge.

6          Mr. McNamara, first question is, although your

7    client's present by phone, he has a right to have this

8    detention hearing take place in a courtroom.

9          Do you waive his presence for the courtroom

10   appearance?  If he doesn't want to waive, I'm happy to

11   reschedule, and we can do it as early as tomorrow.

12         MR. McNAMARA:  Judge, we'll waive.

13         THE COURT:  Okay.  And, Mr. McGraw, do you understand

14   you have a right to have this hearing take place in my

15   courtroom, but that based on the representation of your

16   attorney, you're agreeing to waive your presence?  You're

17   certainly free to participate by phone, which you are right

18   now, but we can do this in my courtroom.  You would see me, I

19   would see you, you'd see the prosecutor, you'd see your

20   lawyer, you'd see the pretrial services officer, and we'd do

21   it in an open courtroom.

22         Are you waiving your right to do that and instead

23   proceeding by phone today?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  Okay.  Any additional questions I should

1    ask on the waiver, Mr. Stone?

2              MR. STONE:  No, Your Honor.

3              THE COURT:  And, Mr. McNamara, do you believe your

4    client is knowing -- is knowingly and voluntarily waiving his

5    right to have this hearing take place in a courtroom?

6              MR. McNAMARA:  Yes.

7              THE COURT:  Okay.  I find that he has waived his

8    right to have it take place in a courtroom, and we'll proceed

9    over the phone.

10             All right.  I have reviewed two reports from pretrial

11   services.

12             Well, let me start, first, with my understanding of

13   the level of review.  My understanding is that the hearing

14   before me allows for *de novo* review.  In other words, it's as

15   if I were the initial judge deciding the issue of bond.

16   Although it's an appeal -- not bond, but the issue of release.

17   Although it's an appeal from Judge Kim, I have to conduct a

18   *de novo* review following the same procedures that apply when

19   taking of evidence before a magistrate judge or hearing

20   arguments before a magistrate judge and giving the defense the

21   right to present witnesses or to make arguments, but that --

22   and basically starting from scratch.  That's *U.S. v. Torres*,

23   929 F.2d 291 at page 292 (7th Circuit 1991).

24             So that is the standard of review I'm employing as if

25   this were in front of me in the first instance.

1        The documents I have in front of me are the pretrial

2  services reports, there's two of them, that Ms. Lesch

3  prepared.  I have received a draft jail call transcript

4  between Jeff McGraw and Ziesha Jones, something that was not

5  before Judge Kim.  I asked for and received the police reports

6  relating to the arrest of Mr. McGraw, and it's multipage

7  documents, but I have those.  And I also have a booking card

8  for Mr. McGraw, two booking cards.  And then I also have a

9  series of what appear to be typewritten reports from

10  correctional officers at Kankakee relating to the incident

11  where the defendant was attacked and his leg was injured.

12        My first question is:  Do -- I got these from the

13  government, but they were copied on the defense.  I want to

14  make sure, Mr. McNamara, you have these same documents.  Is

15  that correct?

16        MR. McNAMARA:  That is correct, Your Honor.  If I

17  could ask:  You also have the booking card for Mr. Macon?

18        THE COURT:  Yes.  Let me look here.  Maybe that's

19  what I...

20        I have one for Jeff McGraw and one for Grieg Macon.

21  Grieg is spelled G-R-I-E-G.

22        What's the relationship between the two?  I just

23  asked for -- I don't know why I have two booking cards.  Maybe

24  someone can explain that.

25        MR. McNAMARA:  On behalf of Mr. McGraw, Mr. Macon is

1   the person that attacked Mr. McGraw upon his arrival at the

2   facility.

3          THE COURT:  Got it.  Okay.  Now I understand.  I --

4   Macon has nothing to do with the incident that's the basis of

5   the indictment.

6          MR. McNAMARA:  Correct.

7          THE COURT:  Of this defendant.  Okay.  I do have

8   Macon's booking card.  Thank you for clarifying that

9   because --

10         MR. McNAMARA:  Your Honor, if I may inquire, because

11  I filed it pretty late yesterday, but you have my reply brief?

12         THE COURT:  I do not.  I do not.  We will print it

13  out right now, and I'll read it over.

