UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

      v.

JEFF MCGRAW

Case No. 23 CR 28

Judge Edmond E. Chang

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
<u>MOTION TO DISMISS THE INDICTMENT
ON SECOND AMENDMENT GROUNDS</u>**

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:    <u>*/s/ Brandon D. Stone*</u>
Brandon D. Stone
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street
Chicago, Illinois 60604
(312) 613-9700

Dated:    April 30, 2024

# TABLE OF CONTENTS

I. Introduction ............................................................................................. 1

II. Factual Background ................................................................................ 1

III. Legal Background ................................................................................... 3

    A. Bruen's "Text and History" Test. ...................................................... 3

    B. Under *Bruen's* Framework, the Overwhelming Majority of Federal Courts Have Upheld § 922(g)(1) as Constitutional. .................................... 7

IV. Argument ............................................................................................. 10

    A. The Possession of Firearms by Felons Is Not Protected Under the Plain Text of the Second Amendment. ...................................................... 10

    B. Section 922(g)(1) Is Consistent With This Nation's Historical Traditions... 12

        1. Firearm Disqualification Laws ................................................ 13

            a. England ......................................................................... 13

            b. Colonial America ........................................................ 18

            c. Revolutionary War ..................................................... 20

            d. Ratification Debates ................................................... 23

        2. Felony Punishment Laws ....................................................... 25

    C. Summary of Historical Record. ....................................................... 30

    D. The *Prince* Decision Does Not Undermine the Government's Analysis. ...... 35

    E. Even Construed as an As-Applied Challenge, Defendant's Motion Still Fails. ............................................................................................. 42

V. Conclusion ........................................................................................... 46

## I.    INTRODUCTION

Defendant Jeff McGraw is charged with being a prohibited person—in this case, a convicted felon—in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Dkt. 1. Defendant now contends that under *New York State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1 (2022), § 922(g)(1) is unconstitutional under the Second Amendment. Dkt. 82. Defendant's constitutional claim is without merit, whether construed as a facial challenge or an as-applied one.

Since the Supreme Court decided *Bruen* in June 2022 (and continuing through April 2024), three federal appeals courts (the Eighth, Tenth, and Eleventh Circuits) have upheld the constitutionality of § 922(g)(1). In more than 600 rulings, numerous district courts around the country have done the same. Eighteen judges in this district have issued such rulings, and 17 of those 18—including this Court—have done so following the Seventh Circuit's decision in *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023). Consistent with this substantial persuasive authority, this Court should deny defendant's motion because (1) the plain text of the Second Amendment does not presumptively protect the right of felons to possess firearms, and (2) even if it did, § 922(g)(1) remains constitutional, as applied to all felons, because it "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

## II.    FACTUAL BACKGROUND

The government's evidence in this case includes, among other items, recordings of 911 calls, police dispatches, body-worn camera footage, witness testimony, court records, and a recovered firearm. Based on such sources of evidence,

the government anticipates that at a trial it would establish the facts that follow concerning defendant's offense.

On July 14, 2022, at around 7:14 a.m., Calumet City Police Department ("CCPD") received a 911 call from a woman reporting a domestic violence situation at her home. The woman caller asked that police be sent to her house because a man had hit her adult daughter and had a gun "in his hands." The woman identified the man as her daughter's boyfriend, "Jeff McGree [sic]." The caller stated that her daughter needed medical attention.[1] In the background, the daughter could be heard repeatedly yelling, "Go home!" The caller pleaded for the police to arrive quickly, exclaiming, "Please somebody come before we be dead!"

At approximately 7:15 a.m., CCPD Dispatch radioed nearby patrol units, which responded less than two minutes after the call came in over the radio.

Upon arriving at the house, an officer observed defendant throw the gun into the bushes next to the porch. BWC footage captured the officer telling a colleague, "I watched him throw it over here," and telling defendant, "See, when you threw the gun, I watched you throw it." The officer then recovered from the ground near the bushes a Glock 45 9mm handgun equipped with a laser and auto-sear switch, which rendered the firearm a fully automatic machinegun.

When he possessed the above-mentioned firearm, defendant was prohibited from possessing a firearm under § 922(g)(1).[2] Defendant has one prior felony

---

[1] The victim daughter's medical records documenting her injuries and statements to medical service providers are filed under seal at Dkt. 53-1 and 53-2.

[2] Section 922(g)(1) concerns any person "who has been convicted in any court of, a crime

conviction for reckless discharge of a firearm, in violation of 720 ILCS 5/24-1.5, and one prior conviction for murder conspiracy, in violation of 702 ILCS 5/9-1(A)(3). conviction for possession of a controlled substance.  Defendant was on parole when he committed the instant offense.

Defendant was indicted on January 18, 2023, with unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Dkt. 1. On April 15, 2024, defendant filed his instant motion to dismiss the indictment.  Dkt. 82.

## III.  LEGAL BACKGROUND

### A.  Bruen's "Text and History" Test.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. 554 U.S. 570, 635 (2008). The Court cautioned, however, that the right to keep and bear arms "is not unlimited" and remains subject to "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626, 627 n.26. Two years later, the Supreme Court extended *Heller* to state and local governments, while "repeat[ing] [the] assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms

---

punishable by imprisonment for a term exceeding one year." Here, the government refers to such individuals as felons.

by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (quoting *Heller*, 554 U.S. at 626-27).

In *Bruen*, the Supreme Court revisited the Second Amendment, explaining that it protects the right of "law-abiding citizens with ordinary self-defense needs . . . to keep and bear arms." 597 U.S. at 71. In so doing, *Bruen* struck down a New York law requiring residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home. *Id.* It also articulated a revised analytical framework for determining whether a modern firearm regulation is constitutional, directing courts to assess whether such regulations "are consistent with the Second Amendment's text and historical understanding." *Id.* at 26. *Bruen* did not overrule *Heller* or *McDonald*. *Id.* at 19, 22-24. Rather, it found that lower courts had misinterpreted those precedents when adding a means-end scrutiny to the Second Amendment, supplementing *Heller*'s history-focused methodology with a "judge-empowering 'interest-balancing inquiry'" that *Heller* and *McDonald* had "expressly rejected." *Id.* at 22 (quoting *Heller*, 554 U.S. at 634). This "two-step approach," *Bruen* explained, was "one step too many." *Id.* at 19.

*Bruen* thus re-oriented the courts to "[s]tep one of the predominant framework," as set forth in *Heller*, "which demands a test rooted in the Second Amendment's text, as informed by history." *Id. Bruen* first directed that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. Second, *Bruen* continued, where a regulation infringes on presumptively protected conduct, "[t]he government must . . .

justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (cleaned up).

*Bruen* set out guideposts for this historical inquiry. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century," *Bruen* directed courts to look for "a distinctly similar historical regulation addressing that problem." *Id.* at 26; *see also id.* (characterizing this inquiry as "fairly straightforward"). And in "cases implicating unprecedented societal concerns or dramatic technological changes," *Bruen* called for "a more nuanced approach." *Id.* at 27. *Bruen* expressly recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* When confronting such present-day firearm regulations," *Bruen* instructed courts to "reason[] by analogy": to determine "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by determining "whether the two regulations are 'relevantly similar.'" *Id.* at 28-29.

*Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it directed courts to treat as "*central* considerations," "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29 (emphasis in original) (cleaned up); *see also id.*

5

("*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense"). *Bruen* continued:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 29 (emphases in original) (cleaned up).

Finally, in *Bruen*, six Justices emphasized that certain firearms regulations—including prohibitions on felons' possession of firearms—remain constitutional. In his concurrence, Justice Alito explained that *Bruen* did not "disturb anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." 597 U.S. at 72, (cleaned up). Justice Kavanaugh, writing separately and joined by Chief Justice Roberts, likewise reiterated that "longstanding prohibitions on the possession of firearms by felons" remain constitutional. *Id.* at 81 (cleaned up). *See also id.* at 129 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) (same).

