**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| *Plaintiff,* | ) | |
| v. | ) | **23 CR 28** |
| | ) | **Honorable Edmond E. Chang** |
| **JEFF MCGRAW,** | ) | |
| *Defendant.* | ) | |

**REPLY IN SUPPORT OF MOTION TO DISMISS**

**TABLE OF CONTENTS**

**INTRODUCTION**……………….…………………………………………………………....3

**ARGUMENT**…………………………………………………………………………..……...6

  **I.** **Mr. McGraw is part of "the people" protected by the Second Amendment**...…..…8

  **II.** **The government has failed to demonstrate a historical tradition of**
       **permanently disarming felons**…….……………………………………………....11

     A.  Because the government cites no evidence of any historical felon
        dispossession laws prior to the 20th Century, it has failed to demonstrate
        a tradition of "distinctly similar" regulations…………..……………………...13

     B.  Even if the Court applies the less exacting "relevantly similar" standard,
        the government has failed to meet it..………………………………...……...... 15

       i. There is no historical tradition of disarming "untrusted groups." The
         examples that the government offers differ substantially from Section
         922(g)(1) both in purpose and in the extent of the burden they place on
         the Second Amendment
         right……………………………………….…………….....17**Error! Bookmark not
         defined.**

           a)  Discriminatory English laws disarming Catholics do not
               support disarming Mr. McGraw.…………………………………......23

           b)  Discriminatory colonial laws disarming the enslaved,
               warring Indian tribes, and religious minorities do not support
               disarming Mr. McGraw…………….......…………………………25

           c)  Revolutionary war measures that disarmed or banished
               British loyalists do not support disarming Mr. McGraw………..…..29
               w
           d)  Failed proposals from the state ratification conventions do
               not support disarming Mr. McGraw.………………………………30

       ii. *The mere existence of the death penalty does not authorize the*
         *government to permanently strip away a person's fundamental rights*
         *after the completion of a sentence*…………………………………….…..…31

  **III.** **The issues that the Seventh Circuit raised in *Atkinson* weigh in favor**
       **of finding Section 922(g) unconstitutional as applied to Mr. McGraw...**…………...35

**CONCLUSION** …………………………………………………………………………...38

## INTRODUCTION

Defense acknowledges the Seventh Circuit's decision, *United States v. Gay*, wishes to preserve the issue of constitutionality of § 922(g)(1) and notes that Mr. McGraw has 20 fewer felony convictions than Gay. *United States v. Gay*, No. 23-2097, 2024 WL 1595285 (7th Cir. Apr. 12, 2024). Defense further acknowledges that this Court upheld the constitutionality of § 922(g)(1) in *United States v. Agee*, No. 21-CR-350, 2023 WL 6443924 (N.D. Ill. Oct. 3, 2023).

Under *Bruen*, the government bears the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022). The government has not come close to meeting this burden in Mr. McGraw's case.

As Judge Gettleman stated "[t]here is no evidence of any law categorically restricting individuals with felony convictions from possessing firearms at the time of the Founding or ratification of the Second or Fourteenth Amendments." *United States v. Prince,* No. 22 CR 240, 2023 WL 7220127, at *6 (N.D. Ill. Nov. 2, 2023). The government's response brief fails to cite an example of any law that permanently prohibited felons from possessing firearms at any point in the nation's history prior to the 20th Century. That is a glaring omission—especially because the government tries to avoid directly stating the obvious, that Section 922(g)(1) addresses individuals with prior felony convictions and individuals committing felonies is unquestionably a "general societal problem that has persisted since the 18th century." *See Bruen*, 142 S. Ct. at 2129.

It is also worth noting that the government did not submit a declaration from an expert historian and failed to put on expert testimony in this case. The Seventh Circuit in pre-*Bruen* decision stated that 'scholars continue to debate the evidence of historical precedent for prohibiting criminals from carrying arms.' *United States v. Yancey, 621 F.3d 681, 684 (7th Cir.*

3

2010) (collecting authorities); *see also United States v. Skoien*, 614 F.3d 638, 650 (7th Cir. 2010) (Sykes, J., dissenting) ('[S]cholars disagree about the extent to which *felons*—let alone misdemeanants—were considered excluded from the right to bear arms during the founding era.')." *United States v. Neal,* No. 20 CR 335; No. 21 CR 52; No. 21 CR 631; No. 21 CR 636-3; No. 22 CR 380, 2024 U.S. Dist. LEXIS 26118, at *11 (N.D. Ill. Feb. 7, 2024).

"[T]he most disappointing failure is that the party with the burden to prove history and tradition—the United States—did not designate a historian to testify on the analogues, if any, to modern felon-in-possession laws." *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *31 (S.D. Miss. June 28, 2023). Another court similarly expressed its frustration, concern and disappointment in government's failure to "enlist a historian to testify on the historical analogues, if any, to modern felon disarmament" or "even secure amicus briefs from historians discussing the issue." *United States v. Leblanc,* No. 23-00045-BAJ-RLB, 2023 WL 8756694, at *8 (M.D. La. Dec. 19, 2023). *LeBlanc* court further astutely reasoned that:

> This Court is *not* an arbiter of history (or even an expert in the field); its role is to make legal rulings "upon a record produced by the parties' own presentations." *Bullock*, 2023 WL 4232309, at *16. And even if these failures are *consistent* with the Government's feeble approach to defending federal gun regulations against *Bruen* challenges (to date at least), they are also surprising in light of recent decisions highlighting the Government's slipshod efforts, and *sustaining* as-applied challenges to § 922(g)(1). *E.g., id.*, at *15 ("The Department of Justice admits that in none of its proffered cases did a district court decide the [constitutionality of § 922(g)(1) post-*Bruen*] with assistance of a professional historian. That is puzzling because such assistance could have come in several forms."). *Id.* (emphasis in original).

Judge Gettleman also emphasized that government's "unmet [history and tradition] burden [under *Bruen*] is compounded by its decision not to offer any expert historian… It is not the court's burden to demonstrate history and tradition in this case by appointing its own independent expert, and the Court stated in *Bruen* that courts should 'follow the principle of party presentation' and are

4

'entitled to decide a case based on the historical record compiled by the parties.'" *Prince*, 2023 WL 7220127, at *11, n.8, quoting *Bruen,* 142 S. Ct. at 2130, n.6. The government's omission of an expert is not surprising—an academic historian cannot invent a historical tradition where none exists—but it is telling.

Instead of presenting evidence about felons, the government attempts to create a historical tradition where none exists. The government asserts—without any supporting evidence—that colonial era laws disarming enslaved people, Native Americans, Catholics, Protestants, and British loyalists prove that the government possesses an undefined and apparently unlimited power to disarm anyone who it deems to be an "untrustworthy adherents to the law[.]" R. 87, ps. 10, 12. But the government can only reach this self-serving conclusion by examining those laws outside their historical context and smuggling in the government's own (entirely modern) judgments about who should and who should not be allowed to bear arms. This effort to revise the historical record is not the sort of exacting analysis that *Bruen* demands.

The government's historical examples all fail for the same reason. Colonial societies disarmed the enslaved, warring Indians, religious minorities, and British loyalists either because they regarded those groups as beneath the rights of citizenship or because they regarded them as seditious enemies of the state. But even if colonial societies disarmed those specific groups,[1] these same societies treated ex-felons very differently.

The historical record demonstrates that—prior to 1968—American society did not punish felons by permanently depriving them of the right to bear arms. Certainly, some felons were punished with the death penalty. But most were not. And the government has not produced a single historical example of a felon who completed his sentence and returned to the community, but was

---

[1]     It is more accurate to say that these groups were subject to some restrictions on their ability to bear arms, but were not completely or permanently disarmed.

nevertheless denied the right to bear arms. In the response, the government attempts to equate historical laws allowing individuals to restore their right to bear arms by simply taking a loyalty oath to the modern-day statutory provisions which potentially and, mostly theoretically, permit an insignificant fraction of felons to restore their right to possess a firearm by removing their felonious status. The historical, widely available and simple restorative requirements, do not impose a "comparable burden" to the modern restorative laws pursuant to which a handful of ex-felons would be permitted to possess firearms.

