**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **23 CR 28** |
| | ) | **Honorable Edmond E. Chang** |
| **JEFF MCGRAW** | ) | |

**DEFENDANT, JEFF McGRAW'S CORRECTIONS AND OBJECTIONS TO
PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

**TABLE OF CONTENTS**

Introduction……………………………………………………………………………...…1
I.   Corrections to PSR…………………………………………………………………………3
II.  Objections to Statements in PSR………………………………………………………….3
III. Objections to Guidelines Calculations…………………………………………………...5
     A. Mr. McGraw's Base Offense Level Should Be 20 Not 22………………………………..5
     B. Mr. McGraw Should Not Receive an Enhancement Under USSG 2K2.1(b)(6)(B)………8
     C. Mr. McGraw Should Receive a Three-Level Reduction for
        Acceptance of Responsibility………………………………………………………………10
IV. Objections to Conditions of Supervised Release…………………………………………12
     A. Discretionary Condition 24 Should Not Be Imposed in This Case………………………...12
     B. Uncharged Allegations and Masturbation Do Not Support Imposition of Special
        Condition #15…………………………………………………………………………………12
V.  Sentencing Memorandum………………………………………………………………13
     A. Mr. McGraw Was Born and Raised in a Deplorable Environment, Surrounded by
        Criminals and Drug Users…………………………………………………………………13
     B. Mr. McGraw Lost Loved Ones to Violence………………………………………………14
     C. Mr. McGraw Grew Up in a Home Rampant with Verbal and Physical Abuse…………15
     D. Mr. McGraw was Sexually Abused………………………………………………………...16
     E. Mr. McGraw Enjoyed Living with His Father and Was Devastated When He Was
        Accused of Abusing His Step-Sister………………………………………………………16
     F. Mr. McGraw Was Shot on Three Separate Occasions…………………………………17
     G. Mr. McGraw Was Injured in Jerome Combs Detention Center…....……………………19
     H. Mr. McGraw Suffers from Mental Disorders and Is in Need of Effective
        Mental Health Treatment…………………………………………………………………...20
     I. Mr. McGraw is a Caring Father, Valued Family Member and Contributing
        Community Member…………………………………………………………………………..21
     J. Mr. McGraw is a Talented Musician………………………………………………………23
     K. When Mr. McGraw Was Release from Prison in 2022, He Wanted to
        Start a New Life……………………………………………………………………………23
     L. A Sentence of 37 is Sufficient to Satisfy the Goals of General and Specific Deterrence..24
     M. Mr. McGraw Should Receive Credit for the Time He Spent in State Custody in
        Connection with This Offense…………………………………………………………...24
     N. Rehabilitation, RDAP and Prison Recommendation……………………………………25

NOW COMES the defendant, JEFF McGRAW, by and through his attorney, YELENA A. DOLGOSHEEVA, and respectfully requests this Honorable Court to sentence him to 37 months of imprisonment.

## INTRODUCTION

Mr. McGraw and his girlfriend, Z.J., have been in a relationship for approximately nine years before he was arrested on this case. They continued their relationship during Mr. McGraw's lengthy incarceration on conspiracy to murder case, after he was released on parole and for a period of time while he was incarcerated on parole violation. Mr. McGraw frequently called his girlfriend from jails during the entirety of their relationship. He stopped calling Z.J. soon after he understood that she would have to testify against him before the grand jury, believing that it would be awkward and inappropriate to continue their relationship.

Before Mr. McGraw was arrested on this case, he sometimes stayed at Z.J.'s residence, which she shared with her mother, Tymecia McDonald, and her younger brother. Mr. McGraw visited his girlfriend often, sometimes stayed there overnight; and, he kept in her residence some of his personal belongings and some of the money he earned as an artist.

Z.J.'s younger brother was an active Black Stone gang member who despised Mr. McGraw and on one occasion pointed a firearm and threatened to shoot him in front of his friend. Ms. McDonald always loathed Mr. McGraw and wished for the couple to end their relationship. Z.J. and her mother kept several firearms purchased "on the street," their FOID cards and Z.J.'s legally purchased grey Glock 19 in their residence. **Exhibit 1**.

On July 13, 2022, Mr. McGraw and several other individuals stayed overnight at his ex-girlfriend, Asia Martin's residence. On the following day, people at Ms. Martin's residence were woken up by Z.J.'s belligerent screaming and cursing. During telephonic interview Z.J.

1

confirmed that when she saw Mr. McGraw's phone located at Ms. Martin's residence, she drove to the house and entered it screaming.[1] She then left the house, took bottles of Gatorade that she purchased for Mr. McGraw and poured them on his new Lexus while screaming and crying.[2]

Ms. Martin told counsel that Z.J. was screaming at Mr. McGraw and trying to fight him and her, while Mr. McGraw was keeping Z.J. away from Ms. Martin.[3] Ms. Martin saw a firearm on Z.J.'s waist and felt scared that the argument, which turned physical, would end in a shooting.[4] Then Z.J. told Mr. McGraw to get his personal items out of her house, removed the firearm from her waist, placed it in her vehicle and left.[5] Z.J. informed counsel that Mr. McGraw hit her in the face and broke her jaw as she was getting into her car.[6]

As a side note, about a month earlier Z.J. tried to beat up a stripper at Mr. McGraw's party because she felt jealous. Another young lady stepped in and Z.J. engaged her in a fight. After the fight Z.J. went to Mr. McGraw's mother, Maryam Malone, and told her what has transpired with a stripper; however, her version of events was remarkably different from that told by other people at the party.

Back to July 14- after Z.J. threated to burn Mr. McGraw's personal belongings and money if he does not remove them, Mr. McGraw drove to Z.J.'s residence. He knocked on the front door, then the back door and then the front door again. Angry and upset Z.J., who suspected that Mr. McGraw cheated on her, opened the door, allowed Mr. McGraw into the foyer and the couple immediately resumed their argument. During the argument Mr. McGraw hit Z.J. on the nose.[7]

---

[1] Counsel and Investigator John Rea interviewed Z.J. via telephone on January 13, 2025.
[2] Id.
[3] Counsel and Investigator John Rea interviewed Asia Martin via telephone on January 13, 2025.
[4] Id.
[5] Id.
[6] Counsel and Investigator John Rea interviewed Z.J. via telephone on January 13, 2025.
[7] Id.