14         MR. McNAMARA:  Okay.

15     (Pause in the proceedings.)

16         THE COURT:  Mr. McNamara, I have it.  I'm going to

17  read it real quickly -- I'll read it in the time it takes, but

18  one other thing I have is the transcript of the hearing before

19  Judge Kim.  I didn't see in the docket sheet a separate motion

20  you filed.  Was it an oral motion for release?

21         MR. McNAMARA:  Original --

22         MR. STONE:  Your Honor, this is Brandon Stone from

23  the government.  Did you see on the docket the motion to

24  revoke the release order that -- I can give you the docket

25  entry if you need to -- that was filed on Friday?

1    THE COURT:  Your motion?

2    MR. STONE:  Yes, along with the two exhibits.  I

3  filed those exhibits under seal because they're the

4  medical records, but I just wanted to make sure Your Honor saw

5  that as well.

6    THE COURT:  No.  I'll have to look at those, too.

7  I'll print those out.  Everyone be patient, and I'll get

8  those, too.  I apologize.

9    (Pause in the proceedings.)

10    THE COURT:  Is the noise in the background at the --

11  at the jail, or is it someone else --

12    MR. McNAMARA:  Yes.

13    THE COURT:  -- on the phone?  Okay.

14    (Indiscernible crosstalk.)

15    THE COURT:  Do you have the ability to mute your

16  phone, or no?

17    THE DEFENDANT:  Nah.  I just have to tell --

18    THE COURT:  All right.

19    THE DEFENDANT:  -- tell the lieutenant to tell them

20  to be quiet.

21    THE COURT:  That's fine.

22    (Pause in the proceedings.)

23    THE COURT:  All right.  Thank you.

24    Okay.  I've read the response.  We're copying out the

25  government's motion.  I have -- I did have a conversation with

1    the -- a medical officer at Kankakee, which I'll relate the

2    conversation I had with her when -- when I've looked at the

3    government's motion.  That's being copied out right now, so

4    just give me a second.

5      (Pause in the proceedings.)

6            THE COURT:  All right.  Unfortunately -- well, let

7    me -- I had my law clerk print this out, but the only access

8    we have is to the redacted version.  Let me see if on my

9    computer I can get the unredacted version.

10           MR. STONE:  Your Honor, this is Brandon Stone from

11   the government.  If you would like, I can email your courtroom

12   deputy the unredacted brief and exhibits right now.

13           THE COURT:  Why don't you do that.  Email it to her.

14   She'll bring it in, and I'll look at it.

15           What time is it now?  It's 1:17.  Unless anyone

16   objects to this -- well, if we reconvene this at 1:45, are we

17   likely to lose Mr. McGraw, Emily?

18     (Indiscernible crosstalk.)

19           THE COURT:  Let me see with my courtroom deputy

20   first.

21           THE CLERK:  I'm not sure I'll be able to get him to

22   reconnect.

23           THE COURT:  All right.  Here's what I'm going to do.

24   I'm going to put you on mute here, because we're going to have

25   to get these documents printed out, and I need to read them.

1    I don't want to lose Mr. McGraw and have to reschedule this.

2    So why don't you give me about ten minutes or so to have Emily

3    print these out and for me to read them, and I'll just put it

4    on mute on my line.  But everyone should remain on the line,

5    and you can mute your phones.

6            And, Mr. McGraw, you should stay on the line as this

7    hearing is continuing.  Okay?

8            THE DEFENDANT:  Okay.

9            THE COURT:  All right.  Everyone else is free to mute

10   their phones if they'd like, and in about ten minutes I'll

11   come back and we'll talk about -- we'll conduct the hearing.

12   Thank you.

13     (Pause in the proceedings.)

14           THE COURT:  Okay.  I've read the motion by the

15   government and the attachments to it, and I've also read the

16   response of the defense.  Is there anything else that I should

17   have that I have not mentioned?