The Seventh Circuit recently observed that such language in *Bruen* "is hard to square" with the argument that "the Second Amendment permits persons with felony convictions to possess both firearms and ammunition, notwithstanding statutes such as 18 U.S.C. § 922(g)(1)." *See United States v. Gay*, No. 23-2097, 2024 WL 1595285,

6

at \*3 (7th Cir. Apr. 12, 2024). *Gay* wrote that the Supreme Court "pointedly stated that longstanding prohibitions on the possession of firearms by felons are valid." *Id.* (internal quotation marks omitted). *Gay* also noted that multiple Justices had written separately in *Bruen* to explain that the decision "did not change anything about *Heller*." *Id.* (first citing *Bruen*, 597 U.S. at 72 (Alito, J., concurring); and then citing *Bruen*, 597 U.S. at 80–81 (Kavanaugh J., concurring)).

### B. Under *Bruen's* Framework, the Overwhelming Majority of Federal Courts Have Upheld § 922(g)(1) as Constitutional.

Post-*Bruen*, nearly every federal court to have addressed the constitutionality of § 922(g)(1)—in more than 600 separate rulings—has concluded that the statute remains constitutional.[3] This number includes three federal appeals courts. *See United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023); *Vincent v. Garland*, No. 21-4121, 2023 WL 5988299 (10th Cir. Sept. 15, 2023); *United States v. Dubois*, No. 22-10829, 2024 WL 927030 (11th Cir. Mar. 5, 2024).

---

[3] The government can provide a list of those rulings, which cover the July 2022 through April 2024 timeframe, at the Court's request. Additionally, post-*Bruen*, multiple judges in this district have upheld the constitutionality of other federal statutes criminalizing the possession, use, and sale of firearms. *See, e.g., United States v. Dixon*, No. 22 CR 140 at Dkt. 76 (N.D. Ill. Mar. 28, 2023) (Kendall, J.) (upholding constitutionality of § 922(o), which prohibits possession of machineguns); *United States v. Cooperman*, No. 22 CR 146 at Dkt. 72 (N.D. Ill. July 26, 2023) (Coleman, J.) (same); *United States v. Garrett*, No. 18 CR 880 at Dkt. 144 (N.D. Ill. Jan. 11, 2023) (Bucklo, J.) (upholding constitutionality of § 924(c)); *United States v. Seiwert*, No. 20 CR 443 at Dkt. 89 (N.D. Ill. Sept. 28, 2022) (Gettleman, J.) (upholding constitutionality of § 922(g)(3), which makes unlawful firearms-possession by drug users); *United States v. Sanchez*, No. 23 CR 374 at Dkt. 38 (N.D. Ill. Dec. 27, 2023) (Kennelly, J.) (upholding constitutionality of § 922(a)(1)(A), which prohibits the unlicensed commercial dealing of firearms); *but see United States v. Carbajal-Flores*, No. 20 CR 613 at Dkt. 101 (N.D. Ill. Mar. 8, 2024) (Coleman, J.) (concluding that § 922(g)(5), which makes unlawful firearms-possession by individuals unlawfully in the United States, was unconstitutional as applied to defendant).

In *Atkinson*, the Seventh Circuit left open whether § 922(g)(1) is constitutional in light of *Bruen,* and instead remanded "to allow the district court to undertake the *Bruen* analysis in the first instance." 70 F.4th at 1020. Eighteen courts in the Northern District of Illinois, including this one, are among the courts upholding the constitutionality of § 922(g)(1) post-*Bruen* on both a facial and as-applied basis, and 17 of those courts, including this one, have issued such decisions following the Seventh Circuit's decision in *Atkinson*.[4]

By comparison, a small minority of courts have held that § 922(g)(1) is facially unconstitutional. *See, e.g.*, *United States v. Prince*, No. 22 CR 240, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023) (Gettleman, J.); *United States v. Taylor*, No. 23 CR 40001-SMY, 2024 WL 245557 (S.D. Ill. Jan. 22, 2024) (Yandle, J.); *United States v. Neal*, 20 CR 335 (N.D. Ill. Feb. 7, 2024) (Ellis, J.). The government addresses the shortcomings

---

[4] *See, e.g.*, *United States v. Edward Price*, 656 F. Supp. 3d 772 (N.D. Ill. 2023 Feb. 13, 2023) (Kennelly, J.); *United States v. Ricky Price*, No. 19 CR 824 at Dkt. 105 (N.D. Ill. Mar. 3, 2023) (Guzman, J.); *United States v. Gates*, 22 CR 397, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023) (Chang, J.); *United States v. Myles*, 22 CR 354 at Dkt. 49 (N.D. Ill. Sept. 14, 2023) (Kennelly, J.); *United States v. Reggie Johnson*, No. 18 CR 458, 2023 WL 6690388 (N.D. Ill. Oct. 12, 2023) (Durkin, J.); *United States v. Hardy*, No. 23 CR 129, 2023 WL 6795591 (N.D. Ill. Oct. 13, 2023) (Kendall, J.); *United States v. Rose*, No. 23 CR 09 at Dkt. 36 (N.D. Ill. Oct. 25, 2023) (Leinenweber, J.); *United States v. Jackson*, No. 20 CR 298, 2023 WL 7160921 (N.D. Ill. Oct. 31, 2023) (Bucklo, J.); *United States v. Carter*, No. 19 CR 819, Dkt. 234 (N.D. Ill. Dec. 1, 2023) (Shah, J.); *United States v. Bell*, No. 23 CR 311, 2023 WL 8475814 (N.D. Ill. Dec. 7, 2023) (Alonso, J.); *United States v. Brooks*, No. 22 CR 655 at Dkt. 47 (N.D. Ill. Dec. 7, 2023) (Tharp, J.); *United States v. Jackson*, No. 21 CR 175, 2023 WL 8601498 (N.D. Ill. Dec. 12, 2023) (Valderrama, J.); *United States v. Ibarra*, No. 22 CR 50062 at Dkt. 68 (N.D. Ill. Jan. 3, 2024) (Reinhard, J.); *United States v. Mays*, No. 23 CR 328 at Dkt. 31 (N.D. Ill. Jan. 8, 2024) (Rowland, J.); *United States v. Evans*, 21 CR 396 at Dkt. 185 (N.D. Ill. Feb. 9, 2024) (Pacold, J.) (oral ruling); *United States v. Morgan*, 19 CR 615 at Dkt. 148 (N.D. Ill. Mar. 19, 2024) (Kness, J.) (oral ruling); *United States v. Davis*, No. 23 CR 521 at Dkt. 33 (N.D. Ill. Apr. 10, 2024) (Jenkins, J.); *United States v. Cortez-Gomez*, 20 CR 422 at Dkt. 127 (N.D. Ill. April 23, 2024) (Blakey, J.) (oral ruling); *United States v. Head*, 23 CR 450 at Dkt. 32 (N.D. Ill. April 23, 2024) (oral ruling).

of these decisions later in this response, where it also notes other district courts that have disagreed with the *Prince* decision. *See infra* at Section IV.D.

Another court in the Northern District of Illinois has held that § 922(g)(1) is unconstitutional not on a facial basis, but when applied to felons whose criminal history does not reflect a prior conviction for "a crime *involving the use of a weapon.*" *See United States v. Griffin*, No. 21 CR 693, Dkt. 85 at 16-17 (N.D. Ill. Nov. 30, 2023) (Coleman, J.) (emphasis in original). The same district court, however, has upheld § 922(g)(1) as constitutional when applied to a defendant with a criminal history that reflected convictions for possession of a controlled substance, possession of a firearm by a felon, criminal damage to property, resisting a peace officer, and attempted aggravated vehicular hijacking; a defendant with a criminal history that included a conviction for vehicular hijacking; a defendant whose criminal history included convictions for armed robbery, possession of a controlled substance, manufacture and delivery of a controlled substance, and aggravated battery; and a defendant with a conviction for armed robbery with a dangerous weapon. *See United States v. Vaughns*, No. 22 CR 636, Dkt. 38 at 16-17 (N.D. Ill. Nov. 29, 2023); *United States v. Washington*, No. 23 CR 274, Dkt. 30 at 15-16 (N.D. Ill. Nov. 29, 2023); *United States v. Hudson*, 21 CR 576, Dkt. 161 at 3-4 (N.D. Ill. Jan. 5, 2024); *United States v. Foster*, 20 CR 271, Dkt. 121 at 3-4 (N.D. Ill. Jan. 24, 2024).