The government mentions that many courts have ruled in its favor on the constitutionality of 18 U.S.C., Section 922(g)(1); however, case counting is not a substitute for faithful application of the requisite *Bruen* analysis. Mr. McGraw respectfully requests for this Court to reconsider its position on this issue. The history decides this case. Supreme Court and Seventh Circuit precedent establish that Jeff McGraw remains part of "the people" protected by the Bill of Rights. Because of that, and because there is no historical tradition of permanently disarming felons like Mr. McGraw, the Court must dismiss the Indictment with prejudice.

## ARGUMENT

*Bruen* established a two-step "text and history" test for assessing Second Amendment challenges to the constitutionality of a gun regulation. At the first step, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30.

In the second step, *Bruen* "sets forth two avenues of historical inquiry." On the one hand, when the "challenged regulation addresses a general societal problem that has persisted since the 18th century," courts should conduct "a straightforward historical inquiry." *Bruen*, 142 S. Ct. at 2129. In this situation, the government must cite evidence of a "*distinctly similar* historical

regulation addressing that problem" in order to demonstrate the constitutionality of the modern law. *Id.* (emphasis added).

On the other hand, the Supreme Court held that a broader inquiry is appropriate in situations where the modern gun law was motivated by "unprecedented social concerns or dramatic technological changes." *Id.* at 2132. In that situation—when dealing with "modern regulations that were unimaginable at the founding"—*Bruen* allows courts to reason by analogy and consider laws that are merely "relevantly similar." *Id.* Government applies relevantly similar standard in its response without adequately explaining "unprecedented social concerns or dramatic technological changes" allowing for this more lenient standard to apply. Nor could it – there has not been any "unprecedented social concerns or dramatic technological changes" resulting in "felons." Felons existed long before the enactment of the Second Amendment and certainly during all the time periods discussed in the government's response. And, of course, the disarmament of felons was definitively *not* unimaginable at the Founding.

Government's reference to an increased production of firearms and more advanced guns would hardly classify as a *dramatic* technological change. In finding 922(g)(1) unconstitutional Judge Gettleman determined that government's statements concerning wider availability of more advanced firearms fails to explain "why the modern ubiquity of gun violence, and the heightened lethality of today's firearm technology compared to the Founding, justify a different result." *Prince,* 2023 WL 7220127, at *24.

Section 922(g) addresses a "general societal problem that has persisted since the 18th century." *Bruen*, 142 S. Ct. at 2131. As a result, the government can only prevail if there is evidence of *distinctly similar* historical regulations. The government is unable to make that showing. While it offers far-fetched and unpersuasive analogies—comparing Mr. McGraw to enslaved individuals,

to religious minorities, and to British loyalists during the time of the revolutionary war—the government's elaborate and self-motivated reasoning does not come close to satisfying the "straightforward historical inquiry" that the Court must conduct.

I.      **Mr. McGraw is part of "the people" protected by the Second Amendment.**

This Court recently determined that felons are part of "the people" protected by the Second Amendment – "no reason to think that the word "people" does not cover, on its face, all persons—including a person convicted of a felony." *Agee*, 2023 WL 6443924, at *14-5. Although there is a disagreement among judges, including judges in the Northern District of Illinois, this Court is not alone in its holding that felons are part of "the people" for the purposes of Second Amendment. *See, e.g., United States v. Jackson*, No. 20 CR 298, 2023 WL 7160921, at *5-6 (N.D. Ill. Oct. 31, 2023) (Bucklo, J.); *Prince*, 2023 WL 7220127, at * 5 ("felons are [not] excluded from "the people"…[and their] firearm possession is presumptively protected by the plain text of the Second Amendment"); *United States v. Delany*, No. 22 CR 463, 2023 WL 7325932 (N.D. Ill. Nov. 7, 2023) (Gettleman, J.) (same); *United States v. Salme-Negrete*, No. 22 CR 637, 2023 WL 7325888 (N.D. Ill. Nov. 7, 2023) (Gettleman, J.) (same); *United States v. Griffin*, No. 21 CR 693, 2023 WL 8281564, at *4 (N.D. Ill. Nov. 30, 2023) ("the plain text of the Second Amendment covers all people – including a person convicted of a felony") (Coleman, J.); *United States v. Vaughns*, No. 22 CR 636, 2023 WL 8258575 (N. D. Ill. November 29, 2023) (Coleman, J.) (same); *United States v. Washington*, No. 23 CR 274, 2023 WL 8258654 (N. D. Ill. November 29, 2023) (Coleman, J.) (same); *United States v. Harper*, No. 21 CR 236, 2023 WL 5672311, at * 18 (M.D. Penn. Sept. 1, 2023) (defendant "is one of "the people" protected by the *Second Amendment*" (emphasis in original)).

While it is the government's position that Mr. McGraw is not part of "the people" protected by the Second Amendment, the plain meaning of the Second Amendment precludes any such argument. At the time of the founding, the term "the people" did not exclude those with felony records. To the contrary, the term "signifie[d] every person, or the whole collection of inhabitants in a nation or kingdom[.]" Thomas Dyche & William Pardon, A New General English Dictionary (14th ed. 1771), available at https://tinyurl.com/uk4b4fxd;[2] *see also* 2 Samuel Johnson, A Dictionary of the English Language 306 (1766) (defining "people" as "[a] nation; those who compose a community"), available at https://tinyurl.com/y95erjwf.

*Heller* states that Mr. McGraw is part of "the people" protected by the Second Amendment and *Bruen* further confirms this. *Heller* recognized a "strong presumption that the Second Amendment right is exercised individually *and belongs to all Americans.*" *D.C. v. Heller*, 554 U.S. 570, 581 (2008) (emphasis added). *Bruen* reached the same conclusion, explaining that "[t]he Second Amendment guaranteed to '*all Americans*' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 142 S. Ct. at 2156 (quoting *Heller*, 554 U.S. at 581 (emphasis added)).

Finally, the government tries to bolster its argument by relying on *dicta* in *Heller* and in *Bruen*. But the government's mode of analyzing those two cases is distinctly odd. The government ignores the actual holdings of *Heller* and *Bruen* and, instead, mentions phrases like "ordinary, law-abiding citizens." The government also ignores Justice Alito's concurrence in *Bruen* wherein he clearly states that the case "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Bruen,* 142 S. Ct. at 2157. Multiple circuit courts—including the Seventh Circuit—have found that "those passages did not reflect an

---

[2]     The 1771 Dyche and Pardon dictionary is, unfortunately, unpaginated in the original. The quoted definition of "people" can be found on page 639 of the PDF file.

attempt to define the term 'people.'" *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015); *see also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc); *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023), *cert. granted*, No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023); *Jackson*, 2023 WL 7160921, at *5 ("*Atkinson* confirms that in this circuit, something more than the Supreme Court's statements in *Heller, McDonald,* and *Bruen* is needed to establish the meaning of 'the people' in the Second Amendment.").[3]

The Seventh Circuit recently reiterated that this dictum does not supersede the need for full *Bruen* analysis in *Atkinson*, where the government asked the court to "sidestep *Bruen*" by simply invoking *Heller's* "oft-quoted dicta." *Atkinson*, 70 F.4th at 1022. The court declined, concluding it must "roll[] up its sleeves" and "undertake the text-and-history inquiry the [*Bruen*] Court so plainly announced and expounded upon at great length." *Id.* This Court must do the same.