Mr. McGraw deeply regrets losing control of himself and hurting the woman he loved. He was shocked to later learn that he caused fractures in her jaw and, for some time, he had difficulty believing it. To date, he has difficulty speaking on this subject and he is unable to forgive himself for what he has done.

## I.  CORRECTIONS TO PSR

1. Presentence Investigation Report ("PSR") incorrectly states that Mr. McGraw does not have GED. Mr. McGraw obtained GED in 2022. PSR, p. 2.

2. "The victim's mother then saw McGraw punch the victim in the face with a closed fist." PSR, par. 7. This sentence should be removed. Ms. McDonald later changed her story for the Grand Jury stating that she entered the room after Z.J. was hit. **Exhibit 2, p. 11.**

3. The PSR incorrectly states that the firearm had "extended magazine" as the photograph clearly shows that it does not. PSR, par. 9; Gov. Ver. p. 2.

4. The PSR incorrectly states that Mr. McGraw "was involved in a shoot-out" to the extent that the verbiage implies that Mr. McGraw discharged a firearm. PSR, par. 38. In referring to Mr. McGraw's best friend Effrem Haille, a witness saw Mr. Haille get out of Nissan Altima while holding a firearm in his hand, going between houses and then hearing gunshots. **Exhibit 3, p. 1.** The shootout was between Mr. Haille and Jerome Burt. After the shooting, a woman in black boots took one firearm from another woman and a second firearm from the ground and placed them in Nissan. ***Id.* at p. 2.** Then Nissan drove away with Dorothy Young in the driver's seat, Mr. McGraw in the front seat passenger seat and Rakeem Wilton in the back seat. ***Id.* at p. 2.** Both Mr. Haille and Mr. Burt were shot and Mr. Haille later died.

## II.  OBJECTIONS TO STATEMENTS IN PSR

1. Mr. McGraw disagrees that he forcibly entered and that he entered without permission

3

Z.J.'s residence. PSR, pars. 13, 20. Mr. McGraw came to Z.J.'s residence following her instruction to remove his personal belongings from her house. When he knocked on the front door for the second time, Z.J. opened the door and allowed him into the foyer. *See* Gov. Ver. Ex. 2, p. 3 (McDonald stated that Z.J. opened the door and allowed Mr. McGraw into the house); PSR, par. 7 (Z.J. "let McGraw in through the front door.") Later, Ms. McDonald told Mr. McGraw to get out and he immediately left the house, waiting on the front porch for Z.J. to bring out his personal items and money.

2.   Mr. McGraw disagrees that he attempted to "coerce Ms. Jones from cooperating with the investigation…." by asking "his mother to contact the victim to discourage her participation in the investigation." PSR, par. 14. Notably, Z.J. called Ms. Malone several times during Mr. McGraw's incarceration on parole violation, and during one of these calls she told her about being forced to testify before the Grand Jury. *See e.g.* Gov. Ver. Ex. 4, p. 1, lines 10, 14 where Z.J. asks Mr. McGraw "You talk to your mama?"  and then states "So, um. The feds came to my house." Additionally, Mr. McGraw had numerous conversations with Z.J. and plenty of opportunities to request her not to cooperate with the investigation, but he never did. Even when she told him about being coerced into testifying before the Grand Jury and threatened with an arrest for failure to appear, he did not ask her to make any false statements, and only informed her of what he believed was her right under the Fifth Amendment.

Z.J.     It says I am commanded to come and testify in front of the grand jury. I'm like, "why do I have to do this? This is not what I want to do, like um." They like, "Well, if you don't come, you can issue out a warrant, you can get arrested. You just have to come and answer the questions." Gov. Ver. Ex. 4, p. 2, lines 2-5.

                                           ***

They showed me their badges, and the paper… They talking about how they they own gang, and they overseas, and this that, and just all this crazy shit, like… *Id.,* p. 2, lines 13-16.

                                           ***

That's all—that's what I'm saying, like, I was like, "I'm gonna go," because if not, they're going to issue an arrest warrant, but I'm saying like, "Please, I don't know what y'all doing, this is not

something I was" …Like, why y'all forcing me to do something that I don't want to do?" *Id.,* p. 4, lines 7-14.

In response Mr. McGraw told Z.J.: "Yeah, y'all got the right to remain silent. The Fifth Amendment, y'all ain't gotta say nothing to them." *Id.,* p. 4, lines 15-16. Z.J. then reiterates that the U.S. Marshals scared her "I was just worried, like they scary, that was scary." *Id.,* p. 4, line 23.

3. Defendant further objects to the agent's mischaracterization of recorded phone calls: "Further, Agent Holley stated recorded jail calls indicate the defendant did not show remorse for his behavior. He continued to verbally abuse the victim causing her to cry and would mockingly retell his conversations with the victim to his mother." PSR, par. 17. While counsel does not recall specifics of numerous recorded phone calls, counsel remembers many telephone calls during which Z.J. expressed her love for Mr. McGraw and cried because of her feelings towards him and their separation.

## III.    OBJECTIONS TO GUIDELINES CALCUALTIONS

### A.  Mr. McGraw's Base Offense Level Should Be 20 Not 22

Mr. McGraw received criminal history points for two prior convictions, namely, reckless discharge of a firearm and conspiracy to commit murder. In committing reckless discharge of a firearm offense, Mr. McGraw was shooting into the air. Mr. McGraw's conspiracy conviction resulted from a shooting between Mr. Burt and Mr. McGraw's best friend, Mr. Haille.