18           I'll ask, first, the government?

19           MR. STONE:  Your Honor, this is Brandon Stone from

20   the government.  No, I think that's everything, Your Honor.

21           THE COURT:  All right.  And, Mr. McNamara, for

22   defense?

23           MR. McNAMARA:  I agree.  I think you have everything,

24   Judge.

25           THE COURT:  Okay.  Well, the law allows me to rely

1  upon the transcripts of the hearing before Judge Kim.  I can

2  also take additional evidence or simply hear arguments.

3  You've made arguments in your briefs.  I can hear additional

4  arguments or take any evidence.

5      Does either side wish to present additional evidence

6  beyond what's contained in the materials I've received?

7      First, the government?

8      MR. STONE:  Your Honor, this is the government.  No.

9  We have presented everything in the papers and the exhibits,

10  Your Honor.

11      THE COURT:  All right.  Mr. McNamara?

12      MR. McNAMARA:  No evidence, Your Honor.  If -- I

13  would like an opportunity to perhaps touch on a few things

14  referenced in my submission.

15      THE COURT:  Sure.  Since this is the government's

16  appeal, I'll let them go first, because they are the moving

17  party, or the appellant.

18      Do you wish to say anything, Mr. Stone?

19      MR. STONE:  Your Honor, if you are taking argument, I

20  would like to say a few things.

21      As outlined in the papers and the accompanying

22  documents, Your Honor, the defendant has a history of violent

23  conduct and of engaging in violent conduct while on probation

24  or parole.

25      He has a 2015 conviction for reckless discharge of a

1  firearm where he was placed on probation, and six weeks into

2  that probation, he was charged with a murder conspiracy to

3  which he pled guilty to and received a 14-year sentence.

4        After serving 50 percent of that 14-year sentence, he

5  was released on parole, and within three months was arrested

6  for the present offense, which also involves firearm,

7  Your Honor, and violence.

8        The facts of the present case have been outlined in

9  the papers and the arrest report that Your Honor has reviewed.

10  The fact is police responded to a 9-1-1 call from the victim's

11  mother stating that the defendant was at her house, that he

12  had struck her daughter in the face, and that he was

13  threatening them with a firearm.  Calumet City police

14  responded within a couple of minutes to observe the defendant

15  throwing the gun over the railing where it was recovered on

16  the ground.  This is a Glock 9mm with an auto-sear switch that

17  renders it fully automatic.

18        The mother made a -- after the defendant was

19  arrested, the mother made another statement again affirming

20  her statement that the defendant was carrying a gun and

21  threatening with them -- threatening her and her daughter with

22  the gun and that he had struck defendant -- or the victim.

23        The victim in this case, who was a girlfriend at the

24  time, she made no statement to police.  She declined to give a

25  statement.  However, she did give a statement a few days later

1  to medical service providers in saying that she had been in a

2  domestic violence incident three days prior, and she was

3  diagnosed with a jaw fracture which needed surgery to correct.

4  So all of those facts, Your Honor, here alone warrant

5  pretrial detention. Mr. McGraw is a danger to the community.

6  He is proven to be a danger to the community. The only reason

7  he does not have more violent sentences is because he was

8  incarcerated for the seven years prior to the most recent

9  arrest.

10  With respect to the obstruction, Your Honor, I would

11  submit that that transcript -- and I hope Your Honor listened

12  to the call that we sent as well, along with the transcript.

13  I don't know how anyone else could read that and not think

14  that he's trying to influence the testimony of the victim's

15  mother and to stay in the victim's good graces and to get the

16  mother to change her story to say that he did not have a gun

17  and that she was just mad or trying to get the police over

18  there. I don't think there's any other read there,

19  Your Honor.

20  And so, under the factors in the statute, he not only

21  is a danger to the community, but he's a danger to the

22  judicial and investigatory process here, Your Honor. He is on

23  notice that they had received grand jury subpoenas, and he

24  still tried to influence testimony.

25  And, finally, Your Honor, one last thing I do want to

1   talk about is flight here.  Pretrial services made several

2   findings regarding the defendant's history of nonappearance

3   and failure to appear and failure to abide by court orders,

4   which are known to be circumstances that might lend themselves

5   to believing that defendant may flee or not appear.