For the reasons the government sets forth in Section IV.E, *infra*, it disagrees that the constitutionality of § 922(g)(1) can be determined on an individualized basis at all and, even if that were the case, that this individualized assessment should turn

on whether an individual had previously been convicted of a crime involving the improper use of a weapon. In *Gay*, the Seventh Circuit endorsed those positions in rejecting an as-applied challenge to § 922(g)(1). *See Gay*, No. 23-2097, 2024 WL 1595285, at *3.

## IV.   ARGUMENT

First, under *Bruen*'s "text and history" test, § 922(g)(1) remains a permissible restriction on firearms possession because felons do not fall within the textual purview of the Second Amendment. Second, textual argument aside, § 922(g)(1) remains constitutional because the statute is consistent with this nation's historical tradition of categorically prohibiting firearm possession by untrustworthy adherents to the law and of punishing felons through, among other things, capital punishment and estate forfeiture.

### A.   The Possession of Firearms by Felons Is Not Protected Under the Plain Text of the Second Amendment.

In cases challenging the constitutionality of § 922(g)(1), the government has taken the position that defendants have failed to meet their burden of establishing that felons do not fall within "the people" protected by the Second Amendment, and their "right . . . to keep and bear Arms" is thus not "infringed" by laws prohibiting their possession of firearms. Rather, the Second Amendment's protections extend only to "ordinary, law-abiding, adult citizens," *Bruen*, 597 U.S. at 31, who are "members of the political community," *Heller*, 554 U.S. at 580.

This textual interpretation of the Second Amendment is supported by the wide latitude legislatures have historically exercised to exclude felons from the political

10

community as a consequence of their convictions. *See, e.g.*, *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"); Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868) (recognizing that "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"— including "the idiot, the lunatic, and the felon, on obvious grounds"). It is also supported by the frequency with which *Heller* and *Bruen* used the term "law, abiding, responsible citizens" to describe "the people" protected under the Second Amendment. *See, e.g.*, *Edward Price*, 656 F. Supp. 3d at 775 (concluding that all convicted felons "do not fall within the textual purview of the Second Amendment" and emphasizing that the [*Bruen*] majority used the phrase "law-abiding" to describe "the people" whose rights the Second Amendment guarantees no fewer than fourteen times, including in its concluding paragraph) (Kennelly, J.).

The government recognizes, however, that this Court has concluded differently after considering a more comprehensive version of the government's arguments on this point. *Gates*, 22 CR 397, 2023 WL 5748362, at*4-*5. To preserve its position for the record (but so as not to burden the Court with unnecessarily extensive briefing), the government incorporates by reference its arguments from a response to a motion to dismiss which was earlier before this Court, asserting that possession of firearms

11

by felons is not protected under the plain text of the Second Amendment. *Gates*, No. 22 CR 397, at Dkt. 39 at 12-18.

### B. Section 922(g)(1) Is Consistent With This Nation's Historical Traditions.

Even if this Court were to conclude that the Second Amendment covers felon possession of firearms, defendant still cannot prevail under *Bruen* because § 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 597 U.S. at 19. Beginning in England and lasting at least through the founding era, history is replete with regulations reflecting the power of legislatures to disarm categories of individuals. Two types of historical laws are particularly pertinent to modern-day felon-dispossession laws: (a) laws categorically disqualifying groups who were untrustworthy adherents to the law from possessing firearms; and (b) laws authorizing capital punishment and estate forfeiture for felonies.[5]

Several courts within this district, including this one, have agreed with the government on this point. *See, e.g.*, *Gates*, 2023 WL 5748362, at *5-6 (holding that the government has shown "that the felon dispossession statute is part of this country's historical tradition of firearm regulation" by analogizing to "firearms laws that banned certain groups of potential non-law-abiders from possessing firearms" and "more general laws that authorized capital punishment and estate forfeiture for

---

[5] The section that follows references historical regulations upon which this Court may rely in applying *Bruen*'s "text and history test." Exhibit A includes a list of those laws, along with a link to online databases where they may be accessed. (The government can also provide copies of those laws upon request.)

felony sentences"); *Clark*, No. 20 CR 805, Dkt. 146 at 2-3 (noting "the longstanding legal history and tradition of disarming people perceived as dangerous or not law-abiding" as well as "the historical tradition of rescinding the rights of those considered dangerous and non-law-abiding"); *Reggie Johnson*, 2023 WL 6690388, at *8 ("[T]he government has supplied a sufficient historical tradition of not only harshly punishing felons with sentences that subsumed disarmament, but also of categorically disarming groups perceived as dangerous"; "[t]hese were not isolated instances . . . but rather, were adopted across time in English common law and the early Republic"; and "[t]hey had similar justifications and placed similar burdens on the right to bear arms.").

### 1. Firearm Disqualification Laws

By the time the Second Amendment was ratified in 1791, there was an established tradition of legislatures exercising broad authority to disqualify people categorically from possessing firearms based on a judgment that certain groups simply could not be trusted to adhere to the rule of law. That history is set forth next. *See Bruen*, 597 U.S. at 20 (because the right to keep and bear arms was a "pre-existing right," directing courts to consider "English history dating from the late 1600s, along with American colonial views leading up to the founding").

### a. England

Because the Second Amendment "'codified a right inherited from our English ancestors,'" English legal tradition sheds important light on the limits to the "'right secured by the Second Amendment.'" *Bruen*, 597 U.S. at 20, (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in England was the authority to

13

disarm classes of people who, in the legislature's view, could not be relied upon to obey the rule of law.

In 1689, for example, the English government passed a law disarming Catholics who refused to make declarations renouncing their faith. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688).[6] This "Act for the better secureing the Government by disarming Papists and reputed Papists" provided that a Catholic could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." *Id.*; *see also Jackson*, 69 F.4th at 502. Enacted shortly after the Glorious Revolution of 1688—when Protestant King William and Queen Mary succeeded Catholic King James II—this statute reflected the new government's perception that Catholics who refused to renounce their faith (and thus their allegiance to the Pope) could not be trusted to obey English law. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting); *see also Jackson*, 69 F.4th at 502. This prohibition was not based on a theory that all Catholics were dangerous; rather, the categorical disarmament was based on a concern with a group's propensity to disobey the sovereign. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting). *See also Heller*, 554 U.S. at 592-93 ("Between the Restoration and the Glorious Revolution, the Stuart Kings Charles II and James II

---

[6] Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 *Journals of the House of Lords* 1685-1691, at 208-09 (1767-1830) (reflecting enactment on May 11, 1689); *Bill of Rights* [1688], https://www.legislation.gov.uk/aep/WillandMarSess2/1/2 (explaining that "[i]t appears that all the Acts of" the first Parliament of William and Mary "were treated as being Acts of 1688" in official sources under an "old method of reckoning"— including the English Bill of Rights, discussed shortly, which was similarly enacted in 1689).

14

succeeded in using select militias loyal to them to suppress political dissidents, in part by disarming their opponents.") (Scalia, J.).