Finally, there is a practical reason not to adopt the government's "law-abiding, responsible citizens" standard: it is hopelessly vague and unworkable. *Range*, 69 F.4th at 102; *see also Rahimi*, 61 F.4th at 453 ("the Government's proffered interpretation of 'law-abiding' admits to no true limiting principle"); *Bullock*, 2023 WL 4232309, at *29 (quoting *Range*, 69 F.4th at 102). Thus,

---

[3]     *See also, e.g., United States v. Ware*, No. 22-CV-30096-SPM, 2023 WL 3568606, at *5 (S.D. Ill. May 19, 2023); *United States v. Lowry*, No. 1:22-CR-10031-CBK, 2023 WL 3587309, at *3 (D.S.D. May 5, 2023); *United States v. Martin*, No. 2:21-CR-00068, 2023 WL 1767161, at *2 (D. Vt. Feb. 3, 2023); *United States v. Barber*, No. 4:20-CR-384-SDJ, 2023 WL 1073667, at *6 (E.D. Tex. Jan. 27, 2023 *Campiti v. Garland*, No. 3:22-CV-177 (AWT), 2023 WL 143173, *3 (D. Conn. Jan. 10, 2023); *United States v. Goins*, No. 522CR00091GFVTMAS1, 2022 WL 17836677, at *5 (E.D. Ky. Dec. 21, 2022); *United States v. Carbajal-Flores*, No. 20-cr-613, 2022 WL 17752395 (N.D. Ill. Dec. 19, 2022); *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *7 (S.D.W. Va. Oct. 12, 2022); *United States v. Williams*, No. 1:21-cr-362-LMM, 2022 WL 18285005, *2 (N.D. Ga. Nov. 14, 2022); *United States v. Gray*, No. 22-CR-00247-CNS, 2022 WL 16855696, at *2 (D. Colo. Nov. 10, 2022); *United States v. Coombes*, No. 22-CR-00189- GKF, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022); *United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022).

adopting a "law-abiding, responsible citizens" limitation "devolves authority to legislators to decide whom to exclude from 'the people.'" *Range*, 69 F.4th at 102. That approach—which "gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label"— conflicts with *Bruen's* "warning against 'judicial deference to legislative interest balancing.'" *Id.* at 103 (quoting *Bruen*, 142 S. Ct. at 2131).

Mr. McGraw is part of the United States' "national community." *Heller*, 554 U.S. at 580. He is, therefore, among "the people" protected by the Second Amendment.

## II. The government has failed to demonstrate a historical tradition of permanently disarming felons.

The government cannot deny that Section 922(g)(1) addresses a "general societal problem that has persisted since the 18th Century," despite it misstating that the general societal problem is untrustworthy individuals rather than felons. *Bruen*, 142 S. Ct. at 2131. Judge Ellis called out the government for "framing [general societal] problem so broadly" to "transparently manipulate[] the historical record and *Bruen* inquiry to avoid the implications of the lack of historical regulations of felons' possessions of firearms." *Neal*, 2024 U.S. Dist. LEXIS 26118, at *21. The societal problem at hand is "*§ 922(g)(1)*'s specific focus on prohibiting felons from possessing firearms, which ties concerns about recidivism to felons' access to guns." *Id.* at *22. Further, Judge Coleman confirmed that societal problem at issue is crime and recidivism:

> Indeed, it is undisputed that the problems of crime and recidivism have always existed in this nation. The Court is required to conduct the "straightforward historical inquiry" that requires the government to cite evidence of "distinctly similar historical regulation[s] addressing that problem." *Washington,* 2023 WL 8258654, at *4, citing *Bruen*, 142 S. Ct. 2129.

Thus, because the problems that Section 922(g)(1) addresses (individuals who have committed felonies) are not new, the government can only prevail if it can "pinpoint evidence of 'a *distinctly similar* historical regulation addressing that problem.'" *Bruen*, 142 S. Ct. at 2131

11

(emphasis added)). In other words, the "distinctly similar" standard applies because the government failed to produce evidence that felony convictions is an "unprecedented societal concern." To show a tradition of distinctly similar regulation, the government would have to demonstrate that there were historical laws that permanently denied felons the right to bear arms. Other historical firearms regulations—even if they were similar to Section 922(g)(1) in some respects—would not be sufficient to carry the government's burden under the "distinctly similar" test. *See United States v. Daniels*, No. 22-60596, 2023 WL 5091317, at *4 (5th Cir. Aug. 9, 2023) ("Although marihuana might be comparable in some ways to alcohol or tobacco, merely by making the comparison we have moved past the hunt for a distinctly similar law and are engaged in analogical reasoning.").

The government doesn't even try to make the required showing. As in prior cases, the government has failed to cite an example of a single historical law that permanently abridged felons' right to bear arms. *See Bullock*, 2023 WL 4232309, at *31 ("the government put forth no effort to ground in history the present charges it brought again [the defendant]. That is what Bruen requires."). This is not surprising as there is no distinctly similar historical tradition of permanently disarming felons. "[T]he lack of distinctly similar historical regulation addressing that [general societal] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. Furthermore, capital punishment and estate forfeiture are evidence that "earlier generations addressed the societal problem but did so through materially different means[.]" *See Id*. Instead of discussing the (non-existent) history of felon disarmament, the government's brief attempts to assert that Section 922(g)(1) is "relevantly similar" to *other* firearms restrictions that existed at the time of the founding—such as laws that prohibited enslaved people, or warring Indian tribes, or Catholics from possessing arms.

There are two fundamental problems with the government's argument. First, the government is asking the Court to apply the wrong standard. Even if these other laws were "relevantly similar" to Section 922(g)(1), that would not suffice to carry the government's burden. Only a "distinctly similar" law would suffice.

Second, the laws that the government cites are not even "relevantly similar" to Section 922(g)(1). Even this less demanding standard requires the government to demonstrate that the "modern and historical regulations impose a comparable burden on the right of armed self-defense" and that the "burden is comparably justified[.]" *Bruen*, 142 S. Ct. at 2133. The government cannot make that showing either. The historical laws that the government discusses were enacted for different purposes than Section 922(g)(1) and were also less burdensome on the right to bear arms. As a result, the government cannot succeed under either of the two historical tests set out in *Bruen*. Mr. McGraw will start by applying the correct "distinctly similar" standard, and he will then demonstrate that he prevails even under the more relaxed "relevantly similar" test.

### A. Because the government cites no evidence of any historical felon dispossession laws prior to the 20th Century, it has failed to demonstrate a tradition of "distinctly similar" regulations.

Under the "distinctly similar" test, the Court's historical analysis must focus on the specific question of whether felons were traditionally deprived of the right to bear arms. As the Fifth Circuit has recently explained, "*Bruen*'s discussion of 'distinct' and 'relevant' similarity seems aimed at interpreting historical silence." *Daniels*, 2023 WL 5091317, at *5. In applying the "distinctly similar" test, the Court should "count silence as evidence that the public did not approve of such a regulation . . . when the public experienced the harm the modern-day regulation attempts to address." *Id.* Where silence provides direct evidence about the lack of a historical tradition, there is no need to engage in an ill-defined and speculative "analogical" inquiry.

In Mr. McGraw's case, the historical silence on the issue of disarming felons speaks volumes. Felons existed in 1791, as did the problem of recidivism. *See* Jeffrey K. Sawyer, *"Benefit of Clergy" in Maryland and Virginia*, 34 Am J.L. Hist. 49, 62 (1990) (discussing colonial-era measures to deal with recidivism, such as the denial of benefit of clergy and other sentencing procedures). As a result, the "Founders themselves could have adopted" laws like Section 922(g)(1) to "confront" the "perceived societal problem" posed by felons' access to guns. *Bruen*, 142 S. Ct. at 2131. But they declined to do so.