USSG § 2K2.1(a)(3) provides for level 22 where the firearm qualifies as a machinegun and "the defendant committed any part of the instant offense subsequent to sustaining one felony conviction" for crime of violence. *Id.* Crime of violence is defined in USSG § 4B1.2. Defense does not dispute that this case involves a firearm described in 26 U.S.C. § 5845(a)(6), a

machinegun; but disagrees that Mr. McGraw's conspiracy conviction qualifies as a crime of violence. *See* PSR, par. 19, **Exhibit 4.**

In this case Mr. McGraw was arrested for possession of a firearm on July 14, 2022. At the time 2021 guideline manual was in effect, which provided in USSG § 4B1.2(a)(2) that a crime of violence includes murder; and, in application note 1 to the guideline, that crime of violence includes a conspiracy to commit violent offenses. An amendment to the guidelines effective November 1, 2023, moved the language of n. 1 into a newly formed subsection (d) to USSG § 4B1.2. However, provided that this amendment became effective subsequent to Mr. McGraw's commission of offense; and, given that the amendment increases his offense level by two levels, a 2021 guideline manual must be applied in this case to avoid a violation of the Ex Post Facto Clause. *See Peugh v. United States,* 569 U.S. 530 (2013) (Sentencing Mr. McGraw to a lengthier term of imprisonment based on guidelines effective subsequent to the commission of offense would violate the Ex Post Facto Clause).

Further, applying 2021 guidelines, the Court should find that conspiracy to commit murder does not qualify as a crime of violence. "The amount of deference owed to application notes is different than the amount of deference owed to the Guidelines." *United States v. Chick,* No. 20-CR-55 JD, 2022 WL 621037, at *2 (N.D. Ind. March 3, 2022) (not reported in Fed. Supp).

> The application notes cannot add to the Guidelines, and they have no independent force. [*United States v. Rollins*, 836 F.3d 737, 742 (7th Cir. 2016)]. So the application note of § 4B1.2 above, listing out certain qualifying crimes, such as aiding and abetting, conspiracy, and attempt, was only "enforceable [ ] as an interpretation of the term 'crime of violence' in the guideline itself." *Id.; Chick,* 2022 WL 621037, at *2.

Inchoate crimes, such as conspiracy to commit murder, is different from the murder offense, and the two offenses have different elements. *See Chick,* at *3. The *Chick* court held that

"it is clear that conspiracy to commit murder would not fall under either the elements clause or the enumerated clause" of the guideline. *Id.* at \*5. It considered Indiana's conspiracy to commit murder offense with the following elements: '(1) the defendant (2) agreed with one or more other persons to commit the crime of murder (3) with the intent to commit murder and (4) the defendant or one of the persons to the agreement performed an overt act in furtherance of the agreement.' *Id.* The Indiana conspiracy to commit murder offense then does not require prove of 'the use, attempted use, or threatened use of physical force against the person of another.' *Id.* Similarly, the elements of Illinois conspiracy to commit murder offense are the following: "(1) [defendant made an] agreement with another that an offense be committed, (2) [defendant] inten[ded] that the offense [of killing] be committed... (3) an act in furtherance of the agreement [was made] by the defendant or a co-conspirator." 720 ILCS 5/8-2(a) (West 2000). *People v. Hopp,* 805 N.E.2d 1190, 1198 (2004). As under Indiana law, Illinois conspiracy to commit murder offense does not require State to prove "the use, attempted use, or threatened use of physical force against the person of another," making the elements clause of USSG § 4B1.2 inapplicable. *See Chick,* 2022 WL 621037, at \*5.

Further, "[c]onspiracy to commit murder ["would not come in under the enumerated clause either" as it] does not require that another human be killed unlawfully; it merely requires an overt act." *Id.* Then, n. 1 to USSG. § 4B1.2 does not simply interpret the guideline, but instead adds conspiracy and other offenses, making the commentary inconsistent with the applicable guideline. *Id.* In summary, this Court should adopt reasoning in *United States v. Chick,* and find that Mr. McGraw's prior conviction for conspiracy to commit murder is not a crime of violence under USSG § 4B1.2 and his base offense level is 20.

**B. Mr. McGraw Should Not Receive an Enhancement Under USSG 2K2.1(b)(6)(B)**

**1. Aggravated Assault**

PSR incorrectly states that aggravated assault[8] would qualify for a four-level enhancement under USSG § 2K2.1(b)(6)(B). PSR, par. 20. The guideline clearly states that the enhancement applies only where defendant "used or possessed any firearm … in connection with another felony offense." USSG § 2K2.1(b)(6)(B). Aggravated assault of brandishing and not discharging a firearm (720 ILCS 5/12-2(c)(1) is a class A misdemeanor (720 ILCS 5/12-2(d) and would not support the enhancement.

**2. Aggravated Battery**

In its version of offense, the government argues that Mr. McGraw should receive an enhancement pursuant to USSG § 2K2.1(b)(6)(B) for committing aggravated battery, home invasion or intimidation. *See* Gov. Ver. ps. 3-4. Defense disagrees.

Aggravated battery is defined as battery that resulted in great bodily harm. 720 ILCS 5/12-3.05(a)(1). PSR states that Mr. McGraw hit Z.J. with a closed fist, causing her to bleed, and then he displayed a firearm and threatened Z.J. and her mother. First, only Ms. McDonald claimed that Mr. McGraw punched Z.J. with a "with a closed fist," and she later admitted that she did not see what has transpired. Gov. Ver. Ex. 2, p. 3, *see also* PSR, par. 7, **Exhibit 2, p. 11.** Z.J stated that her mother entered the room after Mr. McGraw hit her. **Exhibit 5, p. 11**. Further, Z.J. tol2d medical staff at the Cook County Hospital and counsel that he hit her when "she was getting into her car." Gov. Ver. Ex. 3, p. 1. Z.J. further confirmed during telephonic interview that Mr. McGraw broke her jaw at that time and that he later hit her in the nose at her residence.[9]

---

[8] PSR references aggravated battery statute 720 ILCS 5/12-3.05(a)(1), but counsel confirmed with probation officer that she intended to refer to the statutory provision for aggravated assault.