6          Your Honor, Mr. McNamara has made the representation

7   that defendant was hurt in an altercation in Kankakee.  I

8   totally accept the representations made in that incident

9   report as to how it occurred, but whether or not he was hurt

10  and whether or not the facility itself can accommodate his

11  medical care is not an issue of whether he should be detained

12  or not.  It's an issue of where he should be detained.

13         And further, Your Honor, you know, on the flight

14  point, I understand he has a broken leg, but it's my

15  experience that fugitives do not flee by foot; they do so by

16  plane, train, or automobile, or they cut off their ankle

17  monitor and hide out at a friend's house.  So I don't

18  necessarily think that precludes a finding that he could flee

19  as well.

20         And so, Your Honor, the government respectfully

21  requests that Your Honor revoke Judge Kim's June 7th release

22  order and order that defendant be detained pending trial.

23         THE COURT:  All right.  And, so I'm clear, the

24  standard is by clear and convincing evidence, is that correct,

25  for a dangerousness finding?

1    MR. STONE:  Your Honor, let me -- if you'd just give

2  me a moment to look it up.  I -- you know, I have my book

3  right here.

4    THE COURT:  Yeah.  3142(f)(1)(E) I think is where

5  you're looking.

6    MR. STONE:  Yes, Your Honor.

7    THE COURT:  I think that applies to any crime where

8  the maximum term of imprisonment is ten years or more, which

9  this is, felon in possession.  And it also applies when a

10  firearm is involved, which is also called for in the statute.

11  The standard is possession or use of a firearm, in this case

12  possession.  So that is what I understand to be the standard.

13    Mr. McNamara, do you agree with that?  I just want to

14  make sure --

15    MR. McNAMARA:  Yes.

16    THE COURT:  -- everyone is in agreement on --

17   (Indiscernible crosstalk.)

18    MR. McNAMARA:  Yes, I do, Your Honor.

19    THE COURT:  Very good.

20    Okay.  Mr. McNamara, you may respond.

21    MR. McNAMARA:  Well, I know Your Honor has read the

22  transcript and heard the call.  With regard to this -- these

23  telephone calls, which the -- Ms. Jones, of course, continues

24  to -- continued to answer the phone, had the ability to not

25  answer the phone, naturally.  But there's -- there's nothing

1  that Mr. McGraw says in those that -- there's no condition,

2  there's no "or else" or threat or offer of money.  It's a --

3  it's a conversation about the fact that she received these

4  subpoenas.

5          So the Court can draw its own conclusions from the

6  review, but on behalf of Mr. McGraw, we submit that those --

7  it's not obstructive-type conduct which would weigh towards

8  detaining my client.

9          With regard to this altercation at the Kankakee, my

10 client, after being remanded into federal custody, went

11 directly to this Riverside Medical Center, which is near

12 Kankakee, to be treated for pneumonia, and they -- he was

13 there four days getting over pneumonia before he was

14 transferred to the Kankakee County detention center.  And, as

15 I stated in -- in my brief, he was allowed to shower, he was

16 collecting his belongings, he was supposed to be the only one

17 in that area moving around at that time when he was attacked

18 by this other inmate, who was clearly the aggressor.

19         My client basically to save himself or prevent even

20 worse injuries had to jump off a tier to get away from the

21 person.  So obviously he was driven to that extreme decision

22 to -- to jump like that to get away from this person.  And

23 that's also when my client undoubtedly was very ill at that

24 time, among everything else.

25         And, as Your Honor read, even before he arrived

1  there, there were conversations that he had with the marshals

2  where he informed them that there were people at the facility

3  that would be a danger to him.

4      Most importantly, with regard to conditions that

5  exist, Ms. -- the proposed third-party custodian is an ideal

6  candidate to act as third-party custodian.  She's someone who

7  works for the State of Illinois herself as an agent, with the

8  Department of Children and Family Services.  She has the

9  ability to take custody of minors, if warranted, in -- in

10  abusive or neglectful scenarios.