The statute further made clear that its concern was with propensity to disobey the sovereign by providing that anyone who decided to make the declaration after having previously refused would regain the ability to keep and bear arms. 1 W. & M., Sess. 1, c. 15, *in* 6 *The Statutes of the Realm*, *supra*, at 72. Other colonial- and founding-era laws discussed later in this response had similar "restoration" provisions. *See also, e.g.*, *Range*, 69 F.4th at 123, 125-26 (Krause, J., dissenting); *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). Section 922(g)(1) has similar provisions, allowing for the restoration of the right to keep arms upon the requisite showing. 18 U.S.C. §§ 921(a)(20) and 925(c); *see also Atkinson*, 70 F.4th at 1036 (Wood, J., dissenting) (writing that "relief from disability is possible through executive clemency" and noting that although "Congress has never chosen to activate" the § 925(c) mechanism, an analysis of § 922(g)(1)'s constitutionality "does not depend on its existence"); *Reggie Johnson*, 2023 WL 6690388, at *8 (rejecting defendant's argument that "the analogs presented by the government imposed lesser burdens on the right to bear arms because they either provided exceptions or options to regain the right" because "like the historical examples, convicted felons today may regain their Second Amendment rights under rare circumstances showing that they can be considered trustworthy members of society") (Durkin, J.); *United States v. Bess*, No. CR 3:23-06-CMC, 2023 WL 7019211, at *7 (D.S.C. Oct. 25, 2023) ("Section 922(g)(1) functions similarly to these laws that disarmed groups of 'the people' based on status,

lack of fealty to the Nation, or criminal violations, and allows for restoration of the right to bear arms by expungement, pardon, or restoration of rights under state law."); *United States v. Dan Johnson*, No. CR-23-188-SLP, 2023 WL 6049529, at *7 (W.D. Okla. Sept. 15, 2023) ("18 U.S.C. § 921(a)(20) provides that a conviction which has been expunged, set aside, or pardoned is not subject to § 922(g)(1)'s ban, and therefore provides relevant similarity to Founding–era laws to the extent they allowed an individual to repurchase arms after serving a felony sentence in limited circumstances.").

In her oft-cited dissent in *Kanter v. Barr*, then-Judge Barrett also observed that the English Parliament disarmed Catholics, although her analysis focused on the "threatened violence and the risk of public injury" that Catholics (and later on, slaves and Native Americans) were presumed to present as the primary reason for disarmament. 919 F.3d 437, 456–58 (7th Cir. 2019). But even then-Judge Barrett's dissent recognized "that [the English] Parliament disarmed Catholics because the Protestant majority found them 'untrustworthy.'" *Id.* at 457 (citing Adam Winkler, *Gunfight* 115 (2011)). Moreover, a focus on untrustworthiness—rather than, more explicitly, danger—has other historical roots. For instance, "[f]ollowing the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants," even though such nonconformists included pacifist denominations like the Quakers. *Range*, 69 F.4th at 120-21 (Krause, J., dissenting) (collecting sources). Such groups "often refused to take mandatory oaths acknowledging the King's sovereign authority over matters of religion" and, as a

16

result, "Anglicans accused nonconformists of believing their faith exempted them from obedience to the law." *Id.* Their commitment to non-violence did not spare their firearms. *See also Jackson*, 69 F.4th at 504 ("Not all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty—were violent or dangerous persons" and yet they were disarmed nonetheless); *Range*, 69 F.4th at 124-26 (Krause, J., dissenting) (noting that colonial- and Revolutionary-war-era laws disarmed "sizable numbers of pacifists" such as the Quakers, Moravians, and Mennonites, "not . . . because they were dangerous, but rather because their refusal to swear allegiance demonstrated that they would not submit to communal judgments in law when it conflicted with personal conviction").

The aforementioned examples from England are particularly relevant because the same Parliament wrote the 1689 English Bill of Rights, which "enshrined basic civil liberties" and became the predecessor to our Second Amendment. *Bruen*, 597 U.S. 1, 44-45; *Heller*, 554 U.S. at 593; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). That predecessor specified that "*Protestants* may have Arms for their Defence suitable to their Conditions *and as allowed by Law*." 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (emphases added); *see also Jackson*, 69 F.4th at 502; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 597 U.S. at 44-45 (quotation marks and citation omitted). And yet when they first formally claimed that

17

right, the English ensured that the Parliament retained the power—which it in fact exercised—to arm one class of the population and to disarm another based on concerns that the members of that latter class would not abide by the law. *See Atkinson*, 70 F.4th at 1031 ("Not quite a ringing endorsement of an untrammeled right to keep and bear arms, it instead builds in the idea that this right exists 'as allowed by law.'") (Wood, J., dissenting).

### b. Colonial America

The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were not dependable adherents to the rule of law. For example, firearm regulations directed toward disarming Native Americans and Black people were pervasive.[7] "While some of these categorical prohibitions of course would be impermissible today under other constitutional

---

[7] *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *see also, e.g., Laws and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); 5 *Records Of The Colony Of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); 1 *The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* 117-18 (1811) (1715 Md. Law); 6 *The Public Records Of The Colony Of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From The Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law); *see also Atkinson*, 70 F.4th at 1035 n.2 (Wood, J., dissenting) (citing "laws that disarmed persons found guilty of treason and members of native tribes").

18

provisions, they remain relevant in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th 503; *see also Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting) (rejecting these "bigoted and unconstitutional laws" but citing them to demonstrate the "tradition of categorical, status-based disarmaments"); *Atkinson*, 70 F.4th at 1035-36 (Wood, J., dissenting) ("Though some of those laws would no longer pass muster under the Equal Protection Clause, they reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted."); *United States v. Agee*, No. 21 CR 350, 2023 WL 6443924, at *8 (N.D. Ill. Oct. 3, 2023) (Chang, J.) (writing that "the inquiry here is not whether those laws violated the Equal Protection Clause but instead the "historical tradition that delimits the outer bounds" of the Second Amendment" and "noting that the right to equal protection—via the Due Process Clause of the Fifth Amendment—was not interpreted as applying to federal laws until the mid-20th century, well after the ratification of the Second Amendment.").[8]

---

[8] *See also United States v. Reichenbach*, No. 4:22 CR 00057, 2023 WL 5916467, at *8 (M.D. Pa. Sept. 11, 2023) ("early laws would today rightly be considered odious, as they prohibited racial minorities, religious minorities, and those who would not swear oaths of loyalty to a particular state from possessing firearms," yet where these same laws "were targeted at groups that lawmakers deemed dangerous and disruptive, and the laws sought to protect the public from violence and disorder," they remain relevant to *Bruen's* methodological approach); *United States v. Andrew Lane*, No. 5:22 CR 132, 2023 WL 5614798, at *5 (D. Vt. Aug. 24, 2023) ("With the benefit of hindsight, bans on possession of firearms by Catholics, for example, are offensive, and they would certainly be unconstitutional today. . . . But the court is tasked neither with judging the propriety of such historical laws by modern norms nor their constitutionality.") (*citing* Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, 1, 12 (Duke L. Sch. Pub. L. & Legal Theory Series No. 2020-80), https://perma.cc/V68C-5HEF ("[O]ne can accept that the Framers denied firearms to groups they thought to be particularly dangerous (or unvirtuous, or irresponsible) without sharing their conclusion about which groups qualify as such.")).

The colonies also disarmed full-fledged members of the political community—i.e., free, Christian, white men—"whom the authorities believed could not be trusted to obey the law." *Range*, 69 F.4th at 122 (Krause, J., dissenting). "Those restrictions are telling because they were imposed at a time when, before the advent of the English Bill of Rights, the charters of Virginia and Massachusetts provided unprecedented protections for colonists' firearm rights." *Id.* (citing Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022)); *see also Agee*, 2023 WL 6443924, at *9.

Massachusetts, for example, disarmed the supporters of an outspoken preacher in the 1630s "not because those supporters had demonstrated a propensity for violence," but because "the authorities concluded their conduct evinced a willingness to disobey the law." *Range*, 69 F.4th at 123 (Krause, J., dissenting) (citing Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644, 648 (1937)); Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978); James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988); John Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017)).

c.     **Revolutionary War**

Throughout the Revolutionary War, American legislatures passed numerous disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government.

20

An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the colonies enacted legislation in this vein. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law); *see also Jackson*, 69 F.4th at 503 ("In the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty."); *Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) ("During the

American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").

A common feature of these laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See, e.g.*, 1776 Mass. law at 479-80; 1776 R.I. law at 566-67; 1777 N.C. law at 229-31; 1777 Pa. law; at 111-13; 1777 Va. law at 281-82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, to serve on juries, and to hold public office—further reinforcing the longstanding connection between arms-bearing and these related rights. *See, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282.