The reason that the government has failed to cite any historical laws restricting firearm possession by felons is that no such laws existed. *See, e.g.*, *Griffin,* 2023 WL 8281564, at *4 ("the government has failed to show a felon dispossession statute that existed at the founding. Indeed, history tells us that the disarmament of felons did not happen at the nation's founding"); Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous*," 25 Tex. Rev. L. & Pols. 245, 291 (2021) (noting the lack of "any direct authority whatsoever" for the view that felons were "deprived of firearm rights" at the founding); *Prince,* 2023 WL 7220127, at *6 ("no evidence of any law categorically restricting individuals with felony convictions from possessing firearms at the time of the Founding or ratification of the Second or Fourteenth Amendments"); Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009) (noting felon disarmament laws did not emerge until "the early part of the twentieth century"); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) (same); *see also Binderup v. Att'y Gen.*, 836 F.3d 336, 360 (3d Cir. 2016) (Hardiman, J., concurring) (dating felon dispossession statutes to 1931 and 1961); *Folajtar v. Att'y Gen.,* 980 F.3d 897, 914-15 (3d Cir. 2020) (Bibas, J., dissenting) (concluding no founding era case or statute imposed a "near-blanket ban for all felons").

Section 922(g)(1) is not even 100 years old. It traces its origins to 1938, 147 years after the ratification of the Second Amendment, when Congress passed the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the statute "covered only a few violent offenses[.]" *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). Not until 1961 did Congress amend the statute to cover receipt by "all felons." *Skoien*, 614 F.3d at 640 (citing Pub. L. 87–342, 75 Stat. 757). Section 922(g)(1) "is firmly rooted in the twentieth century" and "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *Booker*, 644 F.3d at 24. Consequently, "the absence of such regulations in the 18th century strongly suggests "that the challenged regulation is inconsistent with the *Second Amendment*." *Neal*, 2024 U.S. Dist. LEXIS 26118, at *24, quoting *Bruen*, 597 U.S. at 26.

*Bruen* provides that cases like this one should be resolved through a "straightforward historical inquiry[.]" *Bruen*, 142 S. Ct. at 2131. Because the historical record demonstrates that felons were not permanently denied the right to bear arms before the twentieth century, the government has failed to establish the existence of a historical tradition that is "distinctly similar" to Section 922(g)(1).

**B.     Even if the Court applies the less exacting "relevantly similar" standard, the government has failed to meet it.**

In the absence of any historical evidence suggesting that felons were ever permanently disarmed, the government asks the Court to conduct its historical analysis at an extremely high level of generality. In particular, the government lumps together wildly disparate historical regulations in an attempt to invent a tradition that would allow disarmament of anyone who it deemed to be an "untrustworthy adherents to the rule of law," or who it thought presented "an overall threat to the social order," or who had a "propensity to disobey the sovereign," or who

"could not be counted upon to be responsible, law-abiding members of the polity." But defining a historical tradition at that stratospheric level of generality was already explicitly rejected in *Bruen* itself.

In *Bruen*, New York attempted to save its gun law by asserting that it fell within a vaguely defined historical tradition that barred the possession of guns in "sensitive places." *Bruen*, 142 S. Ct. at 2133. New York argued that it had the power to expand the historical list of "sensitive places" to include "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id.* But *Bruen* rejected this argument, explaining that it would "eviscerate the general right to publicly carry arms for self-defense" by vesting the state with plenary power to determine where arms could be carried for self-defense. *Id.*; *see also Range*, 69 F.4th at 105 (noting that *Bruen* held that "historical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there.").

The government is attempting the same maneuver here. While New York relied on "sensitive places" as its amorphous catch-all category, the government attempts to do the same with the equally standardless category of people who it deems to be "untrustworthy adherents to the law." But "untrustworthy" standard proposed by the government is hopelessly vague and could easily encompass all people who violated a law by speeding. This is "a mushy standard that sets no limit" at all. *Cf. Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting) (discussing "felony" label).

In fact, this standard would be less protective than the means-end scrutiny test that *Bruen* abrogated, because it would leave the decisions about who can and who cannot bear arms entirely to the discretion of the government. Defining the historical inquiry at this lofty level of generality would allow courts and the government to "engage in independent means-end scrutiny under the

16

guise of an analogical inquiry"—an outcome that *Bruen* specifically forbids. *Bruen*, 142 S. Ct. at 2133 n.7.

As a result, the Court should not—and cannot—engage with the government's proffered analogies by generalizing away the specific content of the historical laws at issue. Instead, "[t]o remain faithful to *Bruen*, the solution is to analyze to *particular regulatory traditions* instead of a general notion of" untrustworthiness posited by the government. *Daniels*, 2023 WL 5091317, at *14 (emphasis added). In considering each historical regulation proposed by the government, the Court "must use *Bruen*'s 'why' and 'how' analysis to assess whether the Founding-era restriction is relevantly similar to the modern one." *Id.*

Notably, *Leblanc* court determined that the government has failed to carry its burden and show a historical tradition of disarming felons where the government presented similar arguments to those being presented in this case. The court stated that

> the Government has once again engaged in its own version of "law office history," or "history lite," ignoring that essentially the same source materials have already been debunked, and can even "be cherry-picked in the exact opposite direction—to support *granting* ...[D]efendant's motion to dismiss." *See Bullock*, 2023 WL 4232309, at *24 (quoting *See* Gordon S. Wood, Scott D. Gerber, *The Supreme Court and the Uses of History*, 39 OHIO N.U. L. REV. 435, 446 (2013)). Still, the Government alone is the master of its defense, *Bruen*, 597 U.S. at 25 n.6, and the Court faithfully considers the "evidence" it has presented to justify § 922(g)(1). *Leblanc*, 2023 WL 8756694, at *8.

> > i. *There is no historical tradition of disarming "untrusted groups." The examples that the government offers differ substantially from Section 922(g)(1) both in purpose and in the extent of the burden they place on the Second Amendment right.*

The government starts by attempting to analogize Section 922(g)(1) to a variety of English and colonial-era laws that disarmed racial, religious, and political minorities. The government has tried to rely on these laws in prior cases, and its attempt has already been rejected by a variety of courts. *See, e.g.*, *Range*, 69 F.4th at 105 ("That Founding-era governments disarmed groups they

distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today."); *Quailes*, 2023 WL 5401733, at *12 (rejecting these same proposed analogues because "[t]he Government's conclusion rests on dangerousness as the historical "touchstone" without any explanation of how the earlier regulations compare in mechanics or purpose to Section 922(g)(1). This comparison is too broad and does not carry the Government's burden under the *Bruen*/*Range* standard."); *LeBlanc,* 2023 WL 8756694, at *13 referencing *Daniels*, 77 F.4th at 354 & n.42 ("the Government has put forward no evidence whatsoever that the concerns motivating Colonial era disarmament of 'Loyalists, Native Americans, Quakers, Catholics, and Blacks'—*i.e.*, collective rebellion—provide the impetus for modern disarmament of felons"); *Rahimi*, 61 F.4th at 457 (rejecting the analogy in the context of a challenge to Section 922(g)(8)); *Daniels*, 2023 WL 5091317, at *14 (noting, in the context of Section 922(g)(3) challenge, that "[m]arihuana users are not a class of political traitors, as British Loyalists were perceived to be. Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists. And even if we consider the racially discriminatory laws at the Founding, Daniels is not like the minorities who the Founders thought threatened violent revolt.").

The Court should reach the same conclusion here. The government's proposed analogies fail on both of the metrics that the Supreme Court set out in *Bruen.* First—as to the "how"—each of the government's proffered analogues was significantly less burdensome on the right to bear arms than the total and practically permanent firearm ban set out in Section 922(g)(1). The laws cited by the government either provided exceptions that allowed for the continued possession of some weapons or allowed their targets to take steps to regain their access to firearms. For instance, the laws contained restorative provisions wherein individuals would regain their right to bear firearms by simply renouncing their religion or making a loyalty oath to the state or the United

States. Section 922(g)(1) does not have a comparably burdensome restorative provision. Felons are unable to regain their right to possess firearms by simply taking an oath and promising to abide by the laws. In conflict with *Bruen's* requirement, Section 922(g)(1) "and historical regulations" presented by the government *do not* "impose a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. 2118.