[9] Counsel and Investigator John Rea interviewed Z.J. via telephone on January 13, 2025.

Her nose was not broken; consequently, Z.J. did not sustain "great injury" required under aggravated battery when Mr. McGraw hit her at her residence.

Moreover, the enhancement is inapplicable because Mr. McGraw never used or possessed a firearm in connection with aggravated battery. There is not a shred of evidence that Mr. McGraw hit Z.J. with a firearm. To the contrary, all witnesses are consistent on at least one point- Mr. McGraw displayed a firearm after he hit Z.J. Thus, Mr. McGraw's possession of a firearm was coincidental and not connected to an aggravated battery.

### 3. Home Invasion

Home invasion, 720 ILCS 5/19-6(a)(3), requires Mr. McGraw to have entered Z.J.'s residence without authority. But he came to Z.J.'s residence upon her request to retrieve his personal belongings and Z.J. opened the door and allowed him into her residence for that purpose.[10] Additionally, after Ms. McDonald told him to leave, Mr. McGraw left the residence and waited on the front porch for Z.J. to bring out his personal items.

### 4. Intimidation

Intimidation, 720 ILCS 5/12-6(a)(1), occurs when a person, "with intent to cause another to perform or to omit the performance of any act…communicates …a threat." *Id.* The government does not attempt to explain how Mr. McGraw intimidated anyone, nor could it. There is no evidence that Mr. McGraw intended anyone to perform any act or omit the performance of any act.

---

[10] McDonald stated that Z.J. opened the door and allowed Mr. McGraw into the house. Gov. Ver. Ex. 2, p. 3. Further, PSR states that Z.J. "let McGraw in through the front door." PSR, par. 7.

**C.  Mr. McGraw Should Receive a Three-Level Reduction for Acceptance of Responsibility**

In this case Mr. McGraw fully accepted responsibility for his conduct and he should receive a three-level reduction in his offense level. PSR did not apply this reduction, citing n. 4 to USSG § 3E1.1, which provides that except in extraordinary cases, a defendant should not receive an acceptance of responsibility if he receives an enhancement for obstruction of justice. PSR, pars. 26-27. PSR states that Mr. McGraw obstructed justice by maintaining contact with Z.J., "calling her over 50 times, and advis[ing] her she 'didn't have to say shit' in a grand jury hearing. He also asked her to instruct her mother to say he did not possess a firearm at the time of the offense." PSR, par. 23.

First, Mr. McGraw was charged with a felon-in-possession of a firearm offense; and not with any conduct involving Z.J. There was no order of protection prohibiting Mr. McGraw from contacting his girlfriend and Z.J. willingly accepted his calls. From their recorded phone conversations, it is clear that Mr. McGraw and Z.J. continued their relationship during his incarceration and they frequently expressed love and affection for each other. It also appears that Z.J. contacted Mr. McGraw's mother after she was served with a subpoena requiring her to testify before the grand jury:

> 10 **Jones:** You talk to your mama?
> 11 **McGraw:** Um. Today?
> 12 **Jones:** Yes.
> 13 **McGraw:** No. Why? What happened?
> 14 **Jones:** So, um. The feds came to my house. Gov. Ver. Ex. 4, p. 1.

Further, as discussed *supra*, after Z.J. complained that she was threatened and coerced into testifying before the grand jury, Mr. McGraw advised her of what he believed was her Fifth Amendment Right. This is certainly not an obstructive conduct. However, even if this Court finds that Mr. McGraw attempted to obstruct justice not only when he told Z.J. to ask her mother

10

to say that he did not possess a firearm, but also when he spoke to her about her Fifth Amendment Right, the reduction for acceptance of responsibility should, nonetheless, apply.

The Seventh Circuit stated that the defendant "might deserve an enhancement for the obstruction of justice yet at the same time earn a discount for having fully, if slightly belatedly, accepted responsibility for his crime." *United States v. Gonzalez,* 608 F.3d 1001, 1008 (7th Cir. 2010). There can be an attempt to obstruct justice and later acceptance of responsibility, and "[t]here is no logical or practical incompatibility, and no barrier in the language of the guidelines." *United States v. Lallemand*, 989 F.2d 936, 938 (7th Cir. 1993).

The presumption against acceptance of responsibility can be rebutted in extraordinary circumstances, such as where "obstruction was trivial, putting the government to no extra expense." *United States v. Hacha*, 727 F.3d 815, 818 (7th Cir. 2013). In addition to considering the seriousness of obstructive conduct, this Court should also consider that the attempted "obstruction was a single incident early in the investigation, [Mr. McGraw] voluntarily abandoned the obstruction, and … he admitted it." *Id.*

The telephone call during which Mr. McGraw attempted to obstruct justice occurred on October 31, 2022, when he was incarcerated for violation of parole in state jail and before he was indicted on this case. Mr. McGraw's single, trivial attempt to obstruct justice by asking Z.J. to tell her mother to say that he did not possess a firearm (and perhaps that Z.J. was not required to testify if she did not want to) did not require government to invest any additional funds into investigation. In fact, both Ms. McDonald and Z.J. testified before the grand jury and there is no evidence that Z.J. ever related the message to her mother. Moreover, Mr. McGraw completely and voluntarily abandoned any further attempts to obstruct justice after this single phone conversation. Thus, he should receive a reduction for acceptance of responsibility as his attempt

to obstruct justice was a trivial, isolated incident before he was indicted in this case; he honestly and fully admitted to the offense and relevant conduct (i.e., the type of firearm he carried and hitting Z.J.); and he admitted to attempt to obstruct justice.

### IV.    OBJECTIONS TO CONDITIONS OF SUPERVISED RELEASE

#### A.  Discretionary Condition #24 Should Not Be Imposed in This Case

Discretionary condition #24 should not be imposed in this case- it is vague, overbroad and poses a significant danger of violating Mr. McGraw's and others' constitutional rights. PSR, p. 28. Conditions of supervised release must be "adequately supported and not [be] vague or overbroad." *United States v. Kappes,* 782 F. 3d 828, 848 (7th Cir. 2015). The conditions are also prohibited to impose "a greater deprivation of liberty than is reasonably necessary to achieve the goals of deterrence, incapacitation, and rehabilitation." *United States v. Goodwin,* 717 F. 3d 511, 521-22 (7th Cir. 2013).