11      THE COURT:  Well, your client -- of course,

12  understanding your client's 29 years old.  He's not a minor.

13  I get your point, but there's a little bit of a difference.

14      MR. McNAMARA:  There is, but she's clearly a very

15  responsible person with a job that carries with it certain

16  powers and that she's maintained that position for quite a

17  long time.  Judge Kim asked her several pointed questions.

18  He -- she answered all those questions.  He assessed her

19  credibility.  And he even commented on her suitability to act

20  as third-party custodian.

21      So it's -- from our perspective, she's a great

22  candidate to act as third-party custodian, obviously, with

23  home incarceration.  Pretrial would know where he's at at all

24  times with GPS capabilities that he would be subjected to.

25      And his injury absolutely cuts against any type of

1    risk of flight.  He can't stand currently.  Literally cannot

2    stand.  And Judge Kim found as much when he stated in his

3    ruling that he saw no risk in terms of Mr. McGraw's absconding

4    or ignoring court orders.

5         Mr. McGraw has never really been outside of the

6    district, outside of the Cook County area, to my knowledge.

7         With regard to this injury, after the plate and the

8    rods were inserted surgically into his leg, he essentially was

9    rushed back to Kankakee jail the very next day and was placed

10   in a -- a cell with very unhygienic conditions, where he noted

11   bloody gauze in the cell, and was asking for a transfer to a

12   different cell, and they told him that he could clean it

13   himself.  However, Mr. McGraw couldn't stand on his own at

14   that time.

15        Kankakee or Riverside for -- he's not going to make

16   the same recovery in those locations as opposed to being in

17   the -- the home of a very close family friend with other

18   people there who can help care for him, because he's clearly

19   going to need a lot of care, and he's going to need a lot of

20   physical therapy with an injury such as this.

21        You read the pretrial services reports, and the

22   pretrial services officer wrote detailed reports and supported

23   her recommendation that he be released with conditions.  And

24   there are a lot of conditions that she proposed and which were

25   ordered, so -- with no movement whatsoever allowed.  And with

1    the -- the conditions that he's going to be expected to comply

2    with, he's going to be monitored very closely.

3            It's our position that Judge Kim made a sound and

4    supported decision, and we would ask that you deny the

5    government's request.  Thank you.

6            THE COURT:  All right.  Anything else by the

7    government?

8            MR. STONE:  Yes, Your Honor, just briefly.  With

9    regard to the third-party custodian, you may have noted that

10   there's no -- there's no -- she didn't have to put up anything

11   to take custody of Mr. McGraw, so she's really got no skin in

12   the game here, Your Honor.

13           With regards to -- you know, Your Honor, the

14   government doesn't take these appeals very often, and we did

15   so in this case because we think that pretrial services and

16   Judge Kim just got it wrong here.  And so we respectfully

17   submit that there are no conditions that -- or set of

18   conditions that can protect the public or ensure the

19   appearance of the defendant.

20           THE COURT:  All right.  Thank you.

21           Ms. Lesch, anything you want to add?

22           PRETRIAL SERVICES:  No, Your Honor.  Thank you.

23           THE COURT:  Well, the government is right, these

24   appeals don't get taken very often.  This is one of the first

25   ones I've had.  And this isn't even on the case that's been

1   assigned to me, but I'm looking at it as a case assigned to me

2   for this purpose.

3          It, I think, is a -- I don't -- I have great respect

4   for Judge Kim and for Ms. Lesch.  Ms. Lesch has handled cases

5   in front of me for a number of years, and Judge Kim has been a

6   magistrate judge for a number of years and has significant

7   experience in issues relating to release.  But I look at it

8   *de novo*.  I'm not deferring to their decision blindly.  I have

9   to look at it as I see it.

10         And a couple issues.  The issue of the jail fight.  I

11  don't know who the aggressor was.  It doesn't matter to me.

12  And it's not really a consideration that I have to make to

13  determine whether or not the defendant should be released.