As noted earlier, the Pennsylvania law had the effect of depriving "sizable numbers of pacifists" of the right to bear arms "because oath-taking violated the religious convictions of Quakers, Mennonites, Moravians, and other groups." *Range*, 69 F.4th at 125 (Krause, J., dissenting). That law is also particularly informative because the year before enacting it, Pennsylvania became one of the first states to adopt a state constitutional provision protecting an individual right to bear arms. *Heller*, 554 U.S. at 601; *see* Pa. Declaration of Rights of 1776 § XIII, *in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 278 (Neil Cogan ed., Oxford University Press 2d ed., 2014); *see also* N.C. Declaration of Rights of 1776 § XVII, *in The Complete Bill of Rights, supra*, at 277-78 (individual rights-based constitutional

22

provision adopted the year before the North Carolina disarmament law cited above); Mass. Const. of 1780, pt. I, art. XVII, *in The Complete Bill of Rights*, *supra*, at 277 (individual rights-based constitutional provision adopted four years after the Massachusetts disarmament law cited above).

### d.  Ratification Debates

The history behind the Second Amendment's adoption provides additional persuasive evidence that the founders understood the individual right to bear arms to be compatible with broad legislative authority to disarm groups who could not be trusted to follow the law.

One "Second Amendment precursor" that *Heller* described as "highly influential" is particularly instructive. 554 U.S. at 604. When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the . . . debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Although the Antifederalists did not persuade a majority of the convention to reject ratification on this basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists. *Id.* at 628 (explaining that these specific proposals are "of great importance in the history of the federal Bill of Rights"). The Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated: "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 665

23

(emphasis added). In other words, the founders recognized that "crimes committed"—violent or not—can supply an independent ground for a legislature to prohibit firearm possession. As the D.C. Circuit has explained, "[t]he use of the word 'or'" in this proposal reflects that "criminals, in addition to those who posed a 'real danger,'" have historically been "proper subjects of disarmament." *Medina*, 913 F.3d at 158-59.

The Pennsylvania Antifederalists were not alone in proposing a Second Amendment precursor that expressly permitted laws disarming untrustworthy people. At the Massachusetts convention, founding father Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681 (emphasis added) (quotation marks omitted). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added). These proposals, like the Pennsylvania one, recognize the prevailing historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry.

To be sure, the Second Amendment, as adopted, does not include the same language as these proposals. But it would have been "obvious" to the founders that certain groups, including "the felon," Cooley, *supra*, at Section IV.A, could properly be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S.

at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood"); *accord United States v. Coombes*, 629 F. Supp. 3d 1149, 1160 (N.D. Okla. 2022).

Under *Bruen*, the absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals permits courts to "assume it settled" that such regulations are "consistent with the Second Amendment." 597 U.S. at 30. *Bruen* itself illustrated that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses"—where the Court was "also aware of no disputes regarding the lawfulness of such prohibitions," it could "assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* The same conclusion can be drawn with respect to felon disarmament.

### 2.    Felony Punishment Laws

For centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, English jurist Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95

25

(1769). Blackstone observed that "[t]he idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *See Medina*, 913 F.3d at 158. Capital punishment for felonies was "ubiquit[ous]" in the late 18th century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including not only offenses like treason, murder on federal land, and piracy on the high seas, but also nonviolent conduct relating to forging or counterfeiting a public security. *See An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112-15 (1790). States in the early Republic likewise treated "nonviolent crimes such as forgery and horse theft" as "capital offenses." *Medina*, 913 F.3d at 159; *see* Banner, *supra*, at 18 (referring to specific examples of individuals in Georgia who "escaped from jail after being condemned to death" for "forgery" or "horse-stealing"). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

Throughout the 1700s, American colonies punished a variety of crimes with death, estate forfeiture, or both. A 1700 Pennsylvania law provided that any person

26

convicted of "wilfully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House of Correction at hard labor." 2 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 12 (1896). A 1705 Pennsylvania law provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and imprisonment for "seven years at hard labor." *Id.* at 178. A 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate or inheritance "shall forfeit all his goods and chattels, lands and tenements." 1 *The Laws of Maryland, With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* 79 (1811). A 1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "be adjudged guilty of Felony" and "suffer the Pains of Death" and that any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony." *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* 33-34 (1767). And a 1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattles [sic]," in addition to receiving 39 lashes and one year's imprisonment. 3 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 545 (1878).

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed previously "ha[d] not a punishment sufficiently exemplary annexed thereto." 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302 (1821) (1777 Va. forgery law). The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes." *Id.* at 302-03. *See also, e.g.*, *A Digest of the Laws of Maryland* 255-56 (1799) (collecting Maryland forgery laws enacted between 1776 and 1778, each of which provided that those convicted "shall suffer death as a felon, without benefit of clergy").

In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes including counterfeiting (as well as burglary, robbery, arson, and malicious maiming and wounding). 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 664-65 (1886) (1788 N.Y. law). The act also established that every person convicted of such an offense "shall forfeit to the people of this State, all his[] or her goods and chattels, and also all such lands, tenements, and hereditaments[] . . . at the time of any such offence committed, or at any time after." *Id.* at 666. For other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal

28

punishment," and the punishment "for any second offense . . . committed after such first conviction" was "death." *Id.* at 665.[9]

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158; *see also Jackson*, 69 F.4th at 503 (noting that early legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property"); *Range*, 69 F.4th at 126-27 (Krause, J., dissenting) ("[T]he ubiquity of the death penalty suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament."). Thus, "tradition and history" show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Medina*, 913 F.3d at 158, 160.

In her dissent in *Kanter*, then-Judge Barrett resisted this analysis, concluding that "[t]he upshot of this history for present purposes is that the consequences of a felony conviction were not as categorically severe as the government suggests." 919 F.3d at 461 (Barrett, J., dissenting). At the same time, even the *Kanter* dissent recognized that "history does show that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights

---

[9] Two years earlier, New York had passed a law severely punishing counterfeiting of bills of credit. 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 260-61 (1886) (1786 N.Y. law). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State . . . ." *Id.* at 261.

belonged only to virtuous citizens." *Id.* at 462 (citing Cooley, *supra*). In other words, even a contrary point of view recognizes a form of "civil death" that resulted from the commission of a felony. *Id.* at 458. Although the *Kanter* dissent tries to divorce this "civil death" from disarmament—arguing that the former implicates rights exercised "as part of the collective enterprise of self-governance," while the right to bear arms is a purely individual one—the majority in *Kanter* did not agree with that view of history. *Id.* at 462 (acknowledging that "the majority is sympathetic to [the] view" that the same lack of virtuosity or "poor character" that cost felons their civic rights also permitted legislatures to disarm them). *See also Coombes*, 629 F. Supp. 3d at 1159-60 (discussing "historical evidence" from the colonial era reflecting that "those who had been subject to revocation of certain societal privileges, including disenfranchisement, should be excluded from the right to bear arms").

The Supreme Court, too, has linked the Second Amendment's protections to the exercise of civic rights. As noted earlier, Supreme Court jurisprudence grants the Second Amendment's protections to "ordinary, law-abiding, adult citizens," *Bruen*, 597 U.S. at 31, who are "members of the political community," *Heller*, 554 U.S. at 580, and as *Heller* pointedly noted, those protections did not extend to categories of people presumptively excluded from bearing arms, such as felons and the mentally ill, *id.* at 626-27.

### C.    Summary of Historical Record.

To help summarize the analysis set forth in Section IV.B above, the government relies on the questions expressly posed by the *Atkinson* panel majority. 70 F.4th at 1023-24. In response to those questions, the government states:

*First*, § 922(g)(1) can be understood as addressing a "general societal problem that has persisted since the 18th century" in that the statute relates to the disarmament of individuals who, like felons, are untrustworthy adherents to the rule of law. The historical record discussed above demonstrates that the founders inherited a tradition under which legislatures had broad discretion to disarm classes of people that could not be counted upon to be responsible, law-abiding members of the polity. Like the laws enacted by earlier generations, § 922(g)(1) permits legislatures to categorically disarm groups of people who present that concern. At the same time, however, modern firearms have raised "unprecedented societal concerns" due to "dramatic technological changes" that render these weapons more dangerous than could have been contemplated at the time of the founders. *Bruen*, 597 U.S. at 27; *Gates*, 2023 WL 5748362, at *8 ("These advancements in firearms technology—both in sheer firepower and accessibility—must be considered when deciding how close a fit the modern felon-dispossession statute must be to historical regulations."). This evolution requires a more nuanced analogical approach, and viewed from that lens, the nation's tradition of firearms regulations supplies sufficiently similar historical analogies that satisfy *Bruen*.