The government argues that felons can restore their right to bear arms through a "myriad of ways" including pardon, expungement and executive clemency, ignoring that millions of felons will never be able to legally own a firearm under any of these provisionss.

Section 921(a)(20) allows an individual previously convicted of a felony to possess a firearm if all of his prior felony convictions were expunged, set aside, or pardoned; or, if the individual's civil rights were restored. *Id.* Importantly, these mechanisms are not restorative provisions; rather than restoring a right, these mechanisms remove an impediment, a felony status, making Section 921(g)(1) inapplicable. For example, setting aside, overturning, expunging or, in some cases, pardoning felony conviction removes the felonious status resulting in an individual no longer falling within the purview of § 921(g)(1).

Moreover, even if this Court considers these to be restorative laws, they are not comparatively burdensome to taking a loyalty oath or renouncing a religion. By way of example, the right to bear arms was restored to all British loyalists who took a loyalty oath, but the vast majority of felons do not have legal means to restore their right to possess a firearm. Approximately "20 million Americans have been convicted of a felony, or 1 out of 12 Americans has a felony record."[4] The obvious question is why these felons do not use one of the "myriads of ways" to

---

[4] How Many Convicted Felons Are There In The United States - WCP Institute, available at https://wcpinstitute.org/how-many-conviced-felons-are-there-in-the-united-states/.

restore their right to possess a firearm, which the government claims is as easy as taking a loyalty oath or denouncing a religion? The answer is simple- because almost none of the felons will ever be able to restore their right to bear a firearm no matter what they do. For instance, state expungement procedures are usually inapplicable as felonies are not generally expungeable.[5] A felon can *apply* for an expungement of Illinois conviction for a class 4 prostitution; two to five years after successfully completing a sentence of supervision (with some convictions being non-expungeable); or five years after completing a sentence of probation for "710 or 1410 First Time Offender Probation for a drug offense, TASC probation, Second Chance probation, or other qualified probation."[6] The state expungement laws cover an insignificant number of individuals with state felonies and even those who are eligible to apply for expungement are not guaranteed that their records will be expunged.

The likelihood of felons expunging a federal conviction is similarly slim. Pursuant to 18 U.S.C. § 3607(c), a conviction for unlawful possession of a controlled substance by an individual under the age of 21 can be expunged. Counsel has been representing federal defendants for more than 18 years and not one of them was charged with a simple possession. Additionally, convictions involving government misconduct or unconstitutional law are also potentially expungeable,[7] but the low possibility of a felon proving government misconduct or unconstitutionality of a federal law cannot be overstated. Thus, state or federal expungement might be available to a handful of felons out of approximately 20 million living in the United States.

---

[5]    Criminal offenses that can be expunged or sealed | Illinois Legal Aid Online, available at hppts://www.illinoislegalaid.org/legal-information/criminal-offenses-can-be-expunged-or-sealed.

[6]    *Id.*

[7]    Get Your Life Back on Track with Federal Expungement - Expunge Center, available at https://wwwxpungecenter.com/get-your-life-back-on-track-with-federal-expungement/.

The government also mentions clemency, which incorporates sentence commutations and pardons. Obviously, a sentence commutation does not restore the right to possess a firearm since the individual will remain a felon. "A commutation does not eliminate the consequences of a conviction but only reduces the time served or changes the terms of release specified in the initial sentence."[8] Similarly, federal pardons and most state pardons do not erase or expunge criminal record and the pardoned individual will continue to be a felon.[9] Moreover, pardons are so rarely granted that they cannot reasonably be considered effective restorative means or comparably burdensome to loyalty oaths. President Biden has pardoned 13 people between 2021 and December 20, 2023[10] and Illinois Governor Pritzker has pardoned 13 individuals between June 15, 2022 and April 3, 2023.[11]

Also, the likelihood of removing felonious status resultant of having a conviction overturned is equally negligible. However, even more interesting is the government's reliance on a "restorative law" *unavailable* to all felons. Administrative relief pursuant to 18 U.S.C. § 925(c) provides that a felon

> may make application to the Attorney General for relief from the disabilities imposed by Federal laws with respect to the acquisition, receipt, transfer, shipment, transportation, or possession of firearms, and the Attorney General may grant such relief if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will

---

[8]     Getting Started - Board of Pardons - State of Delaware, available at https://www.pardons.delaware.gov/getting-started.

[9]     Available at https://www.criminaldefenselawyers.com/pardoned-offense-same-having-record-expunged.htm.

[10]     Office of the Pardon Attorney | Pardons Granted by President Joseph Biden (2021-Present) available at https://www.justice.gov/pardon.

[11]     Fifteen (15) Pardons Granted by Governor Pritzker between June 15, 2022 and April 3, 2023 — Illinois Expungement Lawyer Blog — April 27, 2023, available at https://www.illinoisexpungementlawyerblog/ fifteen-15-pardons-granted-by-governor-pritzker-between-june-15-2022-and-april-3-2023/.

not be likely to act in a manner dangerous to public safety and that the granting of
the relief would not be contrary to the public interest. *Id.*

This remedy exists only in writing as Congress has made the statutory provision inoperative. *See*
*Logan v. United States*, 552 U.S. 23, 28 n.1 (2007) (this "provision has been rendered inoperative,
however, for Congress has repeatedly barred the Attorney General from using appropriated
funds.") Obviously, an unavailable statutory relief cannot be said to impose a comparable burden
to the widely available loyalty oaths in the past.

In sum, while the government is correct that 18 U.S.C. §§ 921(a)(20) and 925(c)
theoretically make § 922(g)(1)'s ban on possession of firearms non-permanent, in reality the ban
is permanent for the vast majority of felons. Felons simply have "no similar opportunity" to legally
possess firearms compared to "untrustworthy" English and American individuals in the past.
*Prince,* 2023 WL 7220127, at *9. Section 922(g)(1) fails to include rights-reclamation provisions
sufficiently comparable to historical predecessors. Therefore, "§ 922(g)(1) imposes a far greater
burden on the right to keep and bear arms than the historical categorical exclusions from the
people's Second Amendment right." *Id*. The historical burden imposed on, i.e. Catholics and
British loyalists, is clearly not the same as the insurmountable burden imposed on felons. Neither
§ 921(a)(20) nor § 925(c) come even close to providing felons with comparatively burdensome
restorative rights as religious minorities or potential insurrectionists enjoyed in the past. Felons
cannot restore their rights to possess a firearm by changing religion, declaring loyalty to the
government or showing that they are now trustworthy members of society.

Second—as to the "why"—the purpose and function of these historical laws were far
different from the modern Section 922(g)(1). While the government attempts to lump these
different regulations under the self-serving umbrella category of regulating "untrustworthy
people," the historical record does not support this view. Instead, as the Fifth Circuit suggested in

22

*Rahimi*, "[t]hese laws disarmed people thought to pose a threat to the security of the state due to their perceived lack of loyalty or societal status…[and were] targeted at groups excluded from the political community—*i.e.*, written out of 'the people' altogether—as much as they were about curtailing violence or ensuring the security of the state. Their utility as historical analogues is therefore dubious, at best." *Rahimi*, 61 F.4th at 457. Specifically, each of the laws cited by the government aimed to disarm groups that the founders either regarded as subhuman or as actively engaged in organized sedition. While it should go without saying, Mr. McGraw does not belong in either of those categories.

a)    <u>Discriminatory English laws disarming Catholics do not support disarming Mr. McGraw.</u>

The government's revisionist history starts with England in 1689, when the newly restored Protestant monarchy disarmed Catholics who refused to make declarations renouncing their faith. Notably, as compared to Section 922(g)(1), this English law did not "impose a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133. First, the English law contained a self-defense exception which allowed Catholics to obtain permission to possess firearms "'for the defense of [their] House or person.'" 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1968). By contrast, Section 922(g)(1) represents a total and basically permanent ban on firearm ownership. Second, colonial- and founding-era laws had restoration provisions similar to the English statute permitting Catholics to retain their arms as long as they swore an oath of allegiance to the King. (citing 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* at 71-73.) *See also, Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting) (Catholics "'willing to swear undivided allegiance to the sovereign' were permitted to keep their arms.")