First, the condition is vague and overbroad in permitting the search of Mr. McGraw, unidentified property, unidentified house (which presumably is not Mr. McGraw's residence since residence is listed separately) and residence (without restricting the search to areas occupied by Mr. McGraw). Second, this condition carries a high risk of depriving Mr. McGraw of liberty to a greater extent than is reasonably necessary to achieve the goals of deterrence, incapacitation and rehabilitation. Finally, the proposed condition gives probation officers the authority to conduct warrantless searches in violation not only of Mr. McGraw's rights under the Fourth Amendment, but also in violation of constitutional rights of individuals who might be present in his residence.

#### B.  Uncharged Allegations and Masturbation Do Not Support Imposition of Special Condition #15

Mr. McGraw objects to the imposition of special condition #15. An uncharged allegation

of criminal sexual assault and "masturbating to staff three times" more than 11 years ago does not warrant imposition of condition requiring him to participate in a sex offender evaluation or assessment. PSR, pars. 38, 59 and p. 31. Section 3583(d) requires that conditions of supervised release be reasonably related to the factors identified in §3553(a). Mr. McGraw has zero sex offense convictions. In fact, he was never charged with sex offense. It is unlikely that a state prosecutor would have failed to charge Mr. McGraw with sexual assault had there been credible evidence supporting such claim. Public masturbation and uncharged claim of sexual misconduct are simply insufficient to label Mr. McGraw a likely sex offender and require him to undergo sex offender evaluation, assessment and/or treatment.

## V.   SENTENCING MEMORANDUM

### A.  Mr. McGraw Was Born and Raised in a Deplorable Environment, Surrounded by Criminals and Drug Users

Mr. McGraw "was faced with a lot of challenges in his life including being a victim as a youth in experiencing death, domestic violence, single mother household, low income and living in a dangerous neighborhood." **Exhibit 6, p. 1.** "[H]igh criminal activity, drugs, gang infested and increased of violence in his neighborhood, were all obstacles that Jeff had to face and adapt to in his home environment." *Id*. "[T]he trauma Jeff has been through and his environment growing up are the reason for his misfortunes." **Exhibit 7, p. 1.**

Mr. McGraw grew up surrounded by gangs, violence, crime, alcohol and drugs. He spent most of his life in Woodlawn neighborhood; and, parts of it living with his paternal grandmother Gina McGraw on the west side of Chicago, with his cousin in Calumet City, and with his older brother Robert Bowen and mother in Iowa. Mr. Bowen was involved in a gang and in neighborhood's criminal activities; and, he was regularly drunk and high. When Mr. McGraw

13

lived with his brother, they resided in a small apartment, with many other people, no heat, no hot water and no food. Mr. McGraw slept on the floor. Ms. Malone drank and gambled and Gina McGraw used drugs. When Mr. McGraw was young, his grandmother used to give him beer to make him sleepy. Mr. McGraw started cooking for himself when he was eight-years-old as his childhood and adolescent homes rarely had prepared meals.

### B. Mr. McGraw Lost Loved Ones to Violence

Despite her faults Mr. McGraw dearly loved his grandmother who sheltered homeless. They lived together for approximately two years before Ms. McGraw was stabbed over 100 times. Years have gone by, but Mr. McGraw is unable to forgive himself for not being home to prevent her murder. "Jeff blamed himself for that because she let him use her phone and he said if he didn't have her phone outside with him she could have called for help and he should have been there." *Id.* **at p. 2,** *See also* **Exhibit 8.**

This was not the first time Mr. McGraw lost a loved one. At the age of five he saw his Uncle Ali murdered. When he was incarcerated on a prior case, his 13-year-old cousin was murdered and his Uncle Randy was robbed and killed. **Exhibit 9 ps. 1-3.** When Mr. McGraw returned home, instead of 16 friends, there were over a dozen gravestones. Mr. McGraw's childhood friend Carlton was a musician and together they planned to leave their violent neighborhood and use their musical talents to earn money for their families. **Exhibit 10.** Tragically, Carlton was murdered, like many other friends and relatives of Mr. McGraw. *See Id.*

Violent deaths surrounded Mr. McGraw and these tragedies deeply affected him. To date, Mr. McGraw continues to suffer from racing thoughts of loved ones and these thoughts oftentimes prevent him from falling asleep and wake him up at night. During his incarceration on

a prior case, Mr. McGraw suffered from auditory hallucinations during which he had conversations with his deceased grandmother and his deceased friend Shondele.

### C. Mr. McGraw Grew Up in a Home Rampant with Verbal and Physical Abuse

Mr. McGraw was neglected by his parents and he was a victim of and witness to verbal and physical domestic abuse. His mother told him that she never wanted him and his father, Javangeist McGraw, rarely found time for him. He grew up feeling unwanted and unloved, believing that it was somehow his fault that his parents did not care about him.

Additionally, Ms. Malone frequently abused her son verbally, making him feel inadequate and incapable of doing anything right. She used to brutally beat him with anything she could get her hands on, including frying pans, high-heel shoes, cords and a broom. The beatings were so severe that Mr. McGraw recalls feeling terrified of his mother from the time he was a small child. Ms. Malone admitted that she abused and neglected her son. **Exhibit 7, p. 1.**

Teenage Mr. McGraw used to run away from home and live on the streets, other people's residences and abandoned buildings to escape his mother's abuse. Ms. Malone would find him, profusely apologize and promise to never hit him again. Mr. McGraw would return home and in less than a week the abuse-apology cycle would repeat. When Mr. McGraw grew up, he started fighting back, at which point his mother would call the police and complain that he attacked her. As Mr. McGraw got older, the abuse decreased and eventually stopped. Presently, Mr. McGraw enjoys a wonderful relationship with his mother and considers her to be his best friend.