14  Whether he fighted it -- started it or the other person

15  started it, whether Mr. McGraw felt it was necessary to jump

16  off a gallery and injure himself when he came down because he

17  was fearful, that ultimately is an issue for whether or not he

18  can safely be held in custody.  The fact that there were --

19  which is why I wanted to get the reports as to the incident

20  itself, which I've reviewed.

21         My understanding is the defendant is in a separate

22  area.  I don't know if it's segregation, but he's been

23  separated, certainly, from the individual who was involved in

24  the fight with him, whether it was an attack or a fight.  And

25  issues of whether or not a person is secure in a jail don't go

1    to the issue of whether a person is a danger to the community

2    if he's released.

3         He's a danger, or not, no matter how he's being

4    housed.  The question of whether his housing is safe is a

5    matter that needs to be taken up with me or Judge Kim.  If it

6    turns out that either for health reasons he needs to go to a

7    different facility or for security reasons he needs to go to a

8    different facility, that is an issue that can be taken up with

9    the presiding judge on the case.  It can also be taken up, I'd

10   suggest, with the prosecutor, who may know of reasons why the

11   defendant should be separated from other people.  If there's a

12   reason he should be separated from other people the

13   prosecutor's unaware of, he should tell his lawyer, and his

14   lawyer can use his judgment as to the information he discloses

15   to the jail people or to the prosecutor.

16        The government may very well agree he shouldn't be

17   out in Kankakee, he ought to be somewhere else, but that is a

18   decision that the Marshals Service has to make.  And they

19   often take advice from the government with separatee orders,

20   and they listen to defense counsel if there is a reasonable

21   reason why a particular facility is unsafe or the manner in

22   which a person is held at that facility is unsafe.  So I don't

23   view that as a determining factor on this decision.

24        I did speak, as I said, to one of the medical folks

25   out at Kankakee, and much of what has been related by the

1  defense is correct.  He did come into the federal facility

2  with pneumonia.  He was sent to a medical facility where he

3  was treated.  My understanding, it was three days in the

4  hospital.  It may have been four.  When he came back, he

5  showered within one hour after arrival, and that's where there

6  was a fight of some kind, and then Mr. McGraw jumped.  He

7  broke his lower leg.  He needed surgery.  He was taken to a

8  hospital again.  He had the surgery for the leg.  His leg

9  was -- there were plates and pins put in it.  His leg was

10 immobilized.

11         He's on -- in one-on-one housing, which it's my

12 understanding he is now.  And in the next few days he's

13 supposed to meet with the orthopedic surgeon, who will then

14 evaluate the progress he's made from the surgery and then

15 issue orders for physical therapy, which would be administered

16 to Mr. McGraw outside the facility.  They don't have PTs that

17 come to the jail.  They take the prisoner out of the jail to

18 receive physical therapy outside the jail.

19         Now, is that as good as getting it done having a home

20 healthcare professional come to a home to provide physical

21 therapy?  It's probably not as convenient, but the physical

22 therapists are all licensed.  It's the same level of physical

23 therapy you get whether it's in the jail or at someone's home.

24         I know if it's in the jail, it's done at taxpayer

25 expense.  And I don't know what his capabilities, if he's out,

1    are of providing for -- what his insurance capabilities are,

2    what the capabilities are of any third-party custodian of

3    providing that care.  But, ultimately, I don't think he's

4    going to suffer carewise if he remains in jail, a decision

5    I -- I haven't announced yet.  But if he does remain in jail,

6    I don't think his healthcare issues are of concern.  And if

7    they can't treat him at Kankakee, they'll send him to

8    Livingston or some other facility which has more medical care

9    capabilities.

10           And, again, if it's either for medical care or

11   because of safety issues, contact should be made with the

12   assistant U.S. attorney and ultimately with the Court, whether

13   it's me or Judge Chang.  And I have routinely made calls, not

14   that -- "routinely" overstates it, but I have occasionally

15   made calls to different facilities to make sure prisoners are

16   being treated properly.  I can't direct where a person is sent

17   to, and for security reasons they wouldn't tell me if they

18   were going to do it anyway.  But I can express concerns made

19   by parties, and they generally are very cooperative in

20   listening to those concerns.  So I don't view that as a

21   significant issue on the issue of detention.