*Second*, history tells us that (1) across relevant eras, legislatures categorically disarmed groups who they feared would disregard the law and disturb the social order and that such a categorical prohibition specifically appeared in the English precursor to the Second Amendment; (2) the Ratification Debates reflect no meaningful founding-era disputes regarding the lawfulness of disarming criminals, despite the

31

use of express language to that effect in influential American precursors to the Second Amendment, thus demonstrating that the founders understood the right to bear arms to be compatible with the broad legislative authority to disarm felons; and (3) under English common law and throughout early American history, convicted felons were subject to capital punishment, estate forfeiture, and so-called "civil death," thus demonstrating that firearms dispossession was subsumed within those greater punishments.

From these lessons, this Court can conclude that § 922(g)(1) does not violate the Second Amendment. The aforementioned regulations were pervasive, and their underlying rationales—like the impetus behind § 922(g)(1)—prioritized social order and respect for the law over a pre-existing right to self-defense. *See Bruen*, 597 U.S. at 29 (directing courts to consider as "*central* considerations when engaging in an analogical inquiry," "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"); *Jackson*, 69 F.4th at 504-05 (explaining that § 922(g)(1) aims to disarm individuals viewed as "potentially irresponsible" and to prevent not just violence, but also "lawlessness"). Although some of these predecessors do not apply specifically to felons, this Court should remain mindful of *Bruen*'s admonition that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*" and "[s]o even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 597 U.S. at 30. Moreover, the lack of an

32

identical historical statute does not suggest that the founding generation would have viewed § 922(g)(1) as violating the Second Amendment. As one district court has observed, a "list of the laws that *happened to exist* in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 3:22 CR 37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority.

*Third*, although the government has emphasized the historical rationale for disarming groups perceived as an overall threat to the social order, a historical rationale for disarmament based on perceived danger supplies another helpful analogue. In *Jackson*, the Eighth Circuit reviewed a substantially similar set of historical materials as the materials summarized above and concluded that they could be read as supporting either rationale. 69 F.4th at 502 ("While the better interpretation of the history may be debatable, we conclude that either reading supports the constitutionality of § 922(g)(1) as applied to Jackson and other convicted felons."). *See also id.* at 502-05 (evaluating historical materials through a dangerousness lens).

A dangerousness-rooted historical rationale for disarmament supports the validity of § 922(g)(1), as applied to all felons. As *Jackson* explained, "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable *risk of danger* if armed," not based

33

on "an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* at 504 (emphasis added). *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (historical evidence supports the proposition "that the legislature may disarm those who have demonstrated *a proclivity for violence or whose possession of guns would otherwise threaten the public safety*") (emphasis added). And as the Seventh Circuit's *Kanter* majority has explained, "prohibiting even nonviolent felons . . . from possessing firearms is substantially related to [the government's] interest in preventing gun violence" where an empirical connection exists "between nonviolent offenders . . . and a risk of future violent crime." 919 F.3d at 448-49. The Seventh Circuit said the same in *Yancey*, explaining that "most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." 621 F.3d at 685. *See also Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008) ("[N]onviolent offenders not only have a higher recidivism rate than the general population, but certain groups—such as property offenders—have an even higher recidivism rate than violent offenders, and a large percentage of the crimes nonviolent recidivists later commit are violent.").

*Fourth*, the aforementioned analogous laws supply enough of a historical tradition to support the constitutionality of § 922(g)(1). These are not "isolated instances of regulation," *Atkinson*, 70 F.4th at 1024, but are rather rooted in English common law and were adopted across the colonies before their understanding and the practice they represented was incorporated into the Second Amendment.

The government addresses the fifth and final question posed by *Atkinson* in this response's final section (*see infra* Section IV.E), which addresses the as-applied nature of defendant's challenge.

### D. The *Prince* Decision Does Not Undermine the Government's Analysis.

In *Prince*, District Judge Gettleman became the first judge in the country to strike down § 922(g)(1) as facially unconstitutional under the Second Amendment. For the reasons that follow, this Court should not adopt *Prince*'s conclusion that the government's proffered historical regulations are not relevantly similar analogues to § 922(g)(1)'s firearm dispossession of all felons.[10]

---

[10] Relying on different reasoning—and without conducting the analogical-reasoning analysis undertaken in *Prince* and discussed by the government here—District Judge Ellis also found § 922(g)(1) facially unconstitutional. *See Neal*, 20 CR 335 at Dkt. 93. *Neal* addressed only whether regulations "distinctly similar" to § 922(g)(1) existed at the time of the founding and declined to engage in the analogical-reasoning analysis because, according to *Neal*, the government had conceded that § 922(g)(1) only addressed a general societal problem present since the 18th century. 20 CR 335, Dkt. 93 at 18-19 n. 9. The government made no such concession in *Neal*, and does not do so here. Indeed, in *Neal*, the government argued in its response to defendant's motion to dismiss that § 922(g)(1) addresses a general societal problem that has long existed, while also emphasizing—in the alternative—that the court should engage in the analogical-reasoning analysis because "the challenges posed by firearms today are not always the same as those that preoccupied the Founders." *Neal*, 20 CR 335, Dkt. 79 at 16, n. 9 (quoting *Bruen*, 597 U.S. at 27). The government argued similarly orally. *See Neal*, 20 CR 335, Dkt. 94 at 13 ("[W]hat the courts are looking for here is not a historical twin. We're not looking for a historical dead ringer. What we're looking for is a *historical analog*."); at 16-17 (responding to an argument that, historically, individuals could more readily re-attain their right to possess firearms through loyalty oath laws by explaining that "[we] are living in a very different time right now" and that the present-day rights-restoration process is necessarily more involved because individuals are seeking "the ability to regain possession of an item, of a machine that can cause such irreparable harm"); at 17 (in addressing the argument that § 922(g)(1) provides for permanent disarmament, arguing that it is not the case that "922(g)(1) is neither distinctly similar *nor relevantly similar* to the historical predecessors"); at 20 (arguing that "loyalty oath laws may have made sense in a different world," but that is not the world inhabited today).

As a threshold matter, the court in *Prince* agreed with the government in two significant respects. First, relying on historical evidence concerning English disarmament of certain groups (including Catholics and other dissidents), American disarmament of similar groups (including Catholics, enslaved persons, Native Americans, and British loyalists), and other American laws disarming persons "for crimes and danger to the public," *Prince* accepted that "the text, history, and tradition of firearm-dispossession statutes demonstrates that the legislature has the authority to categorically regulate firearm possession by individuals who have demonstrated that they cannot be trusted to obey the law, or pose some other danger to the political community if armed." 2023 WL 7220127, at *8; *see id.* at *6-*8. Put otherwise, *Prince* explained, "the legislature has a long tradition of justifying exclusion from the right to keep and bear arms based on its assessment of [a] group's risk to the rule of law, whether based on mental health, criminal record, loyalty, or character." *Id.* at *8. Second, *Prince* "reject[ed] the notion that history calls for an individualized assessment of risk, or a distinction between violent and nonviolent felonies." *Id.* Instead, *Prince* construed the history to permit "across-the-board disqualifications from gun ownership." *Id.*

Having concluded that § 922(g)(1) was justified by comparable historical tradition, *Prince*'s decision to strike down § 922(g)(1) wholesale thus turned on what the court perceived as a mismatch between the purportedly permanent nature of § 922(g)(1)'s disarmament and what the court construed as only temporary

disarmament regimes that prevailed at the founding. 2023 WL 7220127, at *8. *Prince*'s conclusion in this regard, however, is flawed in at least two key respects.