As discussed *supra,* the burden imposed by the English law was also not "comparably

justified" to the burden imposed by Section 922(g)(1). Moreover, the government characterizes the English law as reflecting the new government's belief that it could not rely on Catholics to follow the law. This argument misrepresents the purpose of the law itself, as well as the broader context of the Glorious Revolution. In the time after the restoration of the Protestant monarchy, Catholics were regarded—not just as generically untrustworthy—but as seditious enemies of the state. *See* Clement Fatovic, *The Anti-Catholic Roots of Liberal and Republican Conceptions of Freedom in English Political Thought*, 66 J. Hist. Ideas 37, 43 (2005) ("throughout the seventeenth century it was widely believed that closet Catholics throughout the country formed a deadly fifth column lying in wait to slaughter Protestants and force their religion on the nation with Catholics"). As a popular and influential seventeenth century tract by Robert Filmer explained, "[t]he main, and indeed only point of popery is the alienating and withdrawing of subjects from their obedience to their prince, to raise sedition and rebellion[.]" Jacqueline Rose, *Robert Brady's Intellectual History and Royalist Antipopery in Restoration England*, 122 Eng. Hist. Rev. 1287, 1289 (quoting Sir Robert Filmer, *Patriarcha and Other Writings* 132–3 (1991)).

In keeping with this widespread sentiment, the purpose of the 1689 law was specifically to prevent insurrection. The law itself is explicit on this point. As the preamble of the statute explains, the law was enacted, "for the better secureing of their Majestyes Persons and Government." 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* at 72. Because Catholic disarmament was targeted at protecting the Protestant monarchy from organized and treasonous revolt, it does not provide historical support for modern blanket regulations that disarm people who have previously been convicted of committing felonies.

*Griffin* court found that discriminatory laws impacting religious minorities were unanalogous to Section 922(g)(1). It noted that "the early English government enacted these laws

solely for discriminatory reasons that would be impermissible today" and such "law cannot impose a 'comparably justified' burden on the right of armed self-defense. Accordingly, the Court declines to use discriminatory laws based on religion as a foundation for denying Second Amendment rights." *Griffin,* 2023 WL 8281564, at *5.

> b) <u>Discriminatory colonial laws disarming the enslaved, warring Indian tribes, and religious minorities do not support disarming Mr. McGraw.</u>

The government then turns to colonial laws that disarmed enslaved individuals, Indians, and religious minorities. None of these examples are relevantly similar to Section 922(g)(1). The government appears to argue that being black or Indian made one not dependable adherents to the rule of law and justified their disarmament. *Griffin* court flatly rejected government's misplaced reliance on "bigoted and racist laws" that considered blacks "three-fifths of a person at best and property at worst" and "this nation's history of explicit discrimination against racial and ethnic minorities to support Section 922(g)(1)'s constitutionality." *Griffin,* 2023 WL 8281564, at *4, 5, 6. It similarly rejected government's attempt to "expand[] on *Bruen*'s test to argue that the denial of all constitutional rights at the founding can justify the denial of some constitutional rights today." *Id.* at *6.

Let's further discuss the laws disarming the enslaved. Unlike Section 922(g)(1), these laws did not totally prohibit the possession of firearms. Instead, each of the laws allowed for firearm possession so long as the enslaved person had "his master's special license[.]" 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law).[12] That same

---

[12]     *See also Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law) (firearm possession prohibited "unless his or their Owner or Owners or a white Man, by order of his or their Owner or Owners, be with the said Slave or Slaves"); 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481 (1823) (1680 Va. law) (firearm possession prohibited "without a certificate from his master, mistris or overseer"); 1 *The Laws of*

fact—that masters and overseers were given the power to decide when and how enslaved persons could be armed—demonstrates that the real purpose of these laws was to maintain white supremacy. Like the rest of colonial laws addressing enslavement, this law was designed to ensure that the enslaved were constantly subject to the control and domination of their masters. In making the argument concerning slaves, "[t]he government demonstrates ignorance and insensitivity toward this nation's history of slavery." *Griffin,* 2023 WL 8281564, at *6. To the extent that the government sees an analogy between that racist purpose and the present prosecution of Jeff McGraw, the Court should be deeply troubled.

The Indian laws that the government cites are even further afield. The vast majority of the statutes that the government cites are not about firearm possession at all. Instead, these statutes banned white colonists from *selling* weapons to Indians.[13] Even if these laws could be considered

---

*Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* 118 (1811) (1715 Md. Law) (forbidding taking weapons off of their master's land "without license from their said master"); *Laws of New York From The Year 1691 to 1773,* at 199 (1752) (1730 N.Y. Law) (forbidding possession "but in the Preference or by the Direction of his, her, or their Master or Mistress"); *Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799,* at 153-55 (1800) (1768 Ga. Law) (firearm possession forbidden "unless in the presence of some white person" or "unless such slave shall have a ticket or license in writing from his master, mistress, or overseer"); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law) (forbidding firearm possession "except [to] such Slave or Slaves who shall have a Certificate" from their owner or overseer).

[13] *Laws and Ordinances of New Netherland,* *1638-1674,* at 18-19 (1868) (1639 New Netherland law) ("every Inhabitant of New Netherland . . . is most expressly forbidden to sell any Guns, Powder, or Lead to the Indians" but not penalizing Indians who possess guns); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law) (prohibiting "what person or persons soever within the collony" from "lend[ing] any Indian either peece, powder and shott"); 5 *Records Of The Colony Of New Plymouth* 173 (1856) (1675 Plymouth law) (whosoeuer shalbe found to sell, barter, or give, directly or indirectly, any gun or guns, or amunition of any kind, to any Indian or Indians); 6 *The Public Records Of The Colony Of Connecticut* 381-82 (1872) (1723 Conn. law) (prohibiting residents of the colony from bringing any "action of debt, dettinue, or other action whatsoever, for any gun or guns or ammunition, lent, sold or any ways trusted to any Indian or Indians"); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801,* at 319-20 (1899) (1763 Pa. law) (making it a crime to "give to, sell, barter or exchange with any Indian or Indians whatsoever any guns").

analogous to modern laws banning the unauthorized sale of guns, they have no relevance to the Court's consideration of Section 922(g)(1).

Admittedly, the 1677 Rhode Island law is slightly more on point, in that it allowed for the confiscation of guns owned by Indians. 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law). But even this law was not a total ban on firearm possession. The statute specifically noted that Indians could possess guns if they had a "ticket or order[.]" *Id.* And even without a ticket, the law provided that Indians who were subject to confiscation should be brought before the "Governor or Deputy Governor" for a hearing at which they could apparently explain and justify their reasons for firearm possession. *Id.* Section 922(g)(1), of course, contains none of those exceptions.

In addition, the purpose that motivated the passage of these Indian disarmament (or, really, non-sale) laws was also totally distinct from the justification for Section 922(g)(1). At the time that these laws were enacted, Indians were considered to be members of hostile foreign nations. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022). At the time "neither slaves nor Indians were understood to be a part of the 'political community' of persons protected by the Second Amendment." *United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138, at *20 (W.D. Okla. Feb. 3, 2023). Restrictions on their Second Amendment rights tell us nothing about the scope of arms-bearing permitted to those who were among "the people." *See also United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) ("Neither the Indian nor the slave was a citizen of the British colonies and, accordingly, neither was entitled to the rights of English subjects."). Mr. McGraw respectfully requests this Court to reconsider its position "on slavery and discrimination toward Native Americans as historical analogues to Section 922(g)(1) given the regulations impermissible premise cannot impose a 'comparably justified' burden on the right of

armed self-defense" and find "that Section 922(g)(1) is not analogous to discriminatory regulations regarding slavery and Native Americans." *Griffin,* 2023 WL 8281564, at *6.