Ms. Malone was verbally and physical abused by her boyfriends and husband Davis Bell, whom she began dating in 2006. Ms. Malone told counsel that Mr. Bell was extremely violent prior to and during their marriage. When Mr. McGraw got older, he stood up for his mother and fought Mr. Bell, but instead of being grateful Ms. Malone broke a vase on her son's head, called

police and lied that her son attacked and threatened to kill her. Ms. Malone admitted that she always took Mr. Bell's side, but repeatedly and vehemently denied that her son ever attacked her.

Likely, Mr. McGraw's life would have turned out different if his home life was full of care and support instead of instability and abuse. In high school Mr. McGraw was a linebacker on the football team and he received a third place in the State of Illinois for wrestling. *See Id.* **p. 1.** He was also a member of chess club and "school matter" program. Unfortunately, teenage Mr. McGraw lacked home stability - he lived with many different relatives, on the streets, at random people's houses and in abandoned buildings. Mr. McGraw was often "shipped" from one home to another like "unwanted parcel" and he attended many schools. In addition to residential instability no one in his life showed any concern about his education and success in sports, so during junior year Mr. McGraw dropped out of high school and abandoned sports. However, in 2022 as part of his efforts to change the course of his life (see *infra*) Mr. McGraw obtained GED.

### D. Mr. McGraw Was Sexually Abused

When Mr. McGraw was in eighth grade, his friend's mother sexually abused him for approximately six months. Mr. McGraw completely changed resultant of being a victim of sexual abuse "[Ms. Malone] now understand[s] that's when things started to get bad for him because I couldn't understand why he changed at that time. He started acting differently than the happy, outgoing kid that I knew, he became secluded and sad and didn't share as much with me as he used to. I still didn't know at the time what to do and how to help him but things just got progressively worse over the years." *Id.* **at ps. 1-2.**

### E. Mr. McGraw Enjoyed Living with His Father and Was Devastated When He Was Accused of Abusing His Step-Sister

At the age of 13 Mr. McGraw moved to live with his father, Javangeist McGraw, step-mother Angelique McGraw and Angelique's daughter. During the year Mr. McGraw lived with

16

his father, he has done particularly well in school and exhibited exemplary behavior. Unfortunately, Ms. McGraw despised her step-son and was determined to get rid him. Her daughter claimed that Mr. McGraw inappropriately touched her, resulting in Mr. McGraw being kicked out of his father's home. The young teen felt devastated and betrayed when his father refused to believe him and took his wife's side. Thereafter, Javangelist largely remained out of his son's life except for a short period of time during Mr. McGraw's prior incarceration.

### F. Mr. McGraw Was Shot on Three Separate Occasions

In 2011, Mr. McGraw was a victim of a drive-by shooting when a bullet hit his right foot. On August 18, 2012, he was shot twice in the right arm, twice in the chest, twice in the left elbow, twice in the right thigh, once on the right shoulder (stabbed) and once on the neck. ***See*** **Exhibit 9, ps. 4-5.** Two other individuals, a man and a woman were also injured during the shooting. "We thought we lost him. I'll never forget the sight of him when I made it to the hospital. The sheets were covered with blood and he was laying there motionless." **Exhibit 7, p. 2.**

About a year later on June 14, 2013, Mr. McGraw was lured into a place where his trusted friend promised to record a video for one of his songs. When he arrived to the agreed-upon location with his then-girlfriend Capricia, a man approached his vehicle and started shooting. Mr. McGraw used his body to protect pregnant Capricia, but one of the bullets went through him and entered her leg. Capricia miscarried their child resultant of the injury she sustained. Mr. McGraw sustained six gunshot wounds – "2 wounds L anterior thigh, 1 wound R buttock, 1 wound R posterior lateral thigh, 1 wound L buttock, 1 wound, 1 would L posterior thigh." **Exhibit 9, ps. 6-15.** Mr. McGraw did not have a firearm during any of the three times he

was attacked and he could not shoot back at the assailants to save himself from sustaining serious and life-threatening injuries.

Mr. McGraw suffered and he will continue to suffer for the remainder of his life from the injuries he sustained as a victim of gun violence. He had a surgery for raptured bladder. ***Id., p. 16.*** He sustained "comminuted fracture[11] of the greater trochanter of the right femur with overlying bullet fragments [and] subcutaneous emphysema."[12] ***Id., p. 17.*** Mr. McGraw has bone "fragments adjacent to the left pubic ramus" and retained bullet fragments in his pelvis ("near the left acetabulum"), "overlying the left gluteal region…, and overlying the right femur." ***Id., ps. 18-19***. He sustained posttraumatic changes in his body, including ossific density projected adjacent to the left ischial spine and he has bullet fragments in his left glute, pelvis, abdominal wall and right thigh. ***Id., ps. 20-21.*** Mr. McGraw has nerve damage in his right arm and left leg. ***Id., p. 22-25.*** For over a decade he has been suffering from C8 traumatic radiculopathy, which residually causes pain, burning and numbness. ***See Id., p. 26.*** In 2014 he developed an infection in his left kidney, likely from the bullet fragment in his bladder surrounded by stone. ***Id., ps. 27-28.*** On April 1, 2015, Mr. McGraw underwent a cystotomy[13] to remove "a jagged bullet" from his bladder. ***Id., p. 29.***

A bullet in his right thigh remained in his body for about a decade until Mr. McGraw was able to squeeze it out during his incarceration on this case. A bullet fragment that caused him significant pain remained in his bladder for 11 years after the shooting until it was surgically removed in June of 2024. PSR, par. 99. Mr. McGraw takes several medications for pain

---

[11] "A comminuted fracture is a type of broken bone in which the bone breaks into three or more pieces." *See* www.verywellhealth.com/comminuted-fracture-7153310.
[12] "A condition where air is trapped under the skin." *See* www.verywellhealth.com/subcutaneous-emphysema-4783487.
[13] Cystotomy is a "(Surgery) surgical incision into the… urinary bladder." *See* https ://www.thefreedictionary.com/cystotomy.

including Gabapentin for nerve pain, Meloxicam for joint pain, Pyridium and Phenazopyridine for urinary tract pain and Tramadol from chronic pain. PSR, par. 100. For the remainder of his life, he will suffer from chronic pain. *See* **Exhibit 9, p. 30,** insomnia, frequent nightmares and flashbacks of the times he was shot.