22           The jail cell call, it's troubling.  I believe there

23   is a -- the fact the defendant called the person on --

24   Ms. Jones some 50 times is troubling.  And I read it --

25   you know, I'm not -- I certainly read it as suggesting that

1    Ms. Jones tell her mother that he didn't have a gun.  I think

2    the evidence is very clear, at least for purposes of today's

3    hearing, based on the police report I reviewed, that by clear

4    and convincing evidence he did have the gun.  And by telling a

5    witness who's been in the grand jury to tell the other witness

6    not to say the defendant had a gun could certainly be

7    considered obstruction.  That's my reading of the transcript

8    and listening to the tape.

9         On flight issues -- and I'll get back to

10   dangerousness in a minute -- but on flight issues, I'm not

11   sure he would fail to appear if he were released.  He's

12   immobilized.  He has nowhere to go.  It's -- he wouldn't be

13   the first person to cut off an ankle bracelet.  And, if

14   necessary, he can be wheeled out of the house and taken

15   somewhere else.  But I don't view any of that as probable.  I

16   think it's unlikely.

17        The reasons the defendant hasn't been anywhere other

18   than Cook County is because he's mainly been in jail for a

19   good part of his life, and that's the most troubling thing in

20   this case.

21        He -- in 2015, he was convicted of reckless discharge

22   of a firearm.  He was sentenced to two years' probation.

23   After being on probation for six weeks, just six weeks, he was

24   arrested on a murder charge.  He pled guilty to murder

25   conspiracy and got 14 years in jail for that.

1          He was released on parole April 12, 2002, having

2    served seven years of that sentence, 50 percent.  Then

3    three months later, he's arrested in this case after a

4    domestic incident in which he did break his girlfriend's jaw.

5    Not allegedly; he did.  And he pointed a handgun at her and

6    her mother and threatened to kill them both.

7          The hospital record makes clear her jaw was broken.

8    And although she, for whatever reason, understandably maybe

9    out of fear, doesn't want to say anything bad about her

10   ex-boyfriend, she told the doctors what happened.  She said

11   she was punched in the mouth by her boyfriend three days ago

12   as she was getting into a car and she noticed she was

13   bleeding.  She also said her boyfriend pistol-whipped her in

14   the back of the head two weeks ago.  She was seriously injured

15   from this.  This is while he's on parole.  I view that as

16   extremely troubling.

17         The question of the conduct itself in this case, he's

18   presumed innocent of this charge, but I have to look at the

19   strength of the case.  The statute says, among other things, I

20   have to look at the nature and circumstances of the offense,

21   including whether it's a crime of violence.  It is a crime of

22   violence, possession of a firearm, under these circumstances.

23   The Glock, which apparently had an auto-sear switch which

24   makes it fully automatic, which was loaded and had 13 rounds

25   in it, was observed by a law enforcement officer being thrown

1   by the defendant off the porch.  A jury will decide whether

2   that officer's testimony is credible if this case goes to

3   trial, but for purposes of this hearing, I can look at that

4   police report and take that as -- as to whether or not there

5   is a strong case, the nature and circumstances of the offense.

6   And the nature and circumstances of those -- of that is such

7   that, again, it is very, very troubling.

8           The circumstances of the arrest itself.  The mother

9   of Ms. Jones called the police and said please send someone to

10   her daughter's house, there's a man who had hit her daughter

11   and had a gun in his hand.  And then there were -- on the tape

12   itself -- I haven't listened to it, but the government

13   represented what it is, the 9-1-1 call, which lasted about

14   4 minutes 52 seconds.  The mother pleaded, "Please somebody

15   come before we be dead."  That type of statement is troubling.

16   And the fact that the gun was found right outside the

17   apartment is consistent with the fears expressed by the

18   mother.

19           The statements made, otherwise, that were made

20   apparently by the -- both victims, both the mother and the

21   daughter, are consistent with what has been represented by the

22   government as to the circumstances of the arrest on that day.