First, *Prince* erroneously brushed aside the myriad of ways in which § 922(g)(1)'s prohibition on firearm possession can be rendered non-permanent. As noted earlier, § 922(g)(1) does not disarm felons whose convictions have been pardoned or expunged, who have received executive clemency, or whose civil rights have been restored. *See, e.g.*, 18 U.S.C. §§ 921(a)(20) and 925(c). As a result of these limits, § 922(g)(1)'s restrictions are rendered non-permanent for those felons whose civil rights are restored by operation of state law, or who obtain pardons, expungement, or executive clemency. *Prince* acknowledged only some, and not all, of these carve-outs to § 922(g)(1) and went on to compare them unfavorably to historical "loyalty oath laws" on dubious grounds. In particular, *Prince* considered it significant that the exemptions provided by § 922(g)(1) removed individuals from the statute's purview altogether, whereas "loyalty oath laws" were embedded within the historical disarmament laws themselves. 2023 WL 7220127, at *8-*9 & n.5. *Prince* did not explain why such a thin distinction between § 922(g)(1) and its predecessors was material to the *Bruen* methodology, which asks courts to locate only a "well-established and representative historical *analogue*," not "a historical *twin*" or "dead ringer." 597 U.S. at 130, 30 (emphases in original).

For example, *Prince* described "loyalty oath laws" as giving "individuals deemed 'untrustworthy'" the chance "to regain their rights after demonstrating their ability to abide by the rule of law," contrary to § 922(g)(1), which *Prince* decried for

giving felons "no similar opportunity." 2023 WL 7220127, at *9. Yet, *Prince* failed to recognize that restoration of civil rights, expungement, pardon, clemency—the exemptions "embedded within" § 922(g)(1)—generally reflect an assessment that the defendant has regained the ability to abide by the law. And, mere sentences later, *Prince* strongly signaled that it would take no issue with a version of § 922(g)(1) that "categorically prohibit[ed] felons from possessing a firearm for a term of years," despite the fact that—unlike "loyalty oath laws," at least as conceptualized by *Prince*—that version of § 922(g)(1) would give a defendant no agency to reclaim his right to keep and bear arms before a hypothetical time limit expired. *Id.*[11]

Second, *Prince* failed to account for the fact that, under the nation's historical tradition, the loss of the right to bear arms often was permanent. As the government has argued, both in *Prince* and here, numerous historical laws subjected convicted felons to capital punishment and estate forfeiture, penalties that necessarily encompassed the permanent dispossession of firearms. *See also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 129 (3d Cir. 2023) (noting that the "longstanding practice of forfeiture . . . resulted in a permanent loss of firearms for those felons convicted of capital offenses or sentenced to life imprisonment") (Krause, J. dissenting). In other words, even assuming that § 922(g)(1) did not already include

---

[11] Indeed, other courts, including in the Northern District of Illinois, to have considered whether § 922(g)(1) allows individuals to regain their right to bear arms in a manner sufficiently analogous to historical predecessors have reached a conclusion opposite to that reached in *Prince*. *See supra* at 20-21 (discussing *Reggie Johnson,* 2023 WL 6690388, at *8; *Bess*, No. CR 3:23-06-CMC, 2023 WL 7019211, at *7; and *Dan Johnson*, No. CR-23-188-SLP, 2023 WL 6049529, at *7 (W.D. Okla. Sept. 15, 2023)). Although *Prince* acknowledged *Reggie Johnson*, it did not acknowledge *Bess* or *Dan Johnson*.

rights-reclamation provisions sufficiently comparable to loyalty oath laws, such an omission would not render § 922(g)(1) unconstitutional in light of a historical record where firearms dispossession could be wholly without recourse. *Prince* responded to this set of historical evidence, in large part, by discounting it altogether, characterizing it as a "punishment" for a felony rather than as a "consequence" of one's status as a felon and thus different from § 922(g)(1). 2023 WL 7220127, at *10. But *Bruen* makes no such consequence/punishment distinction. Instead, it instructed courts to consider only whether a modern firearms regulation imposes a "comparable *burden* on the right of armed self-defense." *Bruen*, 597 U.S. at 29 (emphasis added). In this regard as well, therefore, *Prince* revealed itself as misguidedly searching for an "historical twin," rather than a suitable historical analogue, as required by *Bruen*.

Furthermore, *Prince* elected to view the historical tradition of capital punishment and estate forfeiture for felons as wholly distinct from the historical tradition of disarming those deemed to be untrustworthy adherents of the law. That choice, too, represents an unsound application of *Bruen*, which instructed courts to consider the historical record as a whole, not in artificially constructed silos. And the existence of laws subjecting felons to blanket penalties necessarily encompassing but not limited to disarmament, which rendered redundant any law specifically providing for disarmament, rebuts any suggestion that the Second Amendment was historically understood to prohibit such laws. In any event, although either the tradition of categorically stripping certain groups of their right to bear arms or the tradition of imposing capital punishment and estate forfeiture on felons, standing alone,

establishes § 922(g)(1)'s facial constitutionality, certainly taken together, these historical regulations demonstrate that certain groups of individuals falling outside of the law-abiding citizenry faced permanent disarmament. The *Prince* court's failure to recognize this historically rooted phenomenon renders its analysis profoundly suspect.

Finally, the government notes that following *Prince*, multiple district courts in the Seventh Circuit, including several in the Northern District of Illinois, have noted their disagreement with *Prince*. For example, in *United States v. King*, District Judge Elaine Bucklo upheld the facial constitutionality of § 922(g)(1) and explained that she found "unpersuasive" the argument "that historical firearm regulations imposed a lesser burden than § 922(g)(1)" owing to the purportedly "permanent" nature of the statute's ban. No. 23 CR 143, Dkt. 51 at 2-3 (N.D. Ill. Nov. 17, 2023) (Bucklo, J.). *King* explained:

> Even assuming that "actual practices at the time of the founding show that 'once wrongdoers had paid their debts to society, the colonists forgave them and welcomed them back into the fold,'" . . . . so too may a felon regain his right to possess firearms even after that right has been restricted under § 922(g)(1), specifically through expungement or pardon. . . . . Thus, there is no incongruity in the burdens imposed by § 922(g)(1) and the historical examples the government brings forth.

*Id.* at 3-4 (citing *Atkinson*, 70 F.4th at 1026, 1035 n.3, and *United States v. Lloyd*, 184 F.3d 695, 698–99 (7th Cir. 1999) (explaining that one may regain the right to possess firearms even after that right is restricted pursuant to § 922(g)(1), if the qualifying Illinois state convictions are expunged)).

As another example, in *United States v. Drake*, No. 23 CR 21, Dkt. 39, 2023 WL 8004876, at *7 (N.D. Ind. Nov. 16, 2023), District Judge Holly Brady criticized *Prince* for engaging in "historical hair-splitting" and "miss[ing] the forest by placing too much focus on the trees." *Drake* continued:

> Since 1791, firearms technology has advanced at a rapid pace, far outstripping the firearms-related problems that the Founding Fathers were tasked with addressing. Whereas most guns available in 1791 "could not fire more than one shot without being reloaded," modern firearms can fire multiple rounds without reloading. And modern firearms manufacturers can produce firearms in much greater volume than in 1791. "These advancements in firearms technology—both in sheer firepower and accessibility—must be considered when deciding how close a fit the modern felon-dispossession statute must be to historical regulations that dispossessed groups of non-law-abiders (at least as perceived at the time) and that authorized broad punishment of felons (again, at least at that time)."
>
> *Prince* demands a bullseye for a target that is no longer on the same playing field. "[N]othing in *Bruen* requires [the] level of specificity" that *Range* and *Prince* do. "[C]ommon sense dictates that firearm dispossession for felons is a 'comparable burden on the right of armed self-defense' when the historical alternatives were death or surrendering one's assets." And when "technological developments are taken into account, the government has adequately demonstrated that [Section] 922(g)(1) 'is consistent with the Nation's historical tradition of firearm regulation' and 'is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'"

*Id.* at *7-*8 (citing and quoting *Friedman v. City of Highland Park, Ill.,* 784 F.3d 406, 410 (7th Cir. 2015); *Gates*, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023) (Chang, J.); *Hardy*, 2023 WL 6795591 (N.D. Ill. Oct. 13, 2023) (Kendall, J.); and *United States v. Johnson*, 2023 WL 7284848 (E.D. Wis. Nov. 3, 2023) (Adelman, J.)) (alternations in original)).[12]

---

[12] *See also Agee*, No. 21 CR 350, Dkt. 110 (N.D. Ill. Nov. 20, 2023) (Chang, J.) (denying motion for reconsideration of court's earlier denial of motion to dismiss § 922(g)(1) charge based on

### E. Even Construed as an As-Applied Challenge, Defendant's Motion Still Fails.

To the extent defendant is making an "as applied" challenge to the constitutionality of § 922(g), that challenge should be rejected—both on the timeliness grounds (*see supra* at note 2) and on the merits.