Finally, the government cites a single colonial-era example of disarmament based on religious intolerance. In particular, the government notes that in the 1630s Massachusetts disarmed several of dissident preacher Anne Hutchinson's supporters. But once again, this disarmament differed from Section 922(g)(1) because it was neither permanent nor unconditional. To the contrary, the full history of the Hutchinson affair demonstrates that "supporters who confessed their sins were welcomed back into the community and able to retain their arms." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).

While the government asserts that Hutchinson's supporters were disarmed "'not because those supporters had demonstrated a propensity for violence,' but because 'the authorities concluded their conduct evinced a willingness to disobey the law,'" (quoting *Range*, 69 F.4th at 123 (Krause, J., dissenting)), the government once again misreads the historical record. Hutchinson's supporters represented an existential threat to the Massachusetts colony, and their teachings "would have done away with the state as it then existed." Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 638 (1937). Other scholar cited by the government notes a widespread historical consensus that the trial of Anne Hutchinson involved "'a struggle for control of Massachusetts'" which "carried the colony to 'the verge of armed conflict.'" James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 381 (1988) (but arguing that colonial authorities overreacted and overestimated the actual strength of the group). In other words, Hutchinson's supports were not disarmed because of simple disobedience to the law. Instead, they were disarmed because colonial leaders feared that they were

participants in an organized, seditious revolt that posed a serious threat to the continued existence of the colony itself.

          c)      <u>Revolutionary war measures that disarmed or banished British loyalists do not support disarming Mr. McGraw.</u>

Moving out of the colonial period, the government then cites Revolutionary War-era laws that disarmed British loyalists who did not show loyalty to the American government. Once again, these wartime statutes did not impose a "comparable burden" on the right to keep and bear arms when considered against Section 922(g)(1). *Id.* at 2133. People disarmed under these wartime statutes could regain their right to bear arms at any time simply by swearing a loyalty oath. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 L. & Hist. Rev. 139, 157 (2007). *See also Prince*, 2023 WL 7220127, at *7 ("could regain the ability to keep and bear arms after taking the relevant oath"). It goes without saying that Section 922(g)(1) does not give felons the ability to restore their own right to arms whenever they choose. Moreover, even when the revolutionary authorities took arms away from someone who refused the oath, that person was free to acquire new, additional firearms—unlike a § 922(g)(1) defendant. *See Marshall*, *supra*, at 724 (2009) (explaining loyalty statutes "did not technically prohibit recusants from acquiring new arms," since they "read more like forfeiture laws than disabilities").

Loyalty statutes also were not "comparably justified." *Bruen*, 142 S. Ct. at 2133. The loyalty statutes were a wartime measure that aimed to neutralize Loyalists who might rebel or otherwise undermine the stability of government. Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–07 (2004) (emphasis added); *see Greenlee*, *supra*, at 265 ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them."). In

other words, those laws were not justified by a power to disarm the "untrustworthy" or even the "dangerous." Instead, they were justified by the specific fear of organized and seditious revolt. But that specific, limited purpose does not support the categorical and practically permanent disarmament of felons.

         d)      <u>Failed proposals from the state ratification conventions do not support disarming Mr. McGraw.</u>

The government also points to failed proposals from the Massachusetts, Pennsylvania, and New Hampshire constitutional ratifying conventions in an attempt to bolster its historical argument. At the Massachusetts convention, Samuel Adams proposed that gun rights be limited to "peaceable citizens." In Pennsylvania, Anti-Federalists proposed guaranteeing a right to bear arms "unless for crimes committed." And in New Hampshire, delegates recommended an amendment that guaranteed a right to bear arms to all except those "in actual rebellion."

There are several problems with the government's attempt to rely on these proposals. The first—and most obvious—problem is that none of these proposals became law and only New Hampshire's proposal had majority support. *See Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023); *see also Kanter*, 919 F.3d at 455 (Barrett, J. dissenting). "*Heller* reminds us that '[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process,' *554 U.S. at 590*, and this is a good example of why that is true." *Bullock*, 2023 WL 4232309, at *51. The proposals' failure to become law makes them not a "well-established and representative historical analogue" and provides "some probative evidence" that §922(g)(1)'s disarmament is unconstitutional. *Bruen*, 142 S. Ct. at 2133, 2131; *see also Heller*, 554 U.S. at 590. *Bruen* requires the government to demonstrate a "historical tradition of firearm *regulation*," *Bruen*, 142 S.Ct. at 2126 (emphasis added), and a proposal that fails to pass is not a regulation. Moreover, when the Second Amendment was promulgated and ratified, its drafters

did not include any of the restrictive language from these earlier proposals. "Usually, when the relevant lawmaking body does not adopt language in a draft, we presume that the stricken language was not intended." *Daniels*, 2023 WL 5091317, at *12. And, *Bruen* suggests that the *Second Amendment's* silence with respect to the ability to disarm felons, despite the recognition of the potential issue felons' possession of firearms posed during three state ratifying conventions, should be treated as evidence that the public did not support such a restriction." *Neal*, 2024 U.S. Dist. LEXIS 26118, at *26, citing to *Bruen,* 597 U.S. at 26-27; *Daniels,* 77 F.4th at 344. As a result, the existence—and ultimate failure—of these proposals supports Mr. McGraw's position, rather than the government's.

In addition, even if failed proposals could support the government's argument, *Bruen* expressly instructs judges to "doubt that three colonial regulations could suffice to show a tradition" of gun regulation. *Bruen*, 142 S. Ct. at 2142 and 2153 ("[W]e will not give disproportionate weight to a single state statute and a pair of state-court decisions."). The three failed proposals at issue here provide even less support than the enacted regulations considered in *Bruen*.

ii. *The mere existence of the death penalty does not authorize the government to permanently strip away a person's fundamental rights after the completion of a sentence.*

After discussing historical laws that disarmed various racial, religious, and political minorities, the government shifts to a somewhat different track. Specifically, the government argues that the existence of the death penalty and estate forfeiture at the time of the founding supports the notion that ex-felons who have completed their punishment may still be permanently deprived of their Second Amendment rights. In essence, the government's argument rests on the premise that the power to impose the death penalty and estate forfeiture necessarily implies a lesser power to let somebody live but permanently deprive them of their fundamental rights. Logically,

there is "no comparison and [the court] strongly disagree[s] that the authority to impose the death penalty implies a lesser right to disregard the fundamental rights of felons." *Griffin,* 2023 WL 8281564, at *8. Government's premise of "lesser punishment included" makes no sense – if an individual is facing capital punishment, could this same individual be punished by fine, pillory or lashes only resultant of such penalties being less severe punishments? Of course not. The lesser punishment is not automatically included in the law authorizing a different and greater penalty. While "capital punishment and estate forfeiture laws imposed severe consequences on certain felons,"…"these consequences 'do[ ] not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition.'" *Prince*, 2023 WL 7220127, at *10, quoting *Range,* 69 F.4th at 105.

   As a side matter, the defense is not arguing that imprisoned or executed individuals are entitled to possess a firearm. Indeed, arguing that deceased could possess a firearm makes no sense. *See Kanter*, 919 F.3d at 461–462 (Barrett, J., dissenting) ("we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding. The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society.") The issue at hand is whether a living felon who completed his sentence is permitted to possess firearms.

   Additionally, the government's argument that individuals facing capital punishment and estate forfeiture were permanently disarmed is wrong—both as a matter of historical practice and as a matter of constitutional law. As a historical matter, the American states did not automatically punish felons with the death penalty. *See Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) ("Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was

used 'sparingly,' and property crimes including variations on theft, burglary, and robbery 'were, on the whole, not capital.'") (quoting Lawrence M. Friedman, Crime and Punishment in American History 42 (1993)). Fewer than one quarter of felony convictions resulted in the imposition of the death penalty. Javier Bleichmar, *Deportation as Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immgr. L.J. 115, 126 (1999) (citing A. Roger Ekirch, *Bound for America: The Transportation of British Convicts To The Colonies* 1718–1775, at 21 (1987)).