Mr. McGraw has survived a high-violence community, but not without a price – he constantly feels apprehension for his safety and fears that each day will be his last. He always feels nervous, stressed, anxious and afraid of being attacked. "After that my son went through many surgeries and health problems from the shootings. He wasn't the same anymore, he became really afraid to leave the house, was having bad dreams and I would watch him sleep only to see him shaking in his sleep or being awake like he's afraid." **Exhibit 7, p. 2.** During incarcerations Mr. McGraw did not feel safe either- he experienced panic attacks and anxiety.

Mr. McGraw lived with a goal of surviving and he carried a firearm to defend his life. The gun provided him with perhaps a false sense of security. Nonetheless, he felt safer. Notably, he carried a firearm not for an illegal purpose, but simply to defend his life and he committed the offense "in order to avoid a perceived greater harm [i.e. being killed]." USSG § 5K2.11. Despite the legitimate and understandable reasons that led to Mr. McGraw to possess a gun in the first place, he admits that he should not have carried it. Further, Mr. McGraw deeply regrets threatening Z.J. and her mother during a heated argument and notes that he never had any intentions of following through with his threats.

**G. Mr. McGraw Was Injured in Jerome Combs Detention Center**

In addition to the attacks on his life when he was a free man, Mr. McGraw was attacked and injured in Jerome Combs Detention Center. After he was taken into federal custody, Mr. McGraw developed pneumonia and was taken to a hospital. Upon his discharge from the

19

hospital, he went to take a shower and was attacked by another inmate; and, according to officers, he was repeatedly punched in abdomen/back. **Exhibit 9, ps. 31-32.** Mr. McGraw was weak and incapable of fighting off the aggressor. To save his life he had to "jump off the top tier," *Id., p. 31,* sustaining right tibial plateau fracture to his right leg that required "open reduction internal fixation and allograft bone" *Id., p. 33,* with a rod and pins placed in his leg. Mr. McGraw's knee was permanently damaged, he will develop an osteoarthritis and will eventually require to undergo a complete knee arthroplasty. *Id.,* **p. 34.**

### H. Mr. McGraw Suffers from Mental Disorders and Is in Need of Effective Mental Health Treatment

Mr. McGraw suffers from post-traumatic stress disorder ("PTSD"), depression and anxiety. *Id.,* **p. 35.** Untreated PTSD can have severe consequences including substance abuse and anger management.[14] "For some the moments of recurring stress and anxiety result in outbursts of anger or rage" which sometimes progresses into an abuse of significant others.[15] It seems that Mr. McGraw's untreated PTSD resulted in or at least contributed to him losing control during heated arguments with Z.J. and her mother on July 14.

However, should Mr. McGraw receive *effective* PTSD treatment, there is a good probability that he will gain a full control of himself and will never raise a hand on anyone else again. Regrettably, Mr. McGraw is unlikely to receive needed treatment, which usually consists of "psychopharmacology, psychotherapy, and[/or] education and[/or] supportive measures"[16] during incarceration. Inmates like Mr. McGraw "rarely, if ever, get therapy or comprehensive treatment."[17]

---

[14] https://blackbearrehab.com/mental-health/ptsd/the-dangers-of-untreated-ptsd/.
[15] *Id.*
[16] https://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/guidelines/acutestressdisorderptsd-guide.pdf at p. 13.
[17] https://www.goodtherapy.org/blog/prison-incarceration-effects-mental-health-0315137.

Unquestionably, incarceration is mentally difficult for everyone, but it is particularly difficult for people inflicted with mental disorders. "[P]rison itself can exacerbate preexisting mental health issues."[18] The verbal, physical and/or sexual violence involving other inmates and/or prison guards is unfortunately not uncommon in prisons and it creates additional trauma that may result in "anxiety, depression, phobias, and PTSD in prisoners who previously had no serious mental health issues."[19] Little is left to be said for people like Mr. McGraw, who are already suffering from serious mental disorders. One thing is certain, the more time he spends in prison, the more his mental health will deteriorate.

## I. Mr. McGraw is a Caring Father, Valued Family Member and Contributing Community Member

Mr. McGraw has a good relationship with his daughter and her mother Tiffany Thompson, but no relationship with his 9-year-old son resultant of his mother prohibiting the child to have any contact with him. Mr. McGraw raised Ms. Thompson's 13-year-old son, T.T. from the age of 5 months old and they formed a strong bond. Mr. McGraw will legally adopt T.T. and move with T.T. and his daughter to Texas to escape the crime, gangs and poverty of Woodlawn community. Ms. Thompson agrees for Mr. McGraw to raise her two oldest children as she is in a relationship with a violent individual who is incarcerated for shooting her 7-year-old child on the chest.

Mr. McGraw's children are his first priority and he wants them to see that "their father is working hard and trying to provide them with a safer environment." **Exhibit 6, p. 2.** He truly cares about his daughter and even asked her to close her ears during a movie scene involving a

---

[18] *Id.*
[19] *Id.*

couple arguing – "he was assuring she is not exposed to any type of violence that has hindered him in the past." *Id.* **at ps. 1-2.**

In addition to being a caring father, Mr. McGraw is a valued family member. He "works extremely hard to provide for his family" both financially and emotionally. **Exhibits 11; 12, p. 2; 13, p. 2; and 14.** Javonte McGraw's achievements during 8.5 years in the U.S. Navy, real estate and education would not have happened without Mr. McGraw's "guidance, encouragement and support." **Exhibit 13, p. 1;** *See also* **Exhibit 15** ("consistently been a source of inspiration, offering unwavering support and encouragement"); **Exhibit 16** ("always been there for me"); **Exhibit 17** (instilled confidence enabling Amari Johnson to make and follow through with important decisions).