23   I don't believe the daughter made a statement to the

24   grand jury.  I don't know.

25           Mr. Stone, are you free to discuss that?

1      MR. STONE:  She did, Your Honor.  She did testify

2  consistent with her mother's statement.

3      THE COURT:  All right.  Then, Mr. McNamara, you have

4  a copy of the grand jury statement?

5      MR. McNAMARA:  I do.

6      THE COURT:  Okay.  Okay.

7      So the other thing I have to look at, beyond nature

8  and circumstances of the offense, is the weight of the

9  evidence -- I've discussed the weight of the evidence; seems

10  fairly strong to me -- and the history and characteristics of

11  the defendant.  The defendant either has been in jail or out

12  committing crimes for most of his life since the age of 15.

13      And another factor I have to consider is whether the

14  defendant at the time of the current offense or arrest was on

15  probation or on parole.  He was.

16      And I also have to look at the nature and seriousness

17  of the danger to any person or community that would be posed

18  by the defendant's release.  He's a danger to the mother and

19  the girlfriend.  He's a danger to the general public.

20      The defendant in the past has shown no ability to

21  abide by the laws that we all have to live with and, more

22  importantly, has shown no ability to abide by the conditions

23  of release that have occurred in the past.  I've related the

24  history of the conduct.  Every time he gets out, he violates

25  parole, probation, or commits -- and often by committing

1    another crime.

2          The fact that he pled guilty, ultimately, to a murder

3    conspiracy, that's the most serious crime -- whether or not he

4    was a shooter or not, he pled guilty to a murder conspiracy.

5    He got 14 years, which is not a life sentence for someone of

6    his age.  And that is a crime that is, if not unforgivable, it

7    is unforgettable, at least for people determining whether or

8    not he ought to be released into the community.

9          And I find by clear and convincing evidence, for all

10   those reasons, the defendant is a danger to the community.

11   I'm not finding there is a risk of flight, but I am finding by

12   clear and convincing evidence, really overwhelming clear and

13   convincing evidence that he is a danger to the community.

14         I view this not -- I don't reverse Judge Kim or the

15   recommendation of the probation office lightly, but I believe

16   I have more information here than they had available to them

17   at the time.  The police reports and the medical records of

18   Ms. Jones and her statements to the -- to the doctors are

19   extremely troubling and give me no choice but to find the

20   defendant, by clear and convincing evidence, is a danger to

21   the community and should not be released pending trial.

22         Anything else from the government?

23         MR. STONE:  Nothing from the government, Your Honor.

24   The only issues -- well, that's it, Your Honor.  Nothing from

25   the government.

1          THE COURT:  All right.  And so it's clear, I'm

2     reversing the order of Judge Kim.

3          Mr. McNamara, anything else?

4          MR. McNAMARA:  Not at this time, Your Honor.

5          THE COURT:  Okay.  Mr. Stone, I think you prepare an

6     order relating to this.  I think that's the practice down in

7     front of the magistrate judges.

8          MR. STONE:  Yes, Your Honor.  I can send over a

9     proposed order to Emily, if that would work for you.

10          THE COURT:  All right.  Just make sure Mr. Stone has

11     seen it, and then if it's -- it doesn't have to be agreed to

12     in substance by Mr. Stone, but at least as to form.  He

13     obviously --

14          MR. STONE:  For Mr. McNamara?  Yes, Your Honor.

15          THE COURT:  Yeah, Mr. McNamara.  Obviously, he

16     disagrees with my conclusion, but the form of it should be

17     something that's agreed to by the parties, if at all possible.

18          Okay.  Anything else by anyone?

19          MR. STONE:  Nothing from the government, Your Honor.

20          THE COURT:  Mr. McNamara, anything else?

21          MR. McNAMARA:  No.  Thank you.

22          THE COURT:  All right.  Bye-bye.

23      (Proceedings concluded at 1:56 p.m.)

24

25

1                              CERTIFICATE

2        I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4    */s/ Elia E. Carrión*          *11th day of March, 2024*

5    _____        _____
     *Elia E. Carrión*                      *Date*
     *Official Court Reporter*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25