First, the Seventh Circuit has never actually upheld an "as applied" Second Amendment challenge to § 922(g) and has, in fact, "repeatedly rejected as-applied Second Amendment challenges" to that statute. *See Kanter,* 919 F.3d at 443. Certainly, the Seventh Circuit in *Kanter* noted that it "left room for as-applied challenges" to § 922(g). *Id.* But, to date, the Seventh Circuit has not done so. *See also Gay*, 2024 WL 1595285, at *3 (assuming, without deciding, that a criminal defendant could bring an as-applied challenge to a § 922(g)(1) conviction).

Second, defendant has proffered no historical evidence to support a position that the constitutionality of § 922(g)(1) turns on individualized assessments. This is a flaw that the *Atkinson* panel majority also noted:

---

*Prince* and writing that "[t]here simply is disagreement over the specificity needed for the analogical analysis"); *United States v. Marzan Williams*, 19 CR 66 at Dkt. 251 (N.D. Ill. Nov. 17, 2023) (Kennelly, J.) (denying motion for reconsideration of court's earlier denial of motion to dismiss § 922(g)(1) charge and noting that it "respectfully disagrees" with the *Prince* decision); *Brooks*, No. 22 CR 655 at Dkt. 47 (N.D. Ill. Dec. 7, 2023) (Tharp, J.) (denying defendant's motion to dismiss § 922(g)(1) as facially unconstitutional and noting points of disagreement with *Prince*); *United States v. Murphy*, 21 CR 76 at Dkt. 89 (N.D. Ill. Nov. 7, 2023) (Shah, J.) (denying motion for reconsideration of court's earlier motion to dismiss a § 922(g)(1) charge and noting: "I am not persuaded by *Prince*"); *United States v. Brown*, No. 22 CR 326, 2023 WL 8236918, at *5 (N.D. Ill. Nov. 28, 2023) (Valderrama, J.) (denying motion to dismiss § 922(g)(1) counts and noting that "the Court respectfully disagrees with the reasoning in *Prince*"); *Vaughns*, 22 CR 636, Dkt. 38 at 13 (Nov. 29, 2023) (Coleman, J.) (rejecting "the characterization of Section 922(g)(1) as having no exceptions" because "felons may regain their right to possess firearms if they were pardoned or their convictions were expunged" and because "[t]he statutory scheme also leaves open the possibility for felons to see administrative relief and regain their right to bear arms").

> [A]lthough Atkinson has shown some support for the idea that a group's "dangerousness" is what mattered to the Founders, he does not provide much historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes. The distinction is not an obvious consequence of many of the laws that Atkinson, and his amicus especially, discuss.

70 F.4th at 1023; *see also id.* ("Atkinson's historical analysis falls short."); *United States v. Lopez*, No. 21 CR 626, Dkt. 55 at 3 (N.D. Ill. Jan. 2, 2024); *Gates*, 2023 WL 5748362, at *9. Instead, as detailed above, the historical tradition supports the legislature's ability to disarm *categories* of individuals. *See Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) ("since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament"); *Jackson*, 69 F.4th at 504 ("Legislatures historically prohibited possession by categories of persons . . . ."); *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) (disarmament "is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons"). The relevant question, in other words, is whether the status at issue indicates that the person cannot be trusted to use a gun responsibly, not whether each individual can be trusted to do so. Although District Judge Coleman has concluded otherwise, explaining that the existence of loyalty oath laws supports a historical tradition of individualized assessments (*see, e.g.*, *Vaughns*, 22 CR 636, Dkt. 38 at 14), the government respectfully disagrees. While loyalty oath laws allowed for individualized assessments for purposes of the *restoration* of gun

rights (much like the modern-day processes of expungement, pardons, clemency, etc.), disarmament was still effectuated on a categorical basis.[13]

Third, even assuming the historical tradition supports disarming only "dangerous" or violent individuals, the definition of "dangerous" or violent is not limited to the use, attempted use, or threatened use of force. As set forth above, the historical tradition reflects a far broader conception of "dangerous," one that includes even the risk of violence. *See, e.g., Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) (disarmament was "based on the danger [categories of persons] pose[d] to the political community if armed"); *Jackson*, 69 F.4th at 504 (disarmament "based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed"); *Alaniz*, 69 F.4th at 1129-30 (there is "a longstanding tradition of enhancing a defendant's sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes"); *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) ("Breaches of the peace comprise not only cases of actual violence to

---

[13] Individualized assessments could also yield wildly disparate results. *See, e.g., Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting) (suggesting that enabling individuals to seek to establish a case-specific exemption from a generally applicable criminal law would create "an arbitrary patchwork of decisions—as far from the rule of law as one could image"); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (individualized exemptions would "obviously present serious problems of administration, consistency and fair warning"). And in the criminal context, in particular, the opportunity for pre-trial fact-finding is limited by Federal Rule of Criminal Procedure 12, which makes such as-applied challenges difficult to administer and resolve before trial if individualized facts, at least those relevant to the crime itself (like a § 922(g)(3) offense), are relevant. *See, e.g., United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) (Gorsuch, J.) (concluding that as-applied Second Amendment challenge to § 922(g)(9) could not be brought pre-trial because the defendant "contends the statute is unconstitutional only in light of the 'facts surrounding the commission of the alleged offense'—the very facts a court may not consider before trial" (citation omitted)); Fed. R. Crim. P. 12(b)(3) (limiting pretrial motions to motions that "can be determined without a trial on the merits").

the person of another, but any unlawful acts, tending to produce an actual breach of the peace; whether the peace of the public, or an individual, be in fact disturbed or not.") (citing *Pearce v. Atwood*, 13 Mass. 324, 332 (1816)); *id.* at 456-66 (writing approvingly of firearm-possession bans on "those who are likely to misuse them," including those convicted of domestic violence misdemeanors, chronic drug users, and individuals "who are difficult to track and who have an interest in eluding law enforcement").

Fourth, defendant's as-applied challenge fails for the same reason that the as-applied challenge failed in *Gay*. *Gay* explained that "*Bruen* repeatedly used the phrase 'law-abiding, responsible citizens' or a variant" to "describ[e] the persons who possess rights under the Second Amendment." 2024 WL 1595285, at *3. It then concluded that the defendant in *Gay* was not such a person, pointing to the following facts, while describing no single fact as dispositive: the defendant in *Gay* had been convicted of numerous felonies; was on parole when he violated § 922(g)(1), having obtained his release by promising, among other things, not to possess a firearm.

Defendant McGraw is like defendant Gay in significant respects. As detailed at the outset of this response, defendant has multiple prior felony convictions. Defendant was also on parole at the time he committed the instant offense. Moreover, defendant did not contest § 922(g)(1)'s constitutionality through a declaratory judgment action—and instead, he is alleged to have "violated the law in secret and tried to avoid detection." *Gay*, 2024 WL 1595285 at *3. There is no question therefore

45

that defendant is among the class of individuals constitutionally prohibited from possessing firearms under § 922(g)(1) and, therefore, any as-applied challenge fails.

## V.    CONCLUSION

For the reasons stated above, the Court should deny defendant's motion to dismiss the indictment.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:    */s/ Brandon D. Stone*
BRANDON D. STONE
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

Dated:      April 30, 2024