Moreover, the historical evidence demonstrates that, in cases where the death penalty was not imposed, "the rights of felons serving less than life were merely *suspended* during the term of the sentence." *Kanter*, 919 F.3d at 461. "[C]ertain severe offenses were not punishable by death or life imprisonment and, while 'the offender was stripped of his then-existing estate, including any firearms,' he could 'presumably repurchase arms' 'upon successfully serving [ ] his sentence and reintegrating into society.'" *Prince*, 2023 WL 7220127, at *10, quoting *Range,* 69 F.4th at 127-28 (Krause, J., dissenting). Of importance is the government's glaring omission to cite "a single statute or case that precludes a convict who has served his sentence from purchasing" firearms or "forfeiture cases in which the convict was prevented from regaining his possession, including firearms." *Range,* 69 F.4th at 105. "That's true whether the object forfeited to the government was a firearm used to hunt out of season, a car used to transport cocaine, or a mobile home used as a methamphetamine lab. And of those three, only firearms are mentioned in the Bill of Rights." *Id.* "If America's historical tradition permitted a felon to repurchase firearms after completing their sentence, why can't Mr. [McGraw] today?" *Bullock*, 2023 WL 4232309, at *55.

Indeed, actual practices at the time of the founding show that "once wrongdoers had paid their debts to society, the colonists forgave them and welcomed them back into the fold." *Folajtar*, 980 F.3d at 923 (Bibas, J., dissenting) (citing scholarly evidence). In other words, the historical record demonstrates denying a citizen's fundamental, individual rights even after the completion of punishment is the kind of restriction "that our ancestors would never have accepted." *Bruen*, 142 S. Ct. at 2133 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)).

The government's attempt to use the availability of the death penalty as a justification to deny fundamental rights even *after* a punishment has been fully served runs contrary to well-established constitutional law. After all, nothing about the logic of this argument is limited to the Second Amendment context. Indeed, the government's underlying premise—that anyone who could be subject to death penalty is necessarily subject to the permanent deprivation of their fundamental rights—would apply with equal force in the context of the First Amendment, the Due Process Clause, or any other provision of the Constitution.

The Supreme Court has expressly rejected that troubling and undemocratic notion. It has held that "the existence of the death penalty is not a license to the Government to devise any punishment short of death within the limit of its imagination." *Trop v. Dulles*, 356 U.S. 86, 99 (1958) (holding that it is unconstitutional to revoke right to citizenship as punishment for a crime). In the context of other enumerated constitutional rights, courts have had no trouble resisting this kind of pernicious reasoning. *See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 108 (1991) (convicted felons retain First Amendment rights); *United States v. Walden*, 146 F.3d 487, 490–91 (7th Cir. 1998) (ex-felons retain Fourth Amendment rights and "[r]easonable suspicion of criminal activity cannot be based solely on a person's prior criminal

record"). There is no reason for the Second Amendment to be treated differently—and less favorably—than these other fundamental rights. *See McDonald v. Chicago*, 561 U.S. 742, 780 (2010) (rejecting the notion that the Second Amendment is a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

III.     **The issues that the Seventh Circuit raised in *Atkinson* weigh in favor of finding Section 922(g) unconstitutional as applied to Mr. McGraw.**

The issues that the Seventh Circuit raised in *Atkinson* weigh in favor of finding Section 922(g) unconstitutional as applied to Mr. McGraw. In *Atkinson*, the Seventh Circuit posed a number of questions that it believed would be helpful for district courts conducting the *Bruen* analysis. *Atkinson v. Garland*, 70 F.4th 1018, 1023 (7th Cir. 2023). By way of summary, Mr. McGraw turns to those questions now.

1.     "Does § 922(g)(1) address a 'general societal problem that has persisted since the 18th century?' *Bruen*, 142 S. Ct. at 2131. If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?' *Id.*" *Atkinson*, 70 F.4th at 1023.

Crime and recidivism are age-old problems, and both certainly existed at the time of the founding. *See Washington,* 2023 WL 8258654, at *4 ("it is undisputed that the problems of crime and recidivism have always existed in this nation"). Yet, "[t]he government does not argue about whether earlier generations addressed the general societal problem of firearm-related violence with similar or materially different means. Nor could it. As the Seventh Circuit acknowledged in United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), the first federal statute disqualifying certain violent felons from firearm possession was not enacted until the Federal Firearms Act in 1938." *Prince*, 2023 WL 7220127, at *15. It is then not surprising that the government has produced no evidence to suggest that the founding generation ever attempted to permanently disarm felons. The judges and scholars who have combed through the historical record have similarly found no

evidence that this occurred. As a result, earlier generations addressed this persistent problem through materially different means than Section 922(g)(1).

2.     "What does history tell us about disarming those convicted of crimes generally and of felonies in particular?" *Atkinson v. Garland*, 70 F.4th at 1023.

History tells us that it did not happen. *See Griffin,* 2023 WL 8281564, at *4 ("the history is void of the disarmament of those convicted of crimes and felonies.") While a minority of the Pennsylvania state constitutional convention proposed an amendment that would have allowed for the disarmament of (some) felons, this proposal never became law. The best—and uncontested—historical evidence demonstrates that felons were not permanently forbidden from possessing firearms at any time before the middle of the twentieth century.

3.     "Are there broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming "dangerous" groups other than felons?" *Atkinson*, 70 F.4th at 1023.

No. The government has identified laws that restricted (but did not totally ban) access to firearms for enslaved people, Indians, religious minorities, and British loyalists. But these laws were not predicated on danger—much less on some amorphous notion of "untrustworthiness," as the government proposes in this case. Instead, these laws were directed at those who were outsiders, either because they were considered sub-human or because they were considered to be potentially seditious enemies of the state.

Even if the Court regarded these regulations as being based on danger, the specific danger that the colonialists were concerned about was the danger of organized, armed sedition. That specific concern—which colonialists addressed through targeted legislation that never amounted to an essentially permanent or unconditional denial of the right to bear arms—is not analogous to Section 922(g)(1)'s broad-brushed disarmament of all felons.

4.      "If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)?" *Atkinson*, 70 F.4th at 1023.

The government has not identified any analogous laws. Moreover, this motion should be decided under *Bruen*'s "distinctly similar" test —not by the government's elaborate and strained analogies—but by considering the specific tradition of how felons were treated after the completion of their sentences. As discussed above, history shows that they regained the right to bear arms.

5.      "If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements?" *Atkinson*, 70 F.4th at 1023.

At this point, the government has failed to demonstrate that the historical record supports disarmament based on "dangerousness." If the Court were to go down that road, it would have to consider the specific kinds of dangerousness that led to disarmament at the time of the founding. At most, the historical evidence suggests that the Founding generation was concerned about the danger of organized insurrection, and that they responded to that danger by imposing temporary and conditional firearms disqualifications. The danger posed by non-political street crime is very different from the danger posed by organized seditious revolt. As a result—even if danger were the right benchmark for analysis—the government has failed to make the required showing in this case.

Here, there is no dispute between the parties about the kinds of evidence the Court can consider. As a result, the Court can save those issues for another day.

37

## CONCLUSION

In conclusion, Jeff McGraw is part of "the people" covered by the plain text of the Second Amendment. The government has failed to carry its burden to demonstrate a well-established and representative tradition of disarming individuals with felony convictions at the time of the Founding Era. For the reasons stated herein, the Court should dismiss the Indictment.

Respectfully submitted,
/s/ Yelena A. Dolgosheeva[14]

DolTer Law, P.C.
Mailing Address: P.O. Box 5382, Buffalo Grove, Illinois 60089
Telephone: 847-208-4348
Fax: 312-267-1810
E-mail: dolgosheeva2002@yahoo.com

---

[14] This Reply was largely prepared by Geoffrey Meyer, Will Hardwicke and Amanda Penabad.