Moreover, Mr. McGraw is a contributing member of society who "will give you clothes off his back and food to feed anyone." **Exhibit 18.** He enjoys helping others, especially older people, and from a young age "he raked snow and picked up leaves for the neighbors and helped them with anything they needed." **Exhibit 7, p. 1.** Mr. McGraw mentored Jessica Chapman's son for more than 14 years and has helped the young man to deal with his mental health problems. **Exhibit 19, p. 1.**

Moreover, he "dedicate[ed] his time and efforts to making a positive difference in the lives of others…[i.e.] volunteering at local shelters or organizing fundraising events…[and leaving a] mark on our community." **Exhibit 15.** Mr. McGraw's "dedication to volunteer work and his willingness to help others in need are truly commendable." **Exhibit 20** (He supported charities and mentored youth.) He was an active member of Push for Peace Organization. He donated food and clothing to impoverished and homeless Chicago residents, supported Chicagoland children academically, delivered lunches to less fortunate, ran weekly events for

children's artistic talents and provided care packages to Ukraine. **Exhibit 12, ps. 2-3.** Additionally, Mr. McGraw "contributed heavily towards Military Care for The McGraw Foundation to help soldiers in need" and his donation in 2022 "has provided hundreds of packages" to service members. **Exhibit 21,** *See also* **Exhibit 22** ("desire[s] to give back, particularly to the military community").

### J. Mr. McGraw Is a Talented Musician

Mr. McGraw had a difficult life and "[h]e puts his pain in his music." **Exhibit 10.** After his second published video received 100,000 views, he realized that he was a talented musician. He is a rapper, producer and songwriter with more than 200 songs released on Tic Toc and YouTube. Even while incarcerated Mr. McGraw continues to write songs, which helps him to stay positive. Mr. McGraw has a contract with Create Music Group. His "exceptional talent and dedication have earned him widespread recognition." **Exhibit 23.** Ms. Malone recalls her son feeling happy and proud whenever people surrounded him asking for his signature and to take a selfie with him.

### K. When Mr. McGraw Was Release from Prison in 2022, He Wanted to Start a New Life

When Mr. McGraw was released on parole in April of 2022, he planned starting a new life in Texas with Z.J. and his mother, but the probation officer denied his request to move out of state and Mr. McGraw was forced back into the "warzone." On the second day as a free man Mr. McGraw witnessed two teenagers with guns and masks at a gas station. Had Mr. McGraw been permitted to move to Texas while on parole, he would not have had the need to carry a firearm.

Mr. McGraw began making preparations to move to Houston upon his completion of parole. Although he was arrested on this case, Ms. Malone secured a residence in Houston for her and her son, hoping that Mr. McGraw would be permitted to reside there during his

supervised release. She presently lives part-time in Texas, where she applied to open a daycare, and part-time in Chicago, where she maintains her daycare business.

Upon his release from state prison, Mr. McGraw realized that he needed help to alter the course of his life and he sought counseling on various subjects, including anger management, from his cousin Priest Uriyah Ban Yasharahla. **Exhibit 12, ps. 1-2.** He has a "heartfelt desire to transform his life" and he "speaks with conviction about his mistakes and the lessons he has learned." **Exhibit 22.**

### L. A Sentence of 37 is Sufficient to Satisfy the Goals of General and Specific Deterrence

The goal of affording both general and specific deterrence would be served by sentencing Mr. McGraw to 37 months' imprisonment. There is absence of evidence to support a notion that increases in sentence length reduces crime through deterrence. *See* **Exhibit 24, p. 8, par. 5e**. Then, there is no reason to impose a harsher sentence under the general deterrence goal as such sentence would be ineffective at achieving the ultimate goal of deterring crime. As to specific deterrence, a study determined that there is no difference in recidivism rate between defendants placed on probation and those sentenced to incarceration. *Id.* **at ps. 11-12, par. 6i**. Thus, sentencing Mr. McGraw to more time in prison will not provide additional specific deterrence and might have the opposite effect – the more time he spends in prison surrounded by criminals with no access to effective mental health care, the lesser are his chances to do well upon release.

### M. Mr. McGraw Should Receive Credit for the Time He Spent in State Custody in Connection with This Offense

From July 15, 2022 and until May 25, 2023 Mr. McGraw was in state custody for parole violation based on his arrest in this matter. The Bureau of Prisons will not credit him for this

time served in prison, but this Court can. Mr. McGraw respectfully requests the Court to reduce his sentence by 10 months he spent in state jail.

### N. Rehabilitation, RDAP and Prison Recommendation

During incarceration on this case Mr. McGraw had no disciplinary issues and fully focused on rehabilitation, health and education. *See i.e.* PSR, p. 5, par. 5. He completed 199 courses on various subjects and 22 hours in AA. **Exhibit 25.** Mr. McGraw "now knows and has a better understanding of life…a different mindset and view of the world and again life itself. He wishes to come [home] and finish becoming the better man he has and to reach his full potential in life." **Exhibit 26.** He is "eager to reconnect with his loved ones and contribute positively to society." **Exhibit 23.**

Unfortunately, Mr. McGraw has a history of drug use and alcohol abuse, including the use of various pills during his last incarceration and alcohol, marijuana and cocaine before his arrest on this case. PSR, par. 115, 117. He seeks this Court's recommendation to participate in RDAP to increase his chances of winning in his struggles against addictions. Finally, Mr. McGraw respectfully requests for this Court to recommend that he serves the remainder of his sentence close to Chicago.

<div style="margin-left:40%">

Respectfully submitted,
/s/Yelena A. Dolgosheeva

</div>

DolTer Law, P.C.
Mailing Address: P.O. Box 5382, Buffalo Grove, Illinois 60089
Telephone: 847-208-4348
Fax: 312-267-1810
E-mail: dolgosheeva2002@yahoo.com