1

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3    UNITED STATES OF AMERICA      )  Case No. 23 CR 00028
                                   )
4              v.                  )
                                   )
5    JEFF McGRAW,                  )  Chicago, Illinois
                                   )  February 10, 2025
6              Defendant.          )  1:30 p.m.

7       TRANSCRIPT OF PROCEEDINGS - SENTENCING HEARING

8          BEFORE THE HONORABLE EDMOND E. CHANG

9    APPEARANCES:

10   For the Government:    MR. MORRIS O. PASQUAL
                           ACTING UNITED STATES ATTORNEY
11                         BY:  MR. JIMMY L. ARCE
                           Assistant United States Attorney
12                         219 South Dearborn Street, Suite 500
                           Chicago, Illinois 60604
13                         (312) 353-5300

14   For the Defendant:     DolTER LAW P.C.
                           BY:  MS. YELENA A. DOLGOSHEEVA
15                         P.O. Box 5382
                           Buffalo Grove, Illinois 60089
16                         (847) 208-4348

17   ALSO PRESENT:          MS. RAQUEL BUTLER,

18                         United States Probation Office

19   Court Reporter:        JUDITH A. WALSH, CSR, RDR, F/CRR
                           Official Court Reporter
20                         219 South Dearborn Street, Room 2342
                           Chicago, Illinois 60604
21                         Telephone:  (312) 702-8865
                           judith_walsh@ilnd.uscourts.gov
22

23                    *   *   *   *   *

24            PROCEEDINGS REPORTED BY STENOTYPE
25   TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1          (Proceedings heard in open court; defendant present:)

2                THE CLERK:  23 CR 28, USA versus Jeff McGraw.

3                THE COURT:  Okay.  Good afternoon.  Let's get

4    appearances.

5                MR. ARCE:  Good morning, your Honor.  Jimmy Arce,

6    A-r-c-e, on behalf of the United States stepping in for Brandon

7    Stone.

8                MS. DOLGOSHEEVA:  Good afternoon, your Honor.  Yelena

9    Dolgosheeva on behalf of Mr. McGraw who's present to my left.

10               THE COURT:  Okay.  Good afternoon.

11               Good afternoon, Mr. McGraw.

12               THE DEFENDANT:  Good afternoon.

13               THE COURT:  And can you make sure your -- that green

14   light is on?

15               THE DEFENDANT:  Yeah, it's on.

16               THE COURT:  All right.  So just maybe pull it closer

17   to you, talk right into the mike.

18               And from the probation office?

19               THE PROBATION OFFICER:  Good afternoon, your Honor.

20   Raquel Butler with U.S. Probation.

21               THE COURT:  Okay.  Good afternoon to you as well.

22               We're here for sentencing.  Are both sides ready to

23   proceed?

24               MR. ARCE:  Yes, your Honor.

25               MS. DOLGOSHEEVA:  Yes, your Honor.

1       THE COURT:  Okay.  Mr. McGraw, we're going to start

2  with you.  Okay.  I want to make sure you've had enough time to

3  prepare for today's hearing and also that you have received all

4  the written filings leading up to today.  So first question --

5  well, actually, before I ask you these questions, you do need

6  to be put under an oath to tell the truth.

7       And I'll ask the courtroom deputy to do that now.

8       THE CLERK:  Would you please raise your right hand.

9    (Defendant sworn.)

10       THE DEFENDANT:  I do.

11       THE CLERK:  Thank you.

12       THE COURT:  All right.  Mr. McGraw, there were a

13  number of things filed, so let's just make sure you've gotten

14  all of them.  First, there was a presentence report that was

15  prepared by the probation office, single spaced, had all sorts

16  of information about you and the offense and so on.

17       Do you remember receiving a copy of that?

18       THE DEFENDANT:  Yes, sir.

19       THE COURT:  Okay.  And then -- let's go off the record

20  for a second.

21    (Discussion off the record.)

22       THE COURT:  Okay.  Aside from the presentence report,

23  the government filed a sentencing memo, and your lawyer filed a

24  sentencing memo and then a response to the government's memo.

25  So have you seen copies of all those things?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And then have you had enough time to

3    prepare for today's sentencing?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  And with regard to Ms. Dolgosheeva's

6    representation of you, are you still satisfied with her

7    representation of you in this case?

8          THE DEFENDANT:  Absolutely.

9          THE COURT:  Okay.  And that means in part that she

10   spent enough time with you?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Okay.  And also when you've asked her

13   questions, did she at least try to answer them?

14         THE DEFENDANT:  Yes.  She's very great with

15   communication.

16         THE COURT:  Okay.  Yeah, I didn't expect anything

17   different from that.  I just need to ask questions for the

18   record.

19         With regard to the presentence report itself, the

20   defense memo had a number of proposed corrections.  Setting

21   aside the sentencing guidelines dispute for the moment, we'll

22   get to those, of course, but there were some other proposed

23   corrections so let me -- let's go through those.

24         And first, this is on Page 4 of the defense sentencing

25   brief which is docket entry 124.  First, with regard to the

1   GED, Ms. Dolgosheeva, do you have any records of the defendant

2   obtaining the GED?

3           MS. DOLGOSHEEVA:  I do not, your Honor.  I believe his

4   mother has it somewhere but because she moved from Chicago to

5   Texas, it's somewhere lost in her items.

6           THE DEFENDANT:  Yeah, she got it.

7           MS. DOLGOSHEEVA:  Oh, she actually has it here in the

8   courtroom.

9           THE COURT:  Why don't you go talk with her for a

10  moment.

11    (Discussion off the record.)

12          MS. DOLGOSHEEVA:  Your Honor, can we go to the next

13  objection, and Ms. Malone will look for the copy on her phone.

14          THE COURT:  The other way to do this, especially if

15  it's going to be digital is, it's Paragraph 122 in particular

16  that describes the defendant saying that he took an online

17  course.  And so it's not so much the cover sheet, Page 2.  It's

18  Paragraph 122 that I think would need to be adjusted.

19          So and I'm not going to be able to make a decision on

20  this based on the digital copy that the probation office hasn't

21  had a chance to verify.  What I do urge you to do is as quickly

22  as you can, try to verify it.  Provide it to the probation

23  office.  And if you can convince the probation office and the

24  government that he has his GED, then I can make a correction to

25  the PSR within the timeframe of the usual corrections.

1          If that doesn't happen within that timeframe, you can

2     still as his lawyer try to supply that to the Bureau of Prisons

3     so that they can be convinced one way or the other that on

4     whether he has a GED.  It is pretty important because the

5     Bureau of Prisons, I think, will require him to take GED

6     classes if he has not proven to them that he has one.

7          So if he wants to avoid that, you definitely should

8     follow up with the BOP.  But we'll see if we can get it done in

9     the corrected PSR but, if not, you have that other route.  All

10    right?

11         MS. DOLGOSHEEVA:  Thank you, Judge.

12         THE COURT:  And then, all right, the next proposed

13    correction -- okay.  I think this one, so Paragraph 7 of the

14    PSR describes what was in the Calumet City police report.  And

15    I think it accurately describes what was in the police report.

16    It's in the grand jury testimony that this person who is an

17    alleged victim with the initials TM -- in the instance they're

18    victims, we do tend to refer to them by their initials -- that

19    TM, instead of saying that as the Cal City arrest report says

20    she said, that she saw the defendant strike ZJ that, in fact,

21    she entered the room, TM, and saw ZJ on the ground and so on

22    but did not see the striking.

23         So I think the way to make sure that when other

24    readers see this that they don't take the Cal City report of

25    what TM said as actually having happened because I think at

1     this point, the government also acknowledges that in the grand

2     jury, TM testified that she entered the room and already saw

3     her daughter on the floor.

4                MR. ARCE:  Correct.

5                THE COURT:  Okay.  So I think what we could do here is

6     after the sentence on Page 5 of the PSR, Paragraph 7 that says,

7     "The victim's mother then saw McGraw punch the victim in the

8     face with a closed fist," we could put in parenthesis right

9     after that, "The Court found at sentencing that consistent with

10    the grand jury testimony of the victim's mother, the mother did

11    not see McGraw punch the victim in the face," period.

12                Does that solve it?

13                MS. DOLGOSHEEVA:  Yes, your Honor.

14                THE COURT:  Okay.  So I'll ask the probation office to

15    make that change.

16                Okay.  Next, yeah, the reference to the extended mag,

17    there was no extended magazine, right?

18                MR. ARCE:  Judge, I'm reading the report from the

19    Calumet City Police Department in which they noted that there

20    was a loaded Glock 45 .9 millimeter handgun containing a

21    magazine with 20 9-by-19 live rounds.  That would qualify as an

22    extended magazine at least according to the inventory report.

23                THE COURT:  Yeah, that is according to the inventory

24    report, but does it actually, in fact, have an extended mag?

25                MR. ARCE:  Judge, I was relying on this inventory

1    report.

2            THE COURT:  I mean, you've physically seen --

3            MR. ARCE:  I have not.  I personally have not

4    physically seen this firearm.

5            THE COURT:  Okay.  Well, there's a photo of it.  I

6    think the defense memo had a photo.

7            MS. DOLGOSHEEVA:  It was the government's memo that

8    had the photograph.

9            THE COURT:  Oh, okay.

10           MS. DOLGOSHEEVA:  The version of the offense,

11   government's version of the offense had a photograph of the

12   firearm.

13           THE COURT:  And while we're looking at that, does the

14   probation office have more information on this or just what was

15   in the inventory report?

16           THE PROBATION OFFICER:  Just what was in the inventory

17   report.

18           THE COURT:  Yeah, so, Mr. Arce?

19           MR. ARCE:  Yes, I can confer with the original AUSA,

20   and I can confer with the agency.  Again, I'm just going off of

21   what was reported in the inventory report.  I understand that

22   the photograph --

23           THE COURT:  Yeah, does not show -- it's docket entry

24   113, Page 2.  That does not look like 20 rounds could fit in

25   there.  Okay.  So and, I mean, the time for sentencing is now

1  so I don't -- as much as Ms. Dolgosheeva's reference to a

2  digital copy of the GED report, I can't just, you know, have

3  you confer and then report back to me this way.  So we're going

4  to change that to, similar to the prior alteration, that in

5  parenthesis after that sentence in Paragraph 9, "The Court

6  found at the sentencing" -- or "At the sentencing, the Court

7  found that the firearm did not have an extended magazine."

8          Okay.  Does that take care of that one,

9  Ms. Dolgosheeva?

10         MS. DOLGOSHEEVA:  Yes, your Honor.

11         THE COURT:  Okay.  So the next proposed correction has

12 to do with the prior conviction for conspiracy to commit

13 murder.  And the concern, I guess, raised by the defense is

14 that the phrasing of "was involved in a shootout" in Paragraph

15 38 might be read to say that the defendant was the shooter.

16         So what's the government's position on this?

17         MR. ARCE:  Judge, I think that the PSR accurately

18 reflects the facts surrounding this particular incident.  He

19 was present during a shootout.  He had a gun during the

20 shootout.  I understand that they may quibble as to whether or

21 not he personally fired a firearm during that shootout, but

22 those other facts that are listed there are true.  That is what

23 the allegations and the charges were.  And so I don't see any

24 need to correct that.

25         MS. DOLGOSHEEVA:  Your Honor, I don't believe he had a

1  gun at -- there was only two individuals who had a gun:  The

2  people who were shooting at each other.  He did not have a gun.

3          THE COURT:  Okay.  Here's what I propose, that it

4  would say, "An online query revealed the defendant entered into

5  a conspiracy which resulted in the death of one of his

6  associates."  I think that squares with the plea colloquy and

7  which was a very short plea colloquy.

8          So is there any objection to that from the defense?

9          MS. DOLGOSHEEVA:  Not from the defense, your Honor.

10 Thank you.

11         THE COURT:  Mr. Arce?

12         MR. ARCE:  That's fine, Judge.

13         THE COURT:  Okay.  So just one more time for the

14 probation office's sake, "An online query revealed the

15 defendant entered into a conspiracy which resulted in the death

16 of one of his associates."

17         Okay.  Next, so then the next set of objections has to

18 do with more like the guideline argument over -- in connection

19 with a felony, so I think we can save that for that part of the

20 argument.  The same thing with the next objection that's stated

21 in the defense response has to do with the obstruction of

22 justice, so we can save that for the guidelines argument.

23         Okay.  And then lastly, what the defense calls as a

24 mischaracterization of recorded phone calls in PSR Paragraph

25 17, so, Ms. Dolgosheeva, I think without you yourself offering

1    some additional either transcripts or the calls themselves, it

2    is difficult to just accept, you know, your representation as

3    you put in a brief here that "while counsel does not recall

4    specifics of numerous recorded phone calls," and then you go on

5    to describe what you remember the phone calls to describe.

6            I think the way that we deal with this is to simply

7    leave it as-is because it is the agent characterizing the phone

8    calls.  I'm not going to rely on it.  It's just, it's the PSR

9    accurately reporting what the agent said, and I won't rely on

10   that.  So would that take care of the concern?

11           MS. DOLGOSHEEVA:  Yes, your Honor.  My only concern

12   was that the agent unfairly villainizes Mr. McGraw in making

13   those statements, but if your Honor said if you're not taking

14   those statements in consideration for sentencing purposes.

15           THE COURT:  Yeah, so that statement of the agent's

16   characterization of the defendant's villainy I don't think is

17   neither here nor there, and I'm not going to rely on it.

18           Okay.  So and then I think everything else is

19   connected to the guidelines objections.  Is that right,

20   Ms. Dolgosheeva?

21           MS. DOLGOSHEEVA:  Yes, your Honor.

22           THE COURT:  Okay.  So still setting aside the

23   guidelines arguments, I otherwise adopt the presentence report

24   subject to the edits that were just made.

25           MR. ARCE:  Judge, I apologize, and I don't mean to

1    interrupt you, but before we move on to this point, I do have a

2    lab report that was turned over to defense counsel.  The

3    firearm, even though it may not look like it had an extended

4    magazine, did have more than 16 rounds in the magazine inserted

5    into the firearm which would qualify as an extended magazine.

6            THE COURT:  And I think the time to have proffered

7    that evidence to the Court would have been in advance of

8    sentencing.

9            MR. ARCE:  And to be fair, Judge, we did proffer that.

10   That's in the -- that's in the government's version, and it's

11   consistent with the report that was attached to it.  Ms. -- the

12   defense counsel has argued that based on a photograph that that

13   doesn't seem to be true, but the evidence that we've submitted

14   actually supports that conclusion that it did have more than 16

15   rounds.

16           THE COURT:  Which exhibit is this?  Is it Exhibit 2,

17   the Cal City --

18           MR. ARCE:  Yes.

19           THE COURT:  -- police report?

20           MR. ARCE:  Yes.

21           THE COURT:  Has the lab report attached to it, not

22   just the narrative of what happened?

23           MR. ARCE:  No, it has a narrative of what happened

24   but --

25           THE COURT:  Oh, no, right.  I'm saying the lab report

1  is what I would have expected to have before sentencing as part

2  of the sentencing record. So is that lab report part of

3  Exhibit 2?

4         MR. ARCE: No, Judge, it's not, but it is consistent

5  with the conclusions or the inventory of the firearm by Calumet

6  City.

7         THE COURT: Okay. I appreciate that. The finding

8  remains as-is. Anything else?

9         MR. ARCE: No, Judge.

10         THE COURT: Okay. Then I otherwise adopt the

11  presentence report as based on detailed and reliable

12  information subject to the edits we just made as well as to the

13  guidelines argument so that we can move on to that.

14         Okay. So the first argument on this is, in connection

15  with a felony. So is there anything else the government wants

16  to add to its written filing on this particular point?

17         MR. ARCE: No, Judge.

18         THE COURT: How about the defense?

19         MS. DOLGOSHEEVA: No, your Honor. We'll rest on our

20  filings.

21         THE COURT: Okay. So here's what -- I think the

22  particular felony that would possibly qualify is actually home

23  invasion. The other statutes under state law, I think somewhat

24  surprisingly, don't actually amount to felonies, but the home

25  invasion I think does qualify so both as a matter of law and

1      then I'll get to the facts in a moment.

2           For as a matter of law under 720 ILCS Chapter 5,

3      Section 19-6, subsection (a)(3), it is a home invasion to

4      knowingly enter and remain in the residence until a defendant

5      knows that persons are present, and then subsection (a)(3) is

6      while armed with a firearm and then threatens the imminent use

7      of force.  So that is a felony.  And it doesn't matter, that

8      form of home invasion does not require that the defendant enter

9      without authorization which is I think the argument that the

10     defense had fairly made as to the most common form of home

11     invasion, which is entering without authorization.

12          There's another form of it in the same, very same

13     section that prohibits knowingly entering even with

14     authorization and then remains until you know persons are

15     present and then threatens the persons with a firearm and the

16     use, the imminent use of force.  So as a matter of law, that

17     can qualify.

18          The other statutes that had been proposed, battery, of

19     course, doesn't apply, and the assault, the form of assault

20     that was proposed is actually misdemeanor somehow.  I don't

21     know why that is, but it is, but home invasion does qualify.

22     And the intimidation statute that was proposed by the

23     government as an alternative, that doesn't -- what's missing

24     there factually is an intent to cause the individuals to do

25     something.  And we just don't have any specifics on that.  But

1    home invasion does cover it as a matter of law.

2          As a matter of fact, so the question here is, did the

3    defendant point the gun at the victims here, ZJ and TM, and

4    threaten to kill them, although probably pointed the gun is

5    itself enough of a threat of the imminent use of force, but

6    along with the verbal threats that I don't need to put what was

7    alleged in the grand jury testimony on the record, but that

8    certainly would qualify as a threat of the imminent use of

9    force.

10          So here by a preponderance of the evidence, the

11    government has shown that this did happen in the way that the

12    government has offered.  So first, the victim TM did testify in

13    the grand jury under oath in a way that I think actually is

14    much more careful than what she had told the Calumet City

15    police on scene.  And the grand jury testimony says that the

16    defendant had pointed the guns at -- the gun at both victims

17    and made that verbal threat at the same time.  And the grand

18    jury testimony is more careful in that it no longer says that

19    TM saw Mr. McGraw punch the victim in the mouth but instead saw

20    that the victim was on the floor and had a bloody mouth by the

21    time that TM entered the room.

22          So one can certainly understand on -- at the time of

23    the attack and given the chaos and distress of the situation in

24    the moment that the victim's mother would say to Calumet City

25    police that, "I saw him punch her" because that is obviously

1    the inference to be drawn by the -- what she saw when she

2    entered into the room.  So I don't think that discredits her

3    grand jury testimony at all.

4         There's also the 911 call in which the victim's mother

5    says that at almost the four-minute mark of the call and yells

6    to the 911 operator, "Come before we be dead."  And so that is

7    also consistent with being threatened at gunpoint.

8         So when you add that plus ZJ's own grand jury

9    testimony which is consistent with her mother's and which was

10   also under oath, the government has satisfied its burden of

11   proving that the victims were the -- were subjected to this

12   threat and the gun pointing.

13        And nothing in the defense kind of version of the

14   facts in terms of the situation with Ms. Asia Martin and the

15   allegations that Ms. -- that ZJ herself had a firearm, none of

16   that undermines the affirmative showing that the government has

17   made.  So those four levels and the proposed corrections that

18   the defense had made and offered in connection with this do

19   apply.

20        All right.  Now, on the obstruction of justice, is

21   there anything more the government has to add on this?

22        MR. ARCE:  No, your Honor.

23        THE COURT:  And the defense?

24        MS. DOLGOSHEEVA:  No, your Honor.

25        THE COURT:  Okay.  This is, I think, similar here

1   where once the finding is in place that Mr. McGraw used the gun

2   to threaten TM and ZJ, then a natural carry-over of that

3   finding is that this call from October 31 of 2022 from the jail

4   that was recorded at about Page 6, Line 27 of the transcript in

5   which Mr. McGraw says, "Your OG," referring to the victim's

6   mother, "just got to let them know that I never had no gun.

7   She said that so the police can hurry up and come."

8           Well, then that's an obvious instruction to the victim

9   to tell the victim's mother that, tell the federal agents a

10  lie.  This is all in the context of the subpoenas and the

11  agents, the federal subpoenas and the federal agents that had

12  tried to interview ZJ.  So with that established, the gunpoint

13  threats establish this is just an instruction to outright lie

14  to federal agents.

15          And it's not a trivial lie.  This is an instruction to

16  commit a federal crime, and it even supplied a motive, I think

17  quite craftily, a motive to the mother that, "I even have a

18  reason why I said that on the call.  It's to get you to

19  come" -- the police to hurry up and come.  So that is -- that's

20  obstruction flat-out.

21          All right.  So with that finding in place, any further

22  argument on acceptance of responsibility from the government?

23          MR. ARCE:  Judge, our argument remains the same.

24  Given the facts that you've just laid out, given the proffer, I

25  guess, in the defense's sentencing memorandum, the defendant

1   has continued to not accept his responsibility for the actions

2   he's committed here, and so three points for acceptance should

3   not be available to the defendant.

4          THE COURT:  Ms. Dolgosheeva?

5          MS. DOLGOSHEEVA:  Judge, Mr. McGraw has completely

6   accepted his responsibility in this case.  And I'm not clear

7   what the government means by the fact that he has not.  He has

8   admitted, you know, that he had a machine gun.  He has admitted

9   that there was a domestic violence incident on the day he got

10  arrested.  He admitted to possession of guns.

11         There's really nothing more that he can possibly admit

12  to.  And he admitted to obstruction of justice.  So the actual

13  obstruction was a single incident that happened before he was

14  indicted on this case.  Later on he full and honestly took

15  responsibility for everything that has transpired including

16  relevant conduct and admitted to it, and I think he should

17  receive the three-point reduction for acceptance of

18  responsibility.

19         THE COURT:  Okay.  Given that the defendant did not

20  admit and continued to contest that he used the gun as part of

21  the threat against ZJ and TM which is a crucial part of the

22  possession of the firearm, acceptance has not been satisfied

23  here.  Now --

24         MS. DOLGOSHEEVA:  Your Honor, my apologies.  I thought

25  we did admit that he pointed a gun and threatened the mother

1    and the daughter.  Am I misunderstanding your Honor?

2         THE COURT:  No, so --

3         MS. DOLGOSHEEVA:  On the bottom of Page 19, the last

4    sentence before paragraph subsection G, it says, "Mr. McGraw

5    deeply regrets threatening ZJ and her mother during a heated

6    argument and knows that he never had any intention of following

7    through with his threats."  Perhaps it doesn't say the firearm,

8    but that was the intent behind that sentence.

9         THE COURT:  Yeah, that doesn't -- there are instances

10   in the memo in which the defendant says he still can't wrap his

11   mind around the fact that he actually broke ZJ's jaw and that

12   he deeply regrets that he did that and he engaged in violence,

13   but there's no admission that he actually pointed the gun at

14   them and said that, "Fuck you, bitches.  I'll kill you ho's."

15        There's admissions in here about carrying a gun which

16   obviously is the possession offense itself.

17        MS. DOLGOSHEEVA:  And I might have not made it very

18   clear, but that's what I intended in that sentence.  There's no

19   other threats that he made.  So when I was referring to threat,

20   I was specifically referring to the time period where he

21   pointed a gun at ZJ and her mother.

22        THE COURT:  Okay.  And I can -- I'll hear more from

23   Mr. McGraw in his allocution about whether he accepts

24   responsibility for that.  The problem is, and you can -- you

25   addressed this in writing, but you can address this further

1    here, that typically when someone has been found to have

2    engaged in obstruction of justice, then they do not receive

3    acceptance of responsibility.  There are exceptions to that,

4    and I have in other cases found that, but that is the general

5    rule.

6              So did you want to amplify on that?  Because you did

7    argue that in writing as well.

8              MS. DOLGOSHEEVA:  Yes, your Honor.  So the obstruction

9    of justice was a single incident.  That took place before he

10   was even indicted on federal charges.  He took full

11   responsibility.  He admitted that he possessed a firearm.  He

12   admitted that he hit ZJ twice, once before she got into the

13   vehicle on that day and once in her house.  And that's --

14   completely correlates with what she told me over the phone in

15   the interview, that she was hit twice that day.  And he also

16   admits to pointing a gun at them and threatening them.

17             And when I said in the memo that he never followed --

18   intended to follow through with the threats, obviously he never

19   intended to shoot them.  But there was never any denial that he

20   did not point the gun.  So he fully took responsibility for his

21   conduct, for all the relevant conduct.  There's nothing related

22   to this -- to relevant conduct in this case that he is denying.

23             And this was a single event, a single phone

24   conversation that took place very early during federal

25   investigation of the case.  So I think given that -- given, as

1   your Honor said, you don't believe it was minor, it was a

2   single phone conversation.  And since then he has not tried

3   even though he had plenty of opportunities because ZJ was

4   picking up the phone, you know, picking up the phone when

5   Mr. McGraw was calling her.

6            He had plenty of opportunities to try it again.  He

7   had plenty of opportunity to ask ZJ to tell the grand jury that

8   he never possessed a gun, and she might have -- might have done

9   it, but he never done that.

10           And I think he has taken full responsibility in this

11  case.  And this is one of those extraordinary circumstances

12  where the obstruction is not particularly serious.  It has not

13  derailed the government's case in any way.  They have not had

14  to spend any extra resources on investigation and prosecution

15  and anything related to this case.  And he owned up to

16  absolutely everything that he has done in this case related to

17  aggravation, related to the actual conduct, and related to

18  relevant conduct.

19           THE COURT:  Okay.  Thank you.

20           Mr. Arce, did you want to reply?

21           MR. ARCE:  Yes, Judge.  Several points.  One, as the

22  government noted in its sentencing memo, the first few pages of

23  the defense's sentencing memo seeks to almost explain this

24  violent conduct committed by the defendant against ZJ, bringing

25  up prior fights between them, bringing up ZJ's brother being

1  part of a different gang than the defendant himself, all of

2  this wind-up to then this violent act committed by the

3  defendant.  And even now, we hear sort of an explanation as to

4  what happened here.  I have it noted that "she was hit twice

5  that day."  No, ZJ was not hit twice that day.  The defendant

6  hit ZJ twice that day.

7       Going to the obstruction of justice, first of all,

8  they did not admit to the obstruction of justice.  We spent

9  four or five minutes in today's hearing hashing out whether

10  that enhancement should apply and your Honor finding that it

11  should apply given the evidence that was proffered by the

12  government.

13       This idea that the government didn't have to expend

14  any resources, any additional resources because of this

15  obstruction is of no moment here.  That this happened before

16  the indictment actually speaks to the intent of the

17  obstruction, Judge.  That is correct, the government had not

18  yet indicted the case, and so that is the perfect opportunity

19  for the defendant to try to obstruct justice to avoid a federal

20  charge.

21       That his efforts were not successful does not mean

22  that he did not try to obstruct justice but, Judge, I want to

23  take a step back.  Setting aside the obstruction, setting aside

24  the relevant conduct, if the question is, does the defendant

25  accept responsibility for having possessed the firearm on the

1    day in question, even that, he has tried to shovel blame onto

2    other people.

3           As the government noted in its sentencing memo, the

4    defendant blames Probation for not allowing him to move to

5    Texas after his conspiracy to murder charge which she says,

6    quote, unquote, forced him to live in this war zone.

7           So even just looking at solely the possession of the

8    firearm, the defendant has not accepted his own responsibility,

9    his own bad decision making in having possessed that firearm

10   unlawfully.  Starting at the very beginning of this case,

11   there's a rejection of responsibility on top of the

12   obstruction, on top of the relevant conduct, Judge.

13          MS. DOLGOSHEEVA:  Your Honor, may I briefly respond?

14   I mean, I -- it's very clear in our sentencing memo, and I'm

15   not sure how the government misreads it, that we admit to the

16   obstruction of justice as it related to the phone call.  We

17   don't argue against the obstruction.  And in acceptance of

18   responsibility, one of the points I make is that he has, you

19   know, acknowledged obstruction of justice.  So I don't know how

20   much clearer I could have made it in my sentencing memo.

21          The second point about government's, the first several

22   pages, the government's -- the government believed, and I don't

23   think they ever asked the victims what has transpired either

24   before or after it, so the government's theory was that he came

25   to her house, hit her, and then stood by the front door to do

1    something evil again.  That was not the case.  He was waiting

2    there for her to bring out the money that he kept at her house

3    from his music and his personal belongings because she

4    threatened to burn them.

5            He was not knocking on the door.  He was not trying to

6    break through the window.  He was on the porch waiting for her

7    to bring out his personal items because they got into a heated

8    argument, he pointed a gun, and he did not want to continue

9    this conflict.

10           So he was waiting outside for her to bring his

11   personal items out, and I thought it would be important for the

12   Court to know, not just the government's two-minute version of

13   what they -- the victim told them but also all of the other

14   things that were happening that day that they never asked the

15   victim about.

16           In terms of him being forced back into the war zone, I

17   have a number of clients who have moved out of state after

18   having extensive criminal histories and specifically, moved out

19   of state to live somewhere new, somewhere where they don't know

20   anybody, where nobody knows them to have a fresh chapter in

21   their life.  And a lot of them are very successful in doing so,

22   and that's what Mr. McGraw was trying to do.

23           So I don't think there is anything wrong with somebody

24   trying to move to a different place to start a new chapter of

25   their life where nobody knows them, where they don't know

1   anybody, and it certainly has helped many people in the past.

2          THE COURT:  Okay.  Thank you.

3          With regard to the argument that there's no acceptance

4   because of the background information that the defense supplied

5   as to the potential move to Texas, that does demand too much

6   for acceptance for responsibility under 3E1.1.  I read that

7   more as like a but-for argument, that but for the fact that he

8   did not move to Texas, he would not have caught this case.  So

9   I don't think it's something that 3E1.1 would be disqualified.

10          And then the kind of lead-up about the drink and the

11  Lexus and all that, that was also, I think, just context and

12  not something that 3E1.1 would require for acceptance of

13  responsibility.

14          But the other part of the context is the context of

15  the obstruction of justice.  And here, it might very well have

16  been, and it was, pre-federal indictment; but as the government

17  correctly points out, that is when the government is

18  investigating whether to bring the case at all.

19          And this label of a single instance, it is one

20  instance.  It's one exceptionally serious instance.  To

21  instruct one person to tell another person to lie to federal

22  agents and then to supply the motive for that lie is enlisting

23  two other individuals to commit a federal crime.  And the

24  obstruction need not be successful in order for it to qualify

25  as obstruction or to qualify as serious obstruction.  So there

1 is -- there is not acceptance of responsibility based on the

2 obstruction of justice finding.

3    This is acceptance of responsibility as a guidelines

4 label.  So, of course, the defense can argue under 3553 that

5 based on the rehabilitative steps and anything else that

6 Mr. McGraw is going to share or his lawyer is going to share

7 with respect to acceptance of responsibility in the English

8 word of -- sense of it rather than the guidelines' formal sense

9 of it, I will certainly consider, and some of it's in the

10 written brief but for guidelines purposes, he does not qualify.

11    Okay.  Now, we have to backtrack to the crime of

12 violence issue to figure out the base offense level.  And here,

13 the question is, the attempted armed robbery, does that qualify

14 under the guidelines as a crime of violence.

15    And so on that point, is there any further argument

16 that the government wants to offer other than what was in

17 writing?

18    MS. DOLGOSHEEVA:  Your Honor, my apologies.  Can

19 Mr. McGraw use the washroom?

20    THE COURT:  Of course, he can, yes.  Please let me

21 know earlier if possible.  So, yes, we'll adjourn for a moment.

22    MS. DOLGOSHEEVA:  Thank you.

23    THE COURT:  We'll take a ten-minute recess.

24  (Recess from 2:12 p.m. to 2:20 p.m.)

25    THE COURT:  All right.  Let's re-call it.

1           THE CLERK:  23 CR 28, USA versus Jeff McGraw.

2           THE COURT:  Okay.  Appearances again, please.

3           MR. ARCE:  Good afternoon, your Honor.  Jimmy Arce on

4 behalf of the United States.

5           MS. DOLGOSHEEVA:  Good afternoon, your Honor.  Yelena

6 Dolgosheeva on behalf of Mr. McGraw.

7           THE COURT:  Okay.  And for the probation office.

8           THE PROBATION OFFICER:  Good afternoon.  Raquel Butler

9 with U.S. Probation.

10          THE COURT:  All right.  We were before the recess

11 going to discuss the crime of violence issue.  So obviously,

12 I've read your written filings, but if there's anything else

13 you'd like to add, go ahead.  For the government first.

14          MR. ARCE:  No, your Honor.

15          THE COURT:  And Ms. Dolgosheeva?

16          MS. DOLGOSHEEVA:  No, your Honor.

17          THE COURT:  Okay.  So the issue is whether under the

18 2021 manual which was in effect at the time of the offense and

19 which if the defense is correct would be more favorable to the

20 defendant and thus should be applied, whether or not the

21 attempted armed robbery was a crime of violence given that at

22 that time, the application note for attempts, conspiracies, and

23 so on was, as I said, in the application note and not in the

24 text of the guidelines.

25          MS. DOLGOSHEEVA:  Your Honor, if I may, your Honor is

1    referring to attempted armed robbery.  We're talking about the

2    conspiracy to commit murder.

3              THE COURT:  I'm sorry.  I had a similar sentencing

4    this morning.  It is conspiracy.  The same issue, application

5    note refers to attempts and conspiracies and inchoate offenses

6    in the application note but not the text.  Correct?

7              MS. DOLGOSHEEVA:  Yes, Judge.  Thank you.

8              THE COURT:  All right.  Thanks for the correction.

9              The defense cites *United States v. Chick* from the

10   Northern District of Indiana.  And that case held that the 2021

11   manual, when the designation of conspiracies to commit crimes

12   of violence was only in the application notes, that that means

13   it is to be disregarded and conflicts with the text of the

14   guideline itself, 4B1.2.

15             So as much as I think the *Chick* case undertook a very

16   substantial and serious analysis, and I think to the extent the

17   government wants to accept some advice from the Court, to call

18   the argument nonsense is, it's overly aggressive especially

19   since your brief did not discuss the *Chick* case.  And the *Chick*

20   case did cite -- did discuss all of the cases that the

21   government did rely on.  So I would in the future try to engage

22   substantively with the defense argument on issues of law where

23   there is a question here.

24             So I think the analysis works as follows.  In the

25   *United States v. Raupp* case, R-a-u-p-p, which was cited by the

1   government and also discussed by the *Chick* case, this is a

2   Seventh Circuit case from 2012.  And that case did directly

3   hold that simply because the listing of inchoate offenses was

4   in the application note did not mean that there was a conflict

5   with the text of the definition of "crime of violence" in the

6   guideline text itself because the definition in the guideline

7   text did not say either way whether inchoate offenses,

8   including conspiracies, were part of the definition.

9           Now, after that, there is a case called *Rollins* -- and

10  again, the *Chick* case does discuss this -- from the Seventh

11  Circuit from 2016.  And the *Rollins* case did overrule the part

12  of *Raupp*'s reasoning that specifically relied on the residual

13  clause which that's the clause that thankfully no longer exists

14  where we would ask whether or not there was a substantial risk

15  of physical injury from a particular offense as a category

16  somehow.

17          And so *Rollins* held that that part of *Raupp*'s

18  reasoning which relied on the residual clause must be

19  overruled, in part because the residual clause does not exist

20  anymore.  But what *Raupp* was not holding and did not need to

21  address was how that residual clause analysis in -- applied at

22  all in *Raupp* because *Raupp* was a listed robbery case.  *Raupp*

23  was not dealing with the residual clause.

24          I'm not even sure that *Rollins*' description of *Raupp*

25  as having relied on the residual clause, I'm not sure that's

1    crystal clear that *Raupp* actually relied on the residual clause

2    at all.  It is -- it's mentioned, but the reasoning certainly

3    does not require any residual clause analysis at all.  It's

4    just a textual issue.  You look at the text, crime of violence

5    definition in the guideline, and then you look at the

6    application note which listed out conspiracies.  There was no

7    conflict in the text.  That was really the primary basis of

8    *Raupp*.

9            Then on top of that, and the government did cite in

10   its brief the *Adams* case, *U.S. v. Adams*, Seventh Circuit case

11   from 2019.  Now, that was a controlled substance offense case,

12   so it did not directly answer the question that is posed by the

13   defense here, but that case did hold that *Raupp*'s analysis of

14   the purely textual issue of whether the guideline text

15   conflicted with the application note -- actually, the other way

16   around, whether the application note conflicted with the

17   guideline text, does that remain sound as to controlled

18   substance offenses because it was controlled substance offenses

19   that were at issue in *Adams*.

20           And *Adams* held that, yes, that still applies and

21   there's -- you know, whatever mention there was in -- of the

22   residual clause in *Raupp* did not prevent the *Adams* case from

23   applying the *Raupp* analysis that there's no conflict in the

24   text to controlled substance offenses.

25           So I do think the *Chick* case over-reads, with all due

1    respect, the importance of the residual clause in *Raupp* which

2    again was a listed robbery case.  The residual clause was not

3    an issue there, and it's not at issue, you know, here, of

4    course, because it's eliminated.  And in any event, this is a

5    listed case because it's conspiracy to commit murder.

6           The *Chick* case does set out what it believes is a

7    distinction between controlled substance offenses and crimes of

8    violence by saying controlled substance, that definition in the

9    text uses the word "prohibits," like, state laws that prohibit

10   what federal laws prohibit to paraphrase everything other

11   than "prohibit," whereas the listed clause uses the verb "is."

12          But I must say, when I read *Adams, Adams* did not rely

13   at all on this -- on the word "prohibits" in controlled

14   substance offenses.  It just said look -- and I think it did

15   this sensibly.  Look at the *Raupp* analysis.  It was primarily

16   about text, and the residual clause is not important to this

17   analysis and so, therefore, it applies to controlled substance

18   offenses.  Adams does not rely on the word "prohibits" in

19   contrast to the word "is."  So I don't think that's actually a

20   distinction between *Adams* and this case.

21          And again, the application note back as it existed in

22   2021, it was instructing that conspiracies attempts and the

23   other, the inchoate offenses, applies to the term "crime of

24   violence."  It did not try to -- the application note did not

25   try to distinguish between the elements listing or the actual

1    list of offenses of enumerated offenses.  So the key term that

2    was being defined by *Adams* and the application note was the

3    term itself, either controlled substance offense or crime of

4    violence when it comes to our case.  So, yeah, *Adams*, I think

5    the reasoning of *Adams* applies to crimes of violence as well.

6          And then I'll just finally note that this is all in

7    the context of sentencing guidelines.  The sentencing

8    guidelines, unlike other regulations, they don't govern primary

9    behavior of the public.  This is not like those administrative

10    agency cases which I think has been driving some courts to say

11    that authoritative text is crucial and that there must not be

12    explanations and definitions and so on in commentary.

13          That makes sense when you have an administrative

14    agency that's governing the primary behavior of the public.

15    Like EPA, the Environmental Protection Agency says don't emit

16    this much of a pollutant or so on, or OSHA regs saying that

17    employers must have this or that safety equipment.  And you can

18    understand then if it's governing primary behavior that you

19    want to have authoritative text.

20          These are sentencing guidelines.  These are

21    instructions to lawyers and the parties and judges on how to

22    calculate sentencing guidelines.  So I don't think it's all

23    that surprising or problematic that there are definitions and

24    examples and hypotheticals in application notes instead of the

25    primary text.

1        Long way of saying, the conspiracy to commit murder

2    does qualify as a crime of violence under the guidelines.  So

3    the guidelines calculation is as follows.  Under 2K2.1, the

4    base offense level is 22 because this was a -- the firearm was,

5    because of the auto sear switch, a machine gun under 26 USC

6    5845(a), and the defendant does have a prior crime of violence.

7    Four levels are added because the possession was in connection

8    with a felony offense.  So that's 26.  And then the obstruction

9    of justice adds two levels, so that's 28.  As I noted before,

10   acceptance of responsibility does not apply, and so it remains

11   at 28.

12       And then for the criminal history points, which I

13   don't think there was a dispute over this, 2015 for the

14   reckless discharge of a firearm, that was two years' probation,

15   so that's one point; and then the 2019 conspiracy to commit

16   murder resulted in a 14-year IDOC sentence, so that was three

17   points.  And that's a total of four points.  That's criminal

18   history category III.  You put those together, and the advice

19   of the sentencing guidelines is 97 to 121 months.

20       Okay.  We'll move on then to 3553 factors, and we'll

21   start with the government.

22       MR. ARCE:  Yes, your Honor.  First, I just want to

23   note that your Honor's admonishment with respect to the

24   sentencing memo is well taken, and the government will take on

25   the arguments in good faith and apologizes for the flippant

1    nature of the response.  So thank you for that.

2          Judge, I want to start the 3553 arguments by

3    acknowledging that the request made by the government is an

4    unusual one and not one taken lightly.  The guidelines that

5    apply to the defendant, Mr. McGraw here, are already high given

6    the nature of the offense and given his criminal background.

7          In reviewing the materials in this case including the

8    PSR, the evidence that was tendered including the grand jury

9    transcripts attached to the defendant's sentencing memo,

10   looking at the medical records, and in reviewing the

11   defendant's sentencing memo, it's the government's view that a

12   maximum sentence of 15 years is sufficient but not greater than

13   necessary to account for all the factors as laid out in the

14   government's sentencing memo.  And I'll begin by discussing the

15   serious nature of the offense.

16         I don't -- I won't belabor the point, Judge.  It

17   appears as though based on the back and forth that we've had so

18   far that your Honor is fully aware of the seriousness of the

19   offense.  And even the defendant in his sentencing memo

20   acknowledges the harm that was placed upon individual ZJ, but I

21   do think it bears sort of noting in chronological order how we

22   got to this point.

23         So the defendant is charged with unlawful possession

24   of a firearm, but as the government noted in its sentencing

25   memo, this is not a run-of-the-mill gun case.  This is not a

1   situation where an individual was stopped on the street or

2   pulled over while he was driving and happened to have a firearm

3   on him.  Instead, this is a situation where the defendant

4   arrives at his then girlfriend's home, enters the home, and

5   almost immediately upon entering strikes her, hitting her so

6   hard that her jaw is fractured, she started bleeding from her

7   mouth and her nose, and she's on the ground.

8          The victim's mother then comes out, sees what has

9   happened, and instructs the defendant to leave the home.  The

10  defendant did not leave the home.  Instead, he pulled out a

11  firearm that had an auto sear switch, essentially a machine

12  gun, pointed it at the victims and threatened to kill them.

13  Now, thankfully the Calumet City Police Department arrived in

14  time to ensure that no one else was harmed, although as the

15  medical records note, the victim's jaw was broken, and it

16  required reconstructive surgery.

17         Now, your Honor has already taken note that the

18  defendant, after having been arrested for this offense, saw an

19  opportunity to try to evade federal charges.  Upon learning

20  that grand jury subpoenas were served on his victim and the

21  victim's mother, he had asked the victim to instruct the mom to

22  lie to law enforcement assuming that the charge that would be

23  coming down the pike against him was not just the possession of

24  a firearm but the possession of a firearm with a Glock switch.

25  In that moment, he understood how serious the conduct was.

1        And so in this district, Judge, a lot of times when

2   we're in front of your Honor asking for a sentence to be

3   imposed, we sometimes wax poetic about the dangers of gun

4   violence, especially in this district, Judge; but for the

5   defendant, the dangers of gun violence are not theoretical.

6   They're real which leads me to the history and characteristics

7   of this particular defendant.

8        As I noted in the sentencing memo, this is the rare

9   occasion where the criminal history points assigned to the

10  defendant actually don't tell the full story of the defendant's

11  criminal conduct.  The defendant is relatively young, I believe

12  30 years old.

13        THE COURT:  I think he turned 31 last November.

14        MR. ARCE:  Turned 31.  Thank you, Judge.

15        When the defendant was 21 years old back in 2015, he

16  was arrested for a reckless discharge of a firearm case.  And

17  the facts laid out in the PSR, Paragraph 37, there were

18  officers who were on patrol in the area where the defendant was

19  located.  They heard 10 to 15 loud bangs and responded to the

20  location where the noise came from.  They observed the

21  defendant discharge a firearm multiple times from near the rear

22  landing of an address.  As the officers approached, the

23  defendant fled.  He went into a home and attempted to discard

24  the firearm where children were present.

25        Despite having seen this, despite having recovered the

1    firearm, the defendant, in March of 2015, was sentenced to two

2    years' probation.  He essentially received a slap on the wrist

3    despite having fired a gun in the middle of a neighborhood.

4            So he receives probation in March of 2015.  Four

5    months later, four months later -- sorry, Judge.  Two months

6    later, the defendant was arrested and charged with a conspiracy

7    to commit murder where according to the PSR, Paragraph 38, the

8    defendant, one of his confederates, one of his friends died as

9    a result of a shootout in which the defendant was there,

10   participated in the conspiracy to commit murder just two months

11   after having fired a gun of his own.  And for that offense, he

12   received 14 years in prison.

13           So that was back, he was arrested in 2015, sentenced

14   in 2019, and he was paroled in April of 2022; again, just

15   months before inflicting violence upon the victim in this case

16   and unlawfully possessing a firearm with a Glock switch.

17           The defendant also has a number of arrests, domestic

18   battery offenses in his record; while he was locked up in the

19   Illinois Department of Corrections had received nine

20   disciplinary violations for fairly serious activity including

21   gang and other unauthorized organization activity.  Up to this

22   point, Judge, the defendant has not shown the ability to abide

23   by the laws and the rules that have been imposed upon him.

24           Now, I understand your Honor's point with respect to

25   whether or not the statements about this but-for causation

1    apply to a Section 3(e) analysis with respect to the acceptance

2    of responsibility.  What I will say, Judge, is that the

3    defendant arguing that had he been allowed to travel out of the

4    state that he wouldn't have engaged in this conduct; that

5    Probation, an arm of the court, there to help assimilate

6    himself back into society in a law-abiding fashion that

7    Probation forced him to live in this, quote, unquote, war zone

8    being the reason or even a reason why he possessed a firearm

9    with a Glock switch demonstrates that up until this point in

10   his life, the defendant has not demonstrated that he has a

11   respect for the law or that he has respect for others in his

12   community.  That just simply has not been demonstrated.

13          And so when the government looks at the previous

14   sentences imposed and the government looks at the seriousness

15   of this particular conduct, the conclusion that the government

16   draws is that a sentence that's slight -- just slightly more

17   serious than the most recent sentence that he received is the

18   only sentence available here to ensure that he no longer

19   engages in this dangerous conduct.

20          We've seen an escalation from one conviction to the

21   next.  Shooting a gun in public, runs away, thankfully no one

22   is hurt.  Released two months later, involved in a conspiracy

23   to commit murder, is arrested, released; just a few months

24   later batters a woman, breaks her jaw, and threatens to kill

25   two people.  Unless a serious sentence is imposed, the very

1    next step may very well cost someone their life, Judge.

2          And so the government is asking that the Court impose

3    a sentence commensurate with the serious conduct in this case,

4    commensurate with the defendant's history and characteristics,

5    and commensurate with the need to deter not only this defendant

6    but others in their shoes who may decide to walk down this path

7    of increasing violence, your Honor.  So the government is

8    asking for a 15-year sentence for Mr. McGraw.

9          THE COURT:  Thank you.

10          Ms. Dolgosheeva?

11          MS. DOLGOSHEEVA:  Your Honor, we have a number of

12    character witnesses.  Would you like me to address 3553(a)

13    factors first or call the character --

14          THE COURT:  No, you can ask them to step up.

15          MS. DOLGOSHEEVA:  Okay.  Our first witness is

16    Mr. Williams.

17          THE COURT:  All right.  Sir, can you come up to the

18    microphone right there.  Can you go ahead and say your name for

19    the record.

20          MR. WILLIAMS:  Brenton T. Williams II.

21          THE COURT:  And can you spell your first name for us?

22          MR. WILLIAMS:  B-r-e-n-t-o-n.

23          THE COURT:  Thank you.  Go ahead.

24          MR. WILLIAMS:  I have my letter on my phone.

25          THE COURT:  Yeah, sure.  You can pull it up.

1          MR. WILLIAMS:  He just told me to turn it off.  Can I

2    turn it back on?

3          THE COURT:  You can turn it back on.

4          MR. WILLIAMS:  All right.

5      (Pause.)

6          MR. WILLIAMS:  Apologies for the delay, but I have it

7    here.  I'm just going to read straight from what I wrote.  This

8    is added on to what I submitted for another character witness.

9          Not only is Jeff my cousin but I also counsel him due

10   to me being a priest.  So just mentioning my character witness

11   here is, I have the pleasure of knowing Jeff all my life, 27

12   years as a cousin and seven as a priest.  We call him Little

13   Jeff because of, you know, his dad.

14         He's a multi-level talented individual, our family

15   members, neighborhoods, friends, cousins, brothers, and so much

16   more.  When we were younger, everybody wanted to hang around

17   him because he was just so much fun.  If it was a Chicago Park

18   District, we played football, and that's when I was able to see

19   the zeal and compassion he had not only for himself but for

20   others, for sports, music, DJ'ing.  He did a lot of different

21   things, and you can see the compassion all throughout.  He had

22   a lot of family members who liked him, a lot of friends as

23   stated here.

24         I remember when Jeff, my aunt, and my mother would go

25   out shopping, and we'd be stuck for hours waiting for them to

1    finish shopping.  And we did essentially what any other group

2    of boys would do:  Laugh, play, have fun, and crack jokes until

3    we went home.

4           Jeff really started to have a major impact on my life

5    about 15 years ago when I was in high school.  He was, I

6    believe, four years, maybe four, give or take.  I think I might

7    have been eighth grade going to ninth grade.  Don't quote me.

8    Somewhere in that timeframe.  He was always extremely positive,

9    take life seriously, treat your mom good, treat your family

10   good.

11          Whatever it was that we would talk about, he would

12   always show me the impactful side of life.  Of course, the

13   biggest message he gave me was to stay in school, get a good

14   education, learn about business, create better opportunities

15   for your family and they won't ever forget the message that you

16   gave back to them.

17          Let's see.  I lost my train of thought.

18          And the one of the major reasons why I didn't go into

19   business and to other fields, specifically political science,

20   is because of what Jeff taught me is you can be anything you

21   want to be to make the world a better place, a more vibrant

22   place.  And I took that serious, and I received my degree in

23   political science, liberal arts at Prairie State College.  I

24   had a dual degree to go to Governors State, but I chose not to

25   due to COVID.

1          And also with that political science degree, it

2    allowed me to have a major impact in my community, specifically

3    the Midway area by the airport, Bronzeville, Kenwood, North

4    Lawndale on the west side.  And I had the opportunity to work

5    with Kim Foxx.  That was a unique experience.  I worked with

6    some of her political figures in the Chicagoland area.

7          Like I said, mainly because of the -- not necessarily

8    the specifics of going into business but more so you have the

9    opportunity to impact major people, whatever it may be.  So if

10   you choose this, you can do that or if you choose this, you can

11   do that.

12         Let's see.  As I aged into adulthood, me and Jeff were

13   able to gain an even closer relationship.  Obviously, he was

14   incarcerated at this time, so we were talking more frequently.

15   I was able to or I believe I was able to gain a relationship

16   that allowed me to step in more so less of the cousin but more

17   so as a counselor due to me being a priest.

18         When Jeff was released from jail in 2022, I had the

19   opportunity to continue to counsel and execute this counsel

20   weekly.  We spent a significant amount of time when he was out.

21   Jeff would listen, and he would express what he would notice

22   some of his weaknesses and how he could turn them into

23   strengths.  Thinking positively and using one of the heavy

24   proverbs we usually use which is, "A soft answer turns away

25   wrath and grievous words stir up anger."  And we would execute

1   upon the seven pillars of wisdom, knowledge, understanding, all

2   of these different things that would aid him in his time out

3   and continuing on further.

4          While he was out, I did notice major improvements.  I

5   believe mainly because he really wanted to improve in all

6   aspects of his life.  Me being a counselor as a priest, I ran

7   into many, many, many people, and I can usually tell, just in

8   this instance, it's kind of short lived, only three months.

9   However, in that three-month window, I was able to tell major

10  improvements.

11         He was -- okay.  Here it is.  I was able to see it

12  daily.  One of the funnest weeks we had was when we went to Six

13  Flags together.  It was his first time going.  He showed that

14  zeal once again, the excitement, the fun aspect of him.  He

15  showed -- I don't know if you were able to read my letter, but

16  it showed how he is always dedicated to that family.  And, of

17  course, and my letter goes into a lot more detail.

18         Let's see where I left off at.  Essentially, what I'm

19  getting at is Jeff is a delightful individual who since his

20  release showed that around everybody, and everybody was able to

21  see it, I believe personally.  He focused on being a better

22  individual daily, not being part of his past which is a staple

23  point of a soft answer, turn away wrath but grievous words stir

24  up anger.

25         Let's keep reading here.  Oh, I forgot to mention

1    earlier, during the week we went to Six Flags, he was able to

2    purchase a vehicle. He stayed positive. They said, "Oh, we

3    can't approve you for the car."

4           I mean, at that specific moment -- not to belabor the

5    point of beating a dead horse, he had the opportunity to, you

6    know, react irrationally. I didn't see that side of him mainly

7    because of the specific proverb. There's many, many proverbs,

8    right, but we focused on one because if you can master on one

9    proverb, you can continue to move forward. So we focused on

10    that one proverb. That's why I keep returning back to it.

11           He was eventually able to purchase the vehicle after a

12    long extended period of time. It was both me, my wife who is

13    in the pew, the -- Mr. McGraw, Jeff McGraw, my cousin and then

14    my aunt, Ms. Mary Malone. And it was a good experience because

15    it showed to me his improvements. Usually you can get

16    extremely agitated, annoyed when things don't go your way. I

17    saw the poise, the calmness of it. And these are just small

18    points highlighting some of the improvement that I saw

19    personally.

20           Let's see here. I can go on for hours about the

21    improvements he made, but I'll summarize it up in these three

22    points. And real quick because I skipped a point, we talk

23    about the things that happened in the past and how he focuses

24    on making sure he doesn't do the same things over and over and

25    over again, which is kind of oxymoronic, but we have talked

1   about it, and he has improved on.

2          And what I mean specifically is he's less reactionary

3   and more proactive.  He would think more.  He would look in to

4   see, how can I improve on this, how can I improve on that.  Of

5   course, that means not all of this is documented because he was

6   incarcerated when we had these conversations, but just from the

7   small conversations we did have, I was able to notice these

8   things.

9          And we also talked about the seven pillars of wisdom

10  which I believe aided him in being less reactionary and more

11  proactive and thinking, you know, being a little more slow,

12  slower, a little more poised, a little more calm.  That's what

13  I was able to notice in the time in which he was out, even in

14  the time as he was incarcerated.  And I believe now he's a lot

15  more calm in his approach.

16         He -- like I said, he acts more instead of reacting

17  and then -- let's see.  Just to conclude, I believe that with

18  the counsel that I have given him, some of the other brothers

19  from our specific chapter in Atlanta, Georgia, communicating

20  with him, associating with him, speaking about, you know, being

21  more impactful in the area, opening up businesses to produce,

22  specifically a studio session or a youth club for up-and-coming

23  younger artists all over the world, different genres, whatever

24  it may be.

25         We talked about many of these things.  We didn't have

1    the opportunity to do the community service that we wanted to

2    do in the city of Chicago, in Texas and California, and in

3    Atlanta because he was incarcerated, but some of these things

4    as a character witness is what I've noticed.

5          And like I said, to summarize it up in essentially two

6    points, less reactionary, more proactive.  On top of that, he

7    was able to be more calm and more poised.  And that's what I

8    would say as far as Jeff.

9          Speaking more so as a priest first, that's my first

10    duty, and then as a cousin, we were able to experience a lot of

11    beautiful, good things when he was out.  So that's what I

12    believe and that's what I saw.  I hope my message is well with

13    you.  And then that's all I have.

14          THE COURT:  Okay.  Thank you.

15          MR. WILLIAMS:  All right.

16          MS. MARES:  Good morning, your Honor.

17          THE COURT:  Good afternoon.  If you could just state

18    your first and last name.

19          MS. MARES:  My name is Estrellita Mares.

20          THE COURT:  And can you spell your first name for us.

21          MS. MARES:  E-s-t-r-e-l-l-i-t-a, last name is

22    M-a-r-e-s.

23          THE COURT:  Go ahead.

24          MS. MARES:  Your Honor, I wrote a letter here in

25    addition to my character letter.

1          THE COURT:  All right.

2          MS. MARES:  So can I read it?

3          THE COURT:  Go ahead.

4          MS. MARES:  Your Honor, I'd like to introduce myself,

5     as I just did.  I'm currently a juvenile probation office --

6     I'm sorry, a child protection investigator for the past six

7     years.  Previously, I was a juvenile probation officer for the

8     19th Judicial Circuit Court, and I served there for 12 years.

9          Currently I do hold a master's degree in social work,

10    and I've been working for families for 20 years.  I'm connected

11    to Jeff McGraw in that we are very close friends of the family

12    and identify him as our nephew.

13         We have known Jeff and his family since he was about

14    18 years old.  When I first came into contact with Jeff, I

15    could sense that he had some issues that needed to be

16    addressed.  I was brought closer to Jeff.  I stayed in touch

17    considering I love to help adolescents, teenagers, and young

18    adults stay out of the legal system.

19         However, shortly after meeting him, we all experienced

20    the death of my son's half-brother who I consider to be my

21    stepson, Joseph Coleman.  Unfortunately, shortly after Joseph's

22    murder, Jeff again endured the loss of many other of his close

23    friends in the music industry.  Your Honor, I'd like to let you

24    know that Jeff did grow up in a neglected home environment and

25    that he was not provided with some of the child's basic needs

1    such as food, clothing, stable housing, or a safety net.

2         Since these basic needs were lacking in Jeff's

3    upbringing, he may have not developed the skills or sense of

4    belonging all the children should have.  Instead, he developed

5    high-risk behaviors such as delinquency, substance abuse,

6    antisocial behaviors including aggression.

7         Jeff grew up in a domestic violence home where his

8    stepfathers were abusive to his mother.  Jeff witnessed his

9    mother being emotionally and physically abused.  I remember

10   when Jeff told me that on one occasion he tried to help his

11   mother from being battered, instead he believed she turned on

12   him.  He was so confused and hurt from this, and he left home.

13        One can only imagine that mindset of a youth when the

14   one person that you think can trust turns their back on you.

15   Your Honor, you will read that Jeff's mother was also

16   physically aggressive towards him.  As I mentioned earlier, she

17   herself was a victim of domestic violence.  During the circle

18   of violence, Jeff would often run away from the home to escape

19   the violence as early as 13.

20        Jeff growing up in a physical and emotional abuse, we

21   as professionals know that children could develop fear and lack

22   of respect for others in this type of environment.  Your Honor,

23   it's clear that Jeff did not have the range of education, of

24   understanding that his stepfather's aggressive behavior towards

25   his mother and his mother's aggression towards him was going to

1    affect him later in life.

2         I was surprised as a child protective specialist in

3    DCFS that DCFS was not called to report these underlying

4    conditions that were occurring in Jeff's home.  This could have

5    an intervention for him as a young child and for his mother

6    should they have been provided the services to address the

7    issue at hand.  Instead, Jeff became a perpetrator.  As a

8    result, young Jeff himself started to mimic what he experienced

9    and observed at home and started to develop the traits of

10   becoming a perpetrator just like his parents.

11        It is obvious Jeff developed anger issues just like he

12   experienced in what was supposed to be a safety net.  The

13   people that were supposed to keep him safe and meet his needs

14   and provide a stable environment didn't.  He started developing

15   mistrust, which leads me to speak on how Jeff could have

16   started to jeopardize his relationships by mistreating his

17   ex-girlfriend and exhibiting aggression during the incident

18   that the Court is addressing today.

19        Jeff never experienced or witnessed the proper example

20   of working a healthy relationship -- or healthy relationships.

21   Due to Jeff's lack of personal development, it hindered his

22   ability to learn how to properly handle an argument and avoid

23   aggression and manage stress in a non-violent way.

24        We as professionals know that communication is key,

25   and simply walking away to get air and address the issue later

1    would be the proper way to handle a situation, but Jeff was

2    never given those tools in his upbringing.  As a result, he did

3    not learn how to respect and properly treat a lady.  Jeff was a

4    victim of his own environment.

5         Furthermore, your Honor, I'd like to provide the Court

6    factors in my professional experience and observation that

7    possibly led Jeff to exhibit but not to justify his aggressive

8    behavior.  As expected, Jeff got in trouble with the law at

9    such a young age.

10        I'd like to take a moment to remind the Court that

11   when an adolescent is sentenced as a result of his behavior

12   that leads him to the judicial court system, the court usually

13   orders the minor to complete some type of counseling or

14   education services.  Jeff was never ordered any services.

15   Instead, he was ordered jail time.

16        As well as we all know, one that was raised with

17   underlying conditions have a higher chance of recidivism as is

18   extremely high.  Therefore, again we can say that Jeff was

19   never provided the education or knowledge which could have

20   prevented him from the circumstances he is in today.

21        Honorable Judge Chang, Jeffrey, Jeff, resided in a

22   high-crime neighborhood where there was heavy drug and gang

23   activity.  Jeff again became a victim of this, the community

24   where he was shot multiple times.  Jeff will develop anger.

25        Moving forward, your Honor, when Jeff was released in

1    April 2022, we were all inseparable.  Jeff was eager to

2    surprise his mother with a birthday party in which we helped

3    facilitate.  Jeff wanted to make sure her decorations were the

4    best and the location of the venue was safe and which they were

5    because, your Honor, I also have a passion for decorating, and

6    I definitely made sure that it was what he envisioned.

7            We invited Jeff to our first home in Buffalo Grove,

8    and when and his daughter arrived, we were watching a movie

9    where a couple was arguing.  And Jeff instantly covered his

10   daughter's ears and tried to cover her eyes to stop her from

11   being exposed to what's to be considered an act of violence.

12           On another occasion, your Honor, we invited Jeff and

13   his ex-girlfriend to my cousin's wedding.  We all enjoyed

14   other's -- each other's company.  And he made a mention that

15   this was the first wedding that he ever attended.

16           And lastly, your Honor, engaging in these family

17   outings demonstrated Jeff's desire of family connectiveness,

18   loving, those who loving, love him, being the best father he

19   can be.  And all these factors and his support system in which

20   he did not have growing up and started to develop when he was a

21   young adult.  Your Honor, Jeff has thousands of followers in

22   that he can reach in a large fan base and encourage the younger

23   population to exhibit positive behaviors, follow rules, and be

24   a productive citizen.

25           Your Honor, please remember that the legal system

1   failed Jeff and his family.  The Department of Children and

2   Family Services were never called.  And when he was sentenced

3   to time as a juvenile probation, as juvenile detention center,

4   he was never ordered services.  As a result, there was no

5   opportunity for education to reduce recidivism or

6   rehabilitation and which hindered Jeff's chances to be a

7   positive citizen.

8              Lastly, your Honor, I strongly ask that your Honor

9   that our nephew Jeff is sentenced to the least amount of time

10  considering all the underlying conditions and other factors

11  including mental and physical abuse, childhood trauma, sexual

12  abuse, grief and loss, substance abuse, child victim of

13  domestic violence that Jeff suffered and which as a child and

14  adolescent should never have experienced.

15             Your Honor, I have some pictures here to show that

16  Jeff was trying to make a change of the wedding that I

17  mentioned.  This is the picture that the cousin talked about

18  where they went to Great America.  He has his daughter right

19  beside him.

20             This is one of the pictures of a picnic that we

21  invited him.  And this is us again.  This is a picture of us.

22  He was grateful when we threw his mother the birthday party,

23  and this is the birthday party.

24             Thank you for your time, your Honor.

25             THE COURT:  Thank you.

1          Anyone else, Ms. Dolgosheeva?

2          MS. DOLGOSHEEVA:  Yes, your Honor, a couple more

3     witnesses.

4          MR. CLEVELAND:  Good afternoon.

5          THE COURT:  Good afternoon.  Please state your first

6     and last name.

7          MR. CLEVELAND:  My name is Albert Cleveland, your

8     Honor.

9          THE COURT:  All right.  Go ahead.

10         MR. CLEVELAND:  I know Jeff McGraw from being a close

11    friend of the family.  I met him in, like, 2022, 2022 when he

12    was released.  And as I'm sitting here listening, I did prepare

13    a statement but I won't be long, probably like two or three

14    minutes because I feel like that everything that's been said

15    don't tell the whole picture, if you will, because you have the

16    man over here.  He's describing an event that is factually -- a

17    lot of it factually you can't really challenge it because the

18    record speaks for itself, but it's a picture that I think that

19    the Court really needs to look at.

20         My sister expounded on the fact that Jeff never really

21    got help from juvenile on up.  I experienced the same thing.

22    I, like Jeff, was incarcerated at an early age.  I spent 21

23    years in prison of my life for something that I did not do.  It

24    took me 21 years of fighting, being indigent and poor before a

25    law firm got in contact with me, and they helped me get my

1    conviction overturned.

2         And one thing I can say with my own experience is that

3    everyone is different.  Jeff's situation is, once again as

4    Estrella Marie's comment that he never really got counseling.

5    And what I'm saying is this.  Since I met Jeff, Jeff has been,

6    number one he's been, I'll call him my nephew.  He's been my

7    boss because in his profession, he's got a nice name for him,

8    and he was able to establish himself pretty early on with

9    lucrative contracts, and he paid me well.

10         But he's been a godfather to my son who was at the

11   age, like, one years old.  And most people when they employ

12   you, they don't want you to bring your kid along with you

13   because I was, like, working as his assistant, but Jeff allowed

14   me to be myself and be a father to my kid where he fostered

15   that.

16         He said, "Okay, I know that your child's mother can't

17   get your kid.  Okay, you can still come to work."

18         So this is the Jeff that I know.  I know Jeff that,

19   from day one he wanted to make a change for his family and for

20   his kids.  He came out being the best father that any daughter

21   could ask for for a father.  I was there when he took her to

22   Chuck E. Cheese, all of these different outings.  So he's a

23   great father.

24         He's a great son.  I know him as being a son.  The

25   minute that Jeff got the chance to get on his feet, he wanted

1    to move his mother away.  And he got a safe place in Texas, I

2    don't want to give out the location, where he moved his mother.

3    He tried to follow her because he wanted to get away from

4    the -- as you guys call it, the shooting streets.  I don't know

5    if I used the right terminology.  I don't want to

6    mischaracterize your statement.  But it's those things that

7    Jeff has to deal with on a daily basis.

8            So Jeff tried to do the right things.  Oftentimes, no

9    fault of anyone, when we do the right thing, sometimes we don't

10   get the best results.  And so what I saw is that with me being

11   working for Jeff, we would go out to outings.  And you got

12   people that are jealous of this man.  They're heckling.

13   They're trying to cause aggression.

14           Each time I was there, Jeff remained calm, and he got

15   us out of there safe.  And his mother hired me to make sure

16   that her son got home to her.  And more than anything when I

17   think about the last two years, I feel like -- and I'm sorry,

18   Jeff.  I feel like I let him down because if I had been there

19   during all the chaos, I would have been able -- Jeff would

20   listen to me.

21           Like she said, sometimes it just takes somebody to do

22   an intervention, like, wait a minute, you're not thinking,

23   you're probably -- you used a couple of alcoholic beverages, if

24   you will.  And that's another thing, and I'm going to end on

25   this.  I'm going to say that from what I've seen, the story

1    that ain't been told is that Jeff hasn't had -- he hasn't had

2    an opportunity to get treatment for his drinking that

3    obviously, I'm sure that drinking was involved.

4         And I would say that more than the Court focusing

5    on -- and I understand that it's a job.  It's incumbent upon

6    you to deliver a just order for the prosecution, if you will,

7    for the State if they have proven their court -- their case,

8    but what I'm asking you is whether to focus so much on the

9    point system or the time, the 120 months or whatever it is that

10   you choose, can we focus a little bit on getting him some help.

11        Jeff needs help.  What everybody said, once Jeff has

12   got help, he's gotten better.  You know, every flower that ever

13   bloomed had to go through some dirt to get there.  With that,

14   I'll rest.

15        THE COURT:  All right.  Thank you, Mr. Cleveland.

16   Good afternoon.

17        MS. MALONE:  Good afternoon.

18        THE COURT:  Can you state your name for the record.

19        MS. MALONE:  Mary Malone.  I'm Jeff's mom.  I'm going

20   to start with me because that's -- it started with me.  I grew

21   up in a household with 13 kids.  My father was a heroin addict,

22   beat my mother on a regular.  We would always taught to never

23   tell anything.  Everything stayed in the house.

24        So as I had kids, I didn't know certain things.  I

25   didn't know that you're supposed to get help.  You're supposed

1    to talk to people about stuff.  The stuff that I endured as a

2    kid, unfortunately, I did to my son:  Mistreating him, calling

3    him names.  I thought I did the best I could.  I just only did

4    what I knew how to do.

5          So but Jeff is, he was a -- we actually planned Jeff.

6    Me and his dad, we planned him.  We wanted him.  We planned

7    him.  Unfortunately, he didn't stick around.  Jeff didn't have

8    him in his life long.  The first day I remember that I should

9    have got him help was, my brother used to keep my kids and I

10   would -- while I work.  I came home one day, and it was a lot

11   of police.  And I just took off running because I felt

12   something was wrong.

13         And I got to the door, and the first thing I asked

14   them, like, where is my brother.  The look that was on his

15   face, fear.  He was terrified.  And he said, "Mama, he back

16   there in the alley."  I'm thinking, not thinking he's dead in

17   the alley.  I'm thinking he's in the alley, you know, seeing

18   what's going on.  That's the first thing I should have got him

19   help with.  I didn't because I didn't know I was supposed to.

20   And he was, like, four or five then.

21         The next incident happened to him that I can remember,

22   one of his friends' mother molested him at the age of 12 or 13.

23   I didn't know about it because he used to stay with his dad and

24   me sometimes.  He told me when he was 18.  And that's another

25   thing I should have got him help for.

1          Excuse me.  Jeff was shot.  He went to shoot a video.

2     He was shot ten times.  I was just -- we were just coming back

3     from dropping my niece off to college in Mississippi.  He got

4     shot ten times.  So I rushed to the hospital.  They wouldn't

5     let me see him.  The chaplain came to me, and I just freaked

6     out because when the chaplain comes, that means it's something

7     really bad.

8          So but when I go back there to see him, he was -- the

9     sheet was filled with blood.  I thought I lost him.  But when I

10    got close to him, I kissed him, and he opened his eyes and he

11    looked at me and he said, "Mama."  I was just so happy because

12    he was alive.

13         Not even a year later after that -- I think he was,

14    like, probably 18, 17, 18 when that first happened.  Not even a

15    year later, he -- some guy called, wanted to do a video again,

16    and he was skeptical.  He went to shoot the video.  He might

17    have been gone 15 minutes, called me, "Ma, he shot me."

18         I get to the hospital.  So they didn't -- I couldn't

19    see him.  That's the one that really, really messed him up

20    really bad.  He still have problems to this day with that.  And

21    I saw the girlfriend he was with at the time and she was, like,

22    "Mama, he jumped on top of me to save me from getting shot and

23    took all the bullets in the back."  And one of the bullets that

24    pierced his bladder hit her in the leg, and she lost her baby

25    soon after.  Should have got him help for that.  I didn't.

1        My husband, very abusive in the house, abusive to me,

2   abusive to my son.  I never said anything to anyone.  I just

3   kept it to myself because you're supposed to keep everything

4   in-house, I was taught.  I should have got him help for that,

5   but I didn't get help for myself.  You know, I didn't know you

6   supposed to get help.  I mean, I know now, but I didn't know

7   you supposed to get help for certain things.

8        And I just think if I knew to get help, I could have

9   gotten my son some help.  He could have been -- you know, he

10  could be different, you know.  He is a really sweet, good

11  person.  He helps everybody.  But I think if I had got him the

12  mental help that he needed, things could have turned out

13  differently.

14       He went to jail.  Three months after he went to jail,

15  my other brother was murdered.  He never got a chance to grieve

16  that because he was in jail.  He just -- he just went through

17  so many traumas.  I hate that he went through traumas like

18  that.  I was abusive towards him because I didn't know how to

19  handle things.  I was being abused, and I turned it on him, you

20  know.  He was just a kid.  He didn't deserve it.

21       You didn't deserve it.

22       But I know better now.  I know better now.  I know, I

23  talk to counseling now about my grief.  And actually, he's the

24  one who helped me talk to someone because he said, "Mama, I've

25  been going, doing these classes, and they really help."

1        So I started talking to someone, and a lot of old

2   memories and stuff started coming up and things.  You know, I

3   thought I was doing right by him, but I didn't always do right

4   by my son.  I was just being the best mother that I can.

5        So I just ask if you could please show some leniency.

6   Help me help my son get the help that he really needs because

7   jail hasn't helped him.  Jail, it's not a reform,

8   rehabilitation.  You just sitting there doing time.  They don't

9   have the services to help him that he deserves, that he really

10  needs.  And so I'm just asking if you could please show some

11  leniency, help me help my son, please.  That's it.

12       THE COURT:  Thank you.

13       Good afternoon.

14       MS. WEEKLY:  Hi, your Honor.  Good afternoon.

15       THE COURT:  Can you state your first and last name.

16       MS. WEEKLY:  My first name is Lasheena Weekly,

17  L-a-s-h-e-e-n-a, W-e-e-k-l-y.

18       THE COURT:  All right.  Thank you.

19       MS. WEEKLY:  I'm here just to speak on the character

20  of Jeff.  I must have -- I met Jeff probably at a time in his

21  life where he was going through the things he were going

22  through.  Ever since I've known him -- first of all, I got to

23  know him because he was in the same rap group as my son Carlton

24  Weekly who was known by his rap and industry name, is FBG Duck.

25       I've seen these babies.  Well, my house was considered

1   a safe haven for these babies because me not knowing the

2   circumstances that they were facing in the streets.  When I

3   lost my son August 4th, 2020, Jeff was incarcerated at the

4   time.  They had talked before he gotten out.  They were

5   speaking about changing things, pushing peace.  And

6   unfortunately, my son was assassinated in front of -- on Oak

7   Street.

8          It kind of messed him up to the point where he

9   promised me that he would never leave, he would take the place

10  of my son.  He used to come -- the last incident, the last time

11  that Jeff was around me was actually probably two days before

12  he was arrested, but before then, July 17, 2022, I threw a

13  barbecue at my home for the remembrance of another son that I

14  lost to street life, to the streets.

15         He appeared there.  He came there -- not once since he

16  was out.  He would come visit.  I stayed in Calumet City at the

17  time.  He would come and visit me at least three times a week

18  because after losing three of my children -- out of losing

19  three of my ten children, him and Carlton being more like

20  brothers, they were working on so much things while he was

21  incarcerated.  They were talking about what they're going to do

22  with the music.  He also had a very big fan base as far as his

23  music.  And that's what him and my son was working on, but

24  unfortunately my son was un-alive.

25         Jeff came to the barbecue.  I invited him to come over

1    with his -- with his girlfriend at the time who the prosecutor

2    was speaking on.  They came.  He was also with his daughter.

3    And we just celebrated the life of my son.  He was so happy.

4    He made sure I didn't want for anything.

5            And I'm asking you, Judge, like his mom just said, a

6    lot of times, you know, we're not perfect.  We can only do the

7    best we can with what we have.  And consider -- like, I'm not

8    trying to, like, justify that he admit what he did, but

9    considering that he does have a loving family, a daughter, kids

10   to raise.  And I think, I'm asking that you show a little

11   leniency because of the circumstances that he had went through

12   and overcame.

13           Like his mom said, I don't think a longer -- jail

14   would be the answer.  Like, resources, because a lot of these

15   babies that I've experienced have been around me suffer from

16   childhood trauma and PDSD and just, it's a lot going on.  So

17   they tends to run to other places to try to find that peace.

18   And I am one of those persons who Jeff came to for peace, to

19   rest, to just, you know, feel like that he just wanted the love

20   of a home life.

21           So I just ask that you, you know, have a little

22   leniency.  And I don't think giving him the maximum would fix

23   anything.  I think some services and programs would help.

24           THE COURT:  Thank you.

25           MS. WEEKLY:  Thank you.

1          THE COURT:  Okay.  And I do want to emphasize,

2   Ms. Dolgosheeva, that I have read the letters.

3          MS. DOLGOSHEEVA:  Your Honor, if we could just have

4   one more witness.

5          THE COURT:  Yes, that's totally fine.  I just want to

6   amplify that because it does also seem like -- for example, you

7   know, I read about Mr. Weekly, and it must be very painful to

8   go through it again.  So I just want them to rest assure that I

9   have read all the letters and all the...

10          MS. DOLGOSHEEVA:  And, of course, we really appreciate

11   your Honor taking the time to listen to so many people.

12          THE COURT:  All right.  Yes, sir.

13          MR. H. McGRAW:  How are you doing today.  My name is

14   Harry McGraw, Harry J. McGraw III.  It was very interesting

15   listening to everybody talk today.  I haven't seen Jeff in a

16   very long time.  And the one thing I will mention is, I am the

17   only person on his father's side is actually present today.

18          The reason why I got introduced to him because his

19   father actually called me.  I got -- I got with Jeff around

20   when he was 18, 19 years old right after the shootings.  And

21   his father seen all the positive things I was doing.  I own a

22   production company.  By the way, I'm only 35.  I'm a college

23   graduate.  My father handed me down a not-for-profit called the

24   McGraw Foundation which was created from the tragedy, the E2

25   tragedy in Chicago.  My father started that for the family, and

1    it been going ever since, and he passed it down to me.

2         So his father seen all the positive things I was doing

3    in my life and he was, like, "Hey, I need you to see your

4    cousin Jeff."  At the time, like, I known Jeff, but I'm really

5    not involved in his life.  I'm doing my own thing.  And he sat

6    down and showed me all the potential and all the things that he

7    was actually doing, but at the time he didn't really have a

8    relationship with Jeff.

9         So what he was saying, "Hey, did you get with your

10   cousin" because my dad and his dad used to do music back in the

11   day.  So what I did was I reached out.  It took a couple days

12   but eventually, you know, he knew who I was.

13        And one thing that resonated with me is Jeff do have

14   trauma.  You know, I was an individual myself.  I was abused as

15   well because I had a stepfather in my life.  I tried to kill

16   myself at the age of nine years old, but the difference between

17   me and Jeff is I actually had help.  I actually went and got

18   counseling.  I actually went and got therapy for the

19   psychological abuse of not having a father around, having an

20   abusive stepfather and actually tried to commit suicide.

21        Now, I'm also Jeff's manager.  One thing that I don't

22   think no one here in the court has recognized, Jeff has been

23   out of jail for -- I mean, in 2022 he was released less than 90

24   days and got re-incarcerated.  But one thing that's very bright

25   in this situation is in less than 90 days -- me myself, I'm not

a gang member.  I have a clean record.  I'm a productive member
of society.  In less than 90 days, Jeff created a corporation
to pay taxes, to -- he was inspired for the American dream,
having a story.

When he was incarcerated, a lot of individuals die.  A
lot of individuals made the news.  He wanted to monetize his
past, so he started a corporation.  In less than 90 days, he
started his corporation.  In less than 90 days, his corporation
was funded by a high label in less than 90 days.  In less than
90 days, he made a considerable cash donation to help military
veterans.

Me myself with the McGraw Foundation, my dad's a
veteran.  My grandfather is a veteran.  His grandfather is a
veteran.  One thing that was missing in Jeff's life is the
presence of a man.  So when Jeff was out, one thing that I
was -- because I was with him every day.  I was with him the
night before.  I actually took him home.

Now, one thing that was essential for me is to make
sure he has a presence of mature men.  I'm a firm believer of
birds together, flock together.  Show me your friend, show me
your future.  I'm a firm believer of that.  So I took it upon
myself, someone with no record, someone that is not involved in
gangs, to mentor and to be his guide through his mission of
being incarcerated for eight years.  The majority of his adult
life, me knowing that his father introduced him to me, me

1    knowing that I had help, he didn't have help.

2           See, I understood, you know what, he can do much

3    better, he can do much better than this.  Jeff come from a long

4    bloodline of productive members of society, but it's

5    unfortunate that I'm the only one on his last name side, the

6    McGraw side.  I'm literally the only one here.  Now it's

7    unfortunate that I'm here, but it's fortunate that I'm the most

8    vital one.  I'm the one that was there.  I'm the one that's

9    productive.  I'm the one that's vouching for him.

10          Now, all things considered, I appreciate Jeff

11   accepting responsibility, not wasting no more of the time, the

12   resources, and moving along with his process and try to get

13   things resolved and try to leave things in the past.  I really

14   appreciate that.  And one thing that I would like, Judge, if

15   you take mercy, definitely consider some of the things that I

16   say.

17          He's also a father as well.  I have a daughter as

18   well.  My daughter is 15 years old, a straight-A student.  And

19   I know the impact that it has when your daughter is not --

20   fathers are not in daughter's lives.  Right now we just sat

21   here and heard generations of trauma.  We sat here and heard

22   the mother admitting, "You know what, I wasn't the best

23   mother."  Her dad wasn't there.

24          The last thing we need is more children without their

25   fathers.  And me standing here as a father, as somebody that

1  has credentials, as someone that took it upon myself to engage

2  with an individual that most people would not like to, like,

3  oh, no, he has all this stuff going on.  I believe in my

4  people.  I believe in God.  I don't allow other things around

5  to convey what the goodness I can bring to people.

6       So as some might say, just to recant everything, in 90

7  days Jeff has created a corporation preparing himself for the

8  future, preparing himself to be involved and to be a productive

9  citizen of society.  He had made a cash donation to help

10 military care packages which I'm involved in to this day, and

11 he also -- yes, he also just wants to change, man.  He needs

12 help.  I can honestly say that.  He does need help.

13      So that's the last thing I want to say.  Thank you so

14 much.

15      THE COURT:  Thank you.

16      All right.  Ms. Dolgosheeva, anyone else?

17      MS. DOLGOSHEEVA:  Your Honor, briefly, you read the

18 sentencing memo.  He had an incredibly difficult life.  His

19 home life was just horrendous.  He was physically abused.  He

20 was verbally abused.  And I think if he lived possibly in a

21 different environment, if it wasn't going from generation to

22 generation where it's normal, you know, to abuse your children,

23 maybe he would have a chance at a normal life.

24      He's a talented musician.  He's able to make a living.

25 He doesn't have to sell drugs.  He doesn't have to do anything.

1   He can perfectly well support himself and his family.  And he

2   has been supporting himself through his music.  He has been

3   supporting his mom.  He has been supporting his daughter and

4   his stepson, the young -- who is about to graduate from the

5   eighth grade.

6         But I think because of all, every -- he didn't get any

7   support growing up.  And I know he's an adult man now, but I

8   think it's the childhood and adolescent years when really

9   you're shaped as a human being.  So if you don't get any

10  support that you need, your chances of succeeding and leading a

11  very successful life are pretty slim to none and unfortunately,

12  that's what has happened to him.

13        And the government talks about him carrying a gun.

14  Yes, he did, but if anybody got shot 16 times -- and every day

15  he is taking a bunch of pills, and he will be for the remainder

16  of his life because he got shot so many times.  And I just want

17  to note that at the time, each time that he got shot, he wasn't

18  doing anything bad.  He was going to shoot a video for one of

19  his -- for one of the songs he wrote.

20        And each -- the two times, the last two times he got

21  shot, he had numerous surgery.  He had extensive

22  hospitalization.  He will continue taking pain medication for

23  the rest of his life which controls a certain degree of pain

24  but not fully.

25        And none of those times he had a gun.  And anybody who

1     got shot probably even once in his back, you know, in the old

2     neighborhood because at that point, he is not able to

3     financially move out, probably would want to carry a gun to

4     protect your life.  I mean, it's a basic human instinct.  You

5     want to stay alive.  Nobody wants to die.  Nobody wants to get

6     shot and killed.

7          And I had recently a number of people that was charged

8     with felon in possession, and over and over I hear the same

9     thing, what are my choices?  My choice is to carry a gun and be

10    able to protect myself, me -- at least it gives you a chance to

11    protect yourself -- or not carry a gun, not risk going to jail,

12    and to die.  Somebody shoots at you, what are you going to do?

13    There's nothing you can do.  You can try to run, but it's

14    really hard to outrun the bullets.

15         And he was -- I just want to kind of highlight that he

16    was even attacked when he was in Kankakee Jail.  As soon as he

17    got transferred into federal custody, he went into Jerome Combs

18    Detention Center in Kankakee.  He developed pneumonia, was

19    taken to a hospital.  As soon as he came back from the

20    hospital, he went to take a shower, and he was attacked for --

21    by another inmate.

22         He was very weak at that time.  He had just returned

23    from the hospital.  And he had to jump from a top tier.  He

24    fractured his leg.  He had to have disks inserted.  And the

25    doctor said at some point he would have to have a knee

1    replacement.  Now, this happened in federal custody.

2         He has serious mental health issues.  And I think

3    anybody who went -- who had a life the way he did being shot,

4    being abused sexually, physically, verbally would have mental

5    health issues.  It's not surprising.  It's very unfortunate,

6    but it's not surprising.

7         And I think the biggest problem is that he has

8    untreated posttraumatic stress disorder.  And I know in a

9    number of cases I had, one, I think it was a drug trafficking

10   case, another case where somebody just came back from maybe

11   Afghanistan, and the person knew he had PTSD.  He developed it

12   while in the Army.

13        And all those cases involved the same thing.  They all

14   involved domestic abuse.  And I think if we can get help that

15   he needs, counseling that he needs and effective mental health

16   treatment, he will be fine and people around him would be fine.

17   But the longer he's incarcerated, I think the more his mental

18   health will deteriorate.

19        He has been in custody in state case.  He's been in

20   custody in federal case.  He never got treatment for PTSD even

21   though it's all over his medical record that he suffers from

22   posttraumatic stress disorder.  It's just getting completely

23   ignored, first by State, now by feds.  And I think somebody who

24   is -- well, first, obviously he got injured while in federal

25   custody.  He's just going to get worse and worse and worse the

1    more time he spends.

2            So if we care, as the government claims, about the

3    public safety, the sooner he comes out, the sooner he starts

4    supervised release, the sooner he can get better because he

5    will get the help that he needs while he's on supervised

6    release and not while he's incarcerated.

7            Obviously, your Honor, you see he has a lot of family

8    members and friends who support him, and I think that speaks

9    volumes.  And they also, it was very difficult for them to come

10   out here to speak to your Honor and to talk about things that

11   most people, they are sacred to them and very painful, most

12   people would not want to talk about.

13           And another just final thing I want to point out, he

14   was not in the community for a long time, but before he got

15   incarcerated on conspiracy to murder case and after, he was

16   very involved in the community.  He was participating in

17   children's events.  He was handing out school supplies.  He was

18   going to Salvation Army to participate in events.  He was

19   donating money for military support.  He was donating money for

20   poor, and he was knitting clothing for poor.  He was

21   volunteering at the shelters.  He was mentoring youth.

22           Maybe he's not the best example, but he's definitely

23   somebody who people in his neighborhood would take seriously,

24   and the fact that he donated his time and his money to help

25   others even though he wasn't able to help himself I think

1       speaks volumes.

2               The final thing, your Honor, we're asking for a

3       sentence below the sentencing guidelines.  We think 37 months

4       is an appropriate sentence in this case.  We're also asking the

5       Court to reduce the time by ten months that he has spent in

6       state custody while serving parole violation.  And we're asking

7       the Court to -- for him to participate in RDAP program and for

8       the Court to recommend that he serve his sentence as close to

9       Chicago as possible.

10              THE COURT:  All right.  Thank you.

11              Before we hear from Mr. McGraw, let's go through the

12      supervised release conditions so we don't have to do that at

13      the end.  And, of course, I'll reserve judgment on the length.

14      So Page 25 of the presentence report, are there any objections,

15      Ms. Dolgosheeva, to mandatory conditions 1, 2, 5, and 6?

16              MS. DOLGOSHEEVA:  No, your Honor.

17              THE COURT:  Those will be imposed as authored.  With

18      regard to No. 6, given the substance abuse concerns mentioned

19      in the presentence report at Paragraphs 115 to 118, that is

20      appropriate including all the way up to the 104 tests per year.

21              On discretionary condition No. 1 which is on Page 26,

22      is there any objection to No. 1, Ms. Dolgosheeva?

23              MS. DOLGOSHEEVA:  No objection.

24              THE COURT:  That does serve a rehabilitative purpose

25      to provide financial support to dependents.

1          Any objection to No. 4, Ms. Dolgosheeva?

2          MS. DOLGOSHEEVA:  No objection.

3          THE COURT:  Obviously, employment always serves a

4     rehabilitative purpose.

5          Then No. 6, I propose to add the word "felony" in

6     front of "criminal activity" given the breadth of federal,

7     state, and local law.  Is there any objection to that edit from

8     the government?

9          MR. ARCE:  No, Judge.

10          THE COURT:  And then with that edit, is there any

11     objection, Ms. Dolgosheeva?

12          MS. DOLGOSHEEVA:  No, your Honor.

13          THE COURT:  And then No. 7, there is an alcohol issue,

14     and it's referenced in Paragraph 115.  And he's in AA now

15     actually.  And then the back half always applies.

16          So is there any objection to that, Ms. Dolgosheeva?

17          MS. DOLGOSHEEVA:  No objection.

18          THE COURT:  And then No. 8 and 9, any objection to

19     those, Ms. Dolgosheeva?

20          MS. DOLGOSHEEVA:  No objection.

21          THE COURT:  8 because the nature of the offense and

22     the criminal history.  No. 9, we've talked about the substance

23     abuse issues, and there are mental health concerns as well

24     including he's already on prescription medication right now.

25          Page 27, any objection for the defense for 14, 15,

1    skip 16 for the moment, 17, and 18?

2              MS. DOLGOSHEEVA:  No objection.

3              THE COURT:  Those are monitoring conditions that help

4    the probation office monitor compliance with all other

5    conditions.

6              No. 16, what I propose is uncheck the boxes for work,

7    school, and community service location and then insert an

8    objection period of seven days from the date of notification of

9    a proposed visit.  In other words, the probation office can

10   still propose work or school or any other location so long as

11   it's reasonable, and if the defendant objects, then he can file

12   an objection with the Court within seven days of notification.

13             So is there any objection to that edit from the

14   government?

15             MR. ARCE:  As phrased by your Honor, that's no

16   objection.  I understand that they typically visit work and

17   these other places as a last resort, so I think with your

18   Honor's modification, that's agreeable to the government.

19             THE COURT:  Okay.  And then any objection to that

20   condition with that edit, Ms. Dolgosheeva?

21             MS. DOLGOSHEEVA:  No objection.

22             THE COURT:  Page 28, any objection -- well, actually,

23   so I propose an edit to No. 24 which is, remove "office"

24   because I don't think interfering with employment, at least in

25   the first instance, would make sense.  We can always consider a

75

1     request from the probation office on that.  So I would remove

2     "office."

3            So is there any objection from the government to

4     removing "office"?

5            MR. ARCE:  No, Judge.  I guess it would -- I'm trying

6     to think through a way to sort of recapture that because as I

7     understand it, the defendant is self-employed and so "office"

8     at this point makes sense, but I understand your Honor's point.

9     If you got sort of a --

10           THE COURT:  Yeah, we don't know what his employment

11    will be.  So you can always come back and propose it upon

12    release.

13           With that edit, is there any objection from the

14    defense?

15           MS. DOLGOSHEEVA:  Your Honor, I generally object to

16    that condition.  I think it's just overbroad, and it has a high

17    potential of violating Mr. McGraw's constitutional right and

18    other individuals' because it allows for warrantless searches.

19           THE COURT:  The objection is overruled.  The condition

20    requires reasonable suspicion as the threshold.  So there's no

21    search without that at all.  And then the defendant would be on

22    supervision where the Fourth Amendment rights apply with less

23    force.

24           And given the excision of "office," I think everything

25    else -- and by the way, I think there might have been a

1    reference to "property" as being confusing.  It is personal

2    property.  So we can make that edit.  I'm not sure what other

3    real estate property there might be later on but that, given

4    the limitations that I've inserted, it is appropriate.

5           Page 29, special condition No. 3, I don't usually

6    impose the community service authorization.  I'd rather talk it

7    through if this arises.  So is there any objection from the

8    government to not imposing 3 for now?

9           MR. ARCE:  With that, Judge, we have no objection.

10          THE COURT:  I'm sorry?

11          MR. ARCE:  With that caveat that --

12          THE COURT:  Yeah, you can always come back.

13          MR. ARCE:  -- we can revisit it, yeah, no objection.

14          THE COURT:  All right.  It won't be imposed.

15          For the defense, any objection on Page 30 to No. 11?

16          MS. DOLGOSHEEVA:  No objection.

17          THE COURT:  That's for the safety of the probation

18   office.  So that will be imposed.

19          Any objection to 14?

20          MS. DOLGOSHEEVA:  No objection.

21          THE COURT:  And that will be imposed to serve a

22   rehabilitative purpose.

23          What's the government's position on, it's Page 31,

24   No. 15?

25          MR. ARCE:  Judge, the government takes the PSR, the

1   summation of some of these violations including ones that would

2   fall under this particular condition at face value.  Given the

3   factual basis outlined in the PSR, I think No. 15 is

4   appropriate given, it wasn't just like a one-time thing.  I

5   think they had outlined there were three separate instances in

6   which this happened.

7           THE COURT:  Okay.  Does the probation office want to

8   elaborate on this any more?

9           THE PROBATION OFFICER:  Just kind of emphasizing that

10   it would be an evaluation and assessment initially and if

11   someone, if they deemed it appropriate, then we would proceed

12   with treatment.  But initially, it's just the evaluation and

13   assessment to see if it is necessary based on the facts in his

14   background.

15           THE COURT:  Okay.  Yeah, I appreciate that.  However,

16   I'm not going to impose it for now.  I think the information in

17   Paragraph 59 which has to do with the 2013 alleged incident,

18   there's just been no proveup of that, and he was released

19   without charging.  So it is very difficult to credit those

20   facts against Mr. McGraw.

21           And then while it is concerning that in IDOC there

22   were these three other incidents, given that he will be under

23   the care of a mental health provider due to the other

24   condition, if that mental health provider believes that an

25   assessment along these lines is required, then I would expect

1   that mental health provider to raise it, and then we can talk

2   about it at that point but I don't think even on the record

3   right now.  So I certainly appreciate the proposal by the

4   probation office, but it's not quite there, I think, in terms

5   of needing to be imposed.

6          All right.  Mr. McGraw, now is your opportunity to

7   speak on your own behalf.  So if you would like to say

8   something, please go ahead.

9          MS. DOLGOSHEEVA:  Your Honor, may he briefly use the

10  washroom one more time?

11         THE COURT:  Yes.  Let's take five minutes.

12    (Recess from 3:46 p.m. to 3:54 p.m.)

13         THE CLERK:  Please be seated and come to order.

14         THE COURT:  Okay.  We're back on the record, same

15  appearances.

16         Mr. McGraw, now is your opportunity to speak, so

17  please go ahead.

18         MS. DOLGOSHEEVA:  Does your Honor want him to go up

19  there?

20         THE COURT:  No.  You can stay seated and talk into the

21  mike, please.  Thank you.

22         THE DEFENDANT:  Okay.  So what all can I talk about?

23         THE COURT:  Anything you want.

24         THE DEFENDANT:  Okay.  First, I got some stuff to say

25  before my actual statement because I know my attorney didn't

1    really want me to talk about it, but I feel the need to because

2    it's a lot of stuff and a lot of factual basis that's portrayed

3    differently than what it really is.  Like, I been sitting here

4    all this time, and I have to speak upon it for somebody just to

5    assassinate my character as a man and as a father and as a

6    king.

7           I do not hurt people.  That's not me.  I help people.

8    I know I been through some rough stuff.  I still help people no

9    matter what.  I been shot up.  My friends been getting killed.

10   I never seek revenge, never, ever.  The first time I was locked

11   up, it was for a reckless discharge.  I was fresh out the

12   hospital from getting a bullet fragment and a bladder stone out

13   of my bladder.

14          I went home.  It was right after New Year's.  I saw

15   different videos.  I'm not making no excuses.  I'm telling you

16   exactly how it is.  I'm not sugar coating it.  I'm letting you

17   know.  I saw videos of some of my friends shooting in the air

18   for New Year's, and I wanted to do it too.  Yeah, I did it, but

19   it was no kids in the house.  I could barely even walk.  I did

20   it just to be a follower.  I wasn't trying to hurt nobody.  I

21   never hurt nobody.  I got locked up for that.  I took my time

22   for that.  I accepted my responsibility and got on probation.

23          Unfortunately, right after that, two of my friends got

24   into an incident, an isolated incident that had nothing to do

25   with me.  Instead of people speaking the factual basics, they

1    are basically determined and, like, it was bad because of an

2    online inquiry, not because a factual basis, not because of

3    discovery of an online inquiry.  I could put in anything on

4    Google right now about somebody, and it wouldn't be true.

5         It was an isolated incident.  Two of my friends shot

6    each other.  Unfortunately, one of them got killed.  I got

7    locked up because I was in the car.  He jumped out of my car.

8    I was in the passenger seat.  I got locked up.  I did seven

9    years of my life in jail for my friend getting killed.  I had

10   nothing to do with it.  I never hurt nobody.

11        All of the seven years I was locked up, my family

12   was -- was breaking bad.  People was leaving me.  My mom got

13   incarcerated.  My friends was dying.  And I still tried to stay

14   as strong as possible.

15        I tried to kill myself on, like, three different

16   times, tried to kill myself, took a lot of pills, hung myself.

17   It was times where I was at my lowest, and God kept me here for

18   a reason.  So when I -- the beginning of my time, I thought I

19   was never going home, never.  So, yeah, I was doing stupid -- I

20   didn't care.  My mind was everywhere.  They was putting me on

21   ten different psyche meds.  I was losing control.

22        I make mistakes.  But at the end of my incarceration,

23   I started putting a plan together to better myself, to move my

24   family out from around this and move me out the area, anywhere

25   in Chicago where I got trauma.  Of course, I've been having

1   trauma.  I got shot up 16 times.  I still got bullets in me.  I

2   just popped a bullet out of my leg in jail.

3          So, yes, I tried to come up with a plan.  When I first

4   came home, the first thing I did was start doing my business.

5   I set up my corporation.  I got my kids with me.  I set them up

6   a college fund.  Even I was -- I got out April 12th.  I had,

7   like, $300 to my name.  My -- I knew my mother's birthday was

8   coming up April 24th.  And I missed seven of her birthdays.  I

9   spent every dollar I had just to surprise my mother for a

10  birthday party, and it was -- it's people that's here that was

11  there.

12         I wasn't on the streets gang-banging.  I wasn't

13  hanging on no street, no shoes, none of that.  Unfortunately, I

14  was in the bad neighborhood.  It's not an excuse.  I tried to

15  move to Texas.  I don't know if God didn't want me to go there

16  for a reason or whatever happened, but I put in the address in

17  Chicago and it was approved.  It's approved on 57th Street.

18  I'm not going to put the other street because it's on the

19  record.

20         The neighborhood I grew up in is six blocks over.  Two

21  blocks where I was living from, one of my friends got killed,

22  got found in the alley which is Ms. Lasheena Weekly's nephew,

23  Brown Weekly, two blocks away from there.

24         So I'm not this person they trying to portray.  I'm

25  not no bad person.  I make -- everybody makes mistakes.  And

1  just because of my profession, a rapper, that don't make me a

2  bad person.  I do that to take care of my family.  That's what

3  I can do.  Y'all went to law school, you know what I'm saying.

4  I didn't have them opportunities.  I found -- I found an avenue

5  and tried to make a way for myself.

6          I just, I go through stuff, you know.  Like, I always

7  was brought up to be a leader and not a follower, and I was

8  always brought up to be a real man.  So I'm not going to lie to

9  you.  When I got out and I knew the neighborhood I was going to

10 live in, yes, I asked for a weapon.  I did.  Not making no

11 excuses.  I needed a weapon because I didn't want to get

12 killed.

13         My second -- my second day out of jail, I was with my

14 ex-girlfriend Zyesha.  I was at a gas station.  I was about to

15 pump the gas, saw two little kids, 15, 16, hop out of a truck

16 with guns out and mask on.  You know how that made me feel?  I

17 thought they was about to rob -- I didn't know what was going

18 on, and this was going on.

19         I haven't seen the world in seven years, and that's

20 the first thing, experience I get?  Yeah, I asked for a weapon.

21 I needed to protect myself.  I didn't have -- I didn't have the

22 resources to move.  I was flat broke.  So yeah, I had a weapon.

23 I was going to protect myself so I could be able to take care

24 of my family.

25         This incident that happened, it was stupid and it was

1   childish of me.  I was -- I wasn't in my right state.  I don't

2   hit no women, man.  That's cowardly.  I don't hit no women,

3   man.  I don't do that stuff.  This is -- it hurt me to this

4   day.  That was somebody that I love and I hurt, and I don't --

5   I don't even remember.  It was just a blur.

6           I don't -- like, it's -- I'm not a bad person, your

7   Honor.  I know it may look like it or what they try to portray

8   me, but that's not me.  I been trying to better myself.  I see

9   the mistakes that I made, you know.  Sometimes I make impulsive

10  decisions, but I've been to AA.  I've been to all type of

11  classes to control it.  I'm even back on my psyche meds, you

12  know, because sometimes it takes one second to think and then

13  to determine the rest of your life.

14          Unfortunately, I made a dumb, childish, cowardly

15  mistake.  It wasn't intentionally.  Like, I'm not making no

16  excuses whatsoever.  I didn't go over there with the intent to

17  hurt nobody.  I just wanted my belongings.  And I been hurt so

18  long, everything was a blur because I feel like I been

19  backstabbed so much and people just snake me out.

20          I don't know, man.  I was -- I did some childish

21  stuff, man.  I should have never did that.  I'm ashamed of

22  myself.  I got my family here.  They hear this crap.  My

23  daughter hear this.  I'm not happy I did this, man.  I -- I'm

24  going to say -- I'm going to say my letter.

25          After a long self-examination, I have came to the

conclusion of me being honest and take responsibility of my actions is the only way to better myself. I am very regretful, remorseful, and I ask God for forgiveness every day. In no way, shape, form, or fashion is what I did acceptable. Every day I'm also making myself a better man, a better father so I can be able to take care of my responsibilities as a man and never miss another day out of my kids' and my family's life.

I understand by me being here has put a lot of hurt on my family and placed me as a burden. I've been through a lot in my life that's caused me to have a lot of inner problems and also a bad temper which I'm currently trying to fix permanently. I am constantly being taken out of my kids' life which has forced me to raise them over visits, phone calls which makes me feel like a coward, a true coward. I feel like a coward because of not just living right and up to my true potential, I constantly make dumb mistakes, impulsive decisions that takes times out of their life.

I lost my temper the day of this incident because I felt the woman who planned -- I planned to be with and trusted broke my privacy, disrespected me, and threatened to damage my clothes and other replaceable items. When I sat back and thought, that was the dumbest, immature, cowardly thing I could have ever did in my entire life.

I grew up watching my stepfather abuse my mother, and I hated him for it, and now I did the same thing. And I can

1     honestly say I hate myself even more.  No woman on this earth

2     deserves to be abused by someone they love, look for

3     protection, or by no man at all.  No matter what, I should have

4     never put my hands on Zyesha.  I should have never did it.

5          Sometimes my temper is so bad, I do and say stuff

6     without thinking and regret it afterwards when it's already too

7     late.  Not only has I lost a significant other, I also lost

8     time out of my kids' life.  I've inconvenienced my family.

9     I've inconvenienced the courts.

10         No matter what the outcome of today is, I'm going to

11    continue working harder to become a better man, a better

12    father, entrepreneur, and a law-abiding citizen.  I'm never,

13    ever going to carry a gun again in my life.  I don't care if

14    it's World War III and I'm put in the war, it's not going to

15    happen, period.

16         I will never hurt anyone mentally, physically, or

17    emotionally ever again no matter the circumstances.  To better

18    myself, I'm going to continue to have my weekly visits with my

19    therapist and seek the best treatment for my mental health

20    diagnosis.  I'm going to continue to go to AA and find a

21    sponsor.  I'm going to continue to do charity events to help

22    kids get off the streets and give them an opportunity so they

23    will never make the dumb mistakes that I did no matter what

24    their upbringing is.

25         I'm going to advocate for people with mental health

1    issues and show people even the strongest people may need help.

2    I'm going to take care of my family and turn my corporation

3    into a multi-billion dollar corporation.  I'm going to use my

4    life of mistakes as a living testimony through my music and my

5    work ethics.  I'm going to be a more productive member of

6    society and work on eventually getting my criminal record

7    expunged and sealed.  I'm also going to continue to pray for

8    forgiveness and leave everything in God's hands.

9            First off, I want to say I'm sorry to my kids.  I love

10   you, baby.  I want to say I'm sorry to my family.  I'm sorry to

11   my family for putting them -- putting y'all through this,

12   embarrassing y'all, taking time out of y'all jobs.  My daughter

13   ain't at school all because I'm -- some childish stuff.  I also

14   want to apologize to the judge and the courts for my

15   inconveniencing.

16           I want to thank my attorney, Ms. Yelena Dolgosheeva,

17   for taking the time to actually see the good in me and fight

18   for me.  And I promise to all of y'all, I'm taking my

19   responsibilities for my action, and I learned my lesson.  I

20   promise y'all, no matter what today's outcome is, I'm going to

21   do whatever I have to do to better myself and make y'all proud.

22   No matter if it's mental health treatment, prison,

23   self-rehabilitation, I'm going to do whatever it takes, and I'm

24   going to make it count.

25           I wish I could turn back the hands of time but I

1  can't, so from now on I'm no longer living in the past because

2  if you keep living in the past, you'll never have a future.

3       THE COURT:  Thank you, Mr. McGraw.

4       Federal law tells judges what we need to consider in

5  picking a sentence.  I do need to consider the nature and

6  circumstances of the crime that you committed as well as your

7  personal history and characteristics.  And then Congress has

8  told judges that we have to try to achieve certain goals of

9  sentencing and then pick a sentence that is enough but not more

10 than needed to achieve the goals.

11      The goals of sentencing include promoting respect for

12 the law.  The sentence must reflect just punishment.  The

13 sentence does also need to reflect the seriousness of the

14 offense.  I have to try to achieve what the law calls

15 deterrence.  And in the law, there's two kinds.  There's

16 specific deterrence, which is picking a sentence that is

17 more -- that is enough but not more than needed to encourage

18 the specific defendant in the case to not commit another

19 offense; and then there's general deterrence which is sending a

20 message out generally to the rest of the community to not

21 commit crimes like this.

22      I do need to provide for the protection of the public.

23 I do take into account medical, rehabilitative, employment

24 needs.  Those kinds of needs can only push a sentence down.

25 That's never a reason to keep someone in prison longer.

1           I do consider the advice of the sentencing guidelines.

2      And I also have to avoid what the law calls unwarranted

3      disparity which means that I ought to treat you the same way I

4      treat any other defendant who has been found guilty of similar

5      conduct and who has the same kind of history that you do.  So

6      those are all the goals and factors that I need to balance in

7      picking a sentence.

8           The first one, you'll remember, is the nature and

9      circumstances of the offense.  And Congress has passed this law

10     that prohibits someone who's been convicted of a felony from

11     possessing a firearm.  And the idea is that just the mere

12     possession of a firearm poses a danger when that person has

13     committed a felony before.

14          But here, the particular circumstances are far beyond

15     just possession of a firearm after being convicted of a felony.

16     It's not just any firearm.  This was a firearm with an auto

17     sear switch which made it a machine gun, and that is a

18     horrible, horrible firearm.  And then even worse, it's not just

19     mere possession.  You did point the gun at two victims and then

20     threaten to kill them.  And this is after you punched this

21     victim bloody and bloodied her mouth, it was that -- that

22     serious of a strike and broke her jaw.  So this goes well

23     beyond just the usual possession of a firearm after a felony.

24          And then on top of that, your criminal history is

25     serious.  There is the reckless discharge of yet another

1   firearm and then conspiracy to commit murder which did result

2   in a gun shooting death of your friend.  And I do need to, and

3   I credit your admission in state court under oath that you did

4   conspire to commit a murder.  So you're kind of walking away

5   from that.  I do understand, it was very -- it was a very, very

6   short plea colloquy.  I have not seen plea colloquies that

7   short in a long time, but you did plead guilty to that offense,

8   so I need to take that into account.  So it was a very serious

9   offense.

10          And this idea that -- and it sounds like from what you

11  have now just said, you now understand that it is not an excuse

12  to carry a firearm just because you are -- live and work and

13  your family is in a dangerous area.  And it is, it's up to

14  Congress and state legislatures and other branches of

15  government to try to stop overlooking these neighborhoods so

16  that there -- people can live and work and play in safe places,

17  but when the criminal justice -- like, our role here is to make

18  sure that people don't think that the solution to a -- living

19  in a dangerous neighborhood is to carry a gun with them.  In

20  that way, madness lies because then that's really leading to

21  everyone being armed in these neighborhoods, and that will only

22  make things so much worse.

23          So from the criminal justice system's perspective, we

24  do have to fight against that kind of thinking and deter those

25  kinds of offenses.  And in the end, you ended up not carrying

1    that machine gun for purposes of just self-defense if you were

2    attacked.  You used it to threaten others.  So that's where it

3    ended up.

4         You did plead guilty.  Although you did not accept

5    responsibility for purposes of the formal sentencing

6    guidelines, at least from what you have said just now, you

7    understand that you must never pick up another firearm and that

8    you do need to make your criminal history, history so that it

9    is in the past and not controlling your future.  So I do hear

10   from you that you are -- you're ready to move on.

11        At the same time, I have to look at your criminal

12   history.  It is part of the record.  And I think I would be

13   naive if I thought that there is zero chance that you're going

14   to re-offend.  There's no way for me to make that finding when

15   this offense was committed three months and two days after you

16   were released on state parole for conspiracy to commit murder.

17   So way too naive for me to think that.  And at the same time, I

18   understand that you are trying to take some additional steps to

19   rehabilitate which I'll mention in a moment.

20        With regard to your upbringing, it was horrific.  You

21   know, raised by mostly a single mother and then suffering the

22   physical and sexual abuse which I don't -- I won't repeat.

23   It's in Paragraphs 73 through 75 of the presentence report

24   although it has been publicly mentioned today.  In some ways,

25   that is a healthy recognition that you need to get these things

1    out and you need to talk about them.

2           And so I understand that that upbringing -- and it's

3    in Woodlawn surrounded by guns and violence, and that not only

4    did your family members and friends suffer the violence, you

5    yourself were shot and it seems like set up twice at least to

6    get ambushed.  So that does add to the understanding of why you

7    had started down this path and including the reckless discharge

8    offense, but at the same time, as I said, the criminal justice

9    system does have to intervene.

10          There are many thousands of young men who grow up in

11   the -- these impoverished areas of Chicago that do not then

12   recklessly discharge a gun, who do not conspire to murder, who

13   do not punch victims and then threaten a mother and a daughter

14   at gunpoint that you are going to fucking kill them.  So that,

15   I understand why that path began, but I think you have to

16   understand that the criminal justice system has to intervene

17   when this happens.

18          Separation from family, that is the worst part of

19   every sentencing because they've done nothing wrong and yet

20   they're being separated from you.  And both the letters and the

21   speakers today as they amplified on their letters from your

22   mother and your aunt to your brother, cousin, family friends,

23   the list goes on, they all speak to how much you have

24   contributed to their personal lives and then also to the

25   community at large through volunteer and charitable donations.

1    And so that is to your credit.

2           And separating you from your children, one of whom you

3    call a stepson, it's not formal in that way but I'm sure you

4    feel it that way and I'm sure he does too.  So he's, in effect,

5    one of your children as well.  That is -- it's awful, right, to

6    have to undergo that family separation both for them and for

7    you.  So I do take that into account.

8           I do need to, however, Mr. McGraw, sentence -- there's

9    two versions of Jeff McGraw.  There's the Jeff McGraw who's

10   contributed to this family life and community life, and there

11   is also the Jeff McGraw who pointed a machine gun at these two

12   victims, and I have to take that into account as well.  So the

13   sentence is not a reflection of how you treat your family and

14   your friends.  It's a reflection of the -- both the criminal

15   history and this particular offense.

16          The rehabilitative steps are very significant.

17   Looking at your class schedule during pretrial detention, 200

18   classes, 182 hours' worth of programming.  There were some on

19   the bottom of the list that you didn't quite finish and needs

20   improvement.  I know it was, like, two or three minutes, but

21   there was a very long list in advance of that where clearly,

22   all manner of classes, whether it's occupational or mental

23   health, personal relationships.  That is a significant step.  I

24   think that number of hours that you spent trying to improve

25   yourself is, that's a very good sign, and it's something that

1    obviously I will take into account.

2          With regard to the possibilities of employment

3    afterwards, there -- I think you either said outright or

4    implied that, like, just because you are a rapper, you feel

5    like you were being treated differently.  The fact that you

6    were able to secure the record deal, that's a positive sign.

7    It is a positive sign to have been able to enter into that

8    contract and then start spreading some of that wealth around to

9    the family and to the community.  So there are some

10   rehabilitative prospects there including employment and perhaps

11   as a rapper again which would be a positive thing.

12         I do also take into account the physical and mental

13   health conditions that have been raised, both verbally and also

14   in writing; with the chronic pain that you suffer from various

15   ailments and not least of which the shootings.  And in terms of

16   your mental health, you are already diagnosed with and

17   prescribed medications for the depression as well as other

18   disorders.  Straight-out PTSD, I'm not -- I don't think that

19   the -- it's fair to say that the pretrial facilities have been

20   ignoring your mental health.  They seem to be assessing it and

21   providing help, both medication and counseling.  So I don't

22   think that's being ignored.

23         I think everyone wishes, you most of all, that you had

24   access to mental health counseling earlier on and maybe, maybe

25   the path would have been different here.  So I take that into

1    account.  At the same time -- well, before I explain the

2    counter to that, the prior attempts at suicide, I think it was

3    actually five listed in the presentence report.  That plus the

4    physical condition and the mental health conditions, prison is

5    harder for you, I think, than defendants who do not suffer from

6    those other conditions, so I take that into account, that every

7    day you do is a harder day than others.

8           So here's the counter, the "but."  I do need to still

9    take into account the seriousness of the offense, the need to

10   provide for general and specific deterrence, and to protect the

11   public, to guard against repeat offense.

12          And there's also this idea, and I understand why your

13   defense lawyer made the argument, but to get credit against the

14   federal sentence for the time you were on state parole hold,

15   you were on parole for conspiracy to commit murder.  So it is

16   not surprising that there would have been a parole hold against

17   you immediately after the commission of this offense.  And

18   yeah, it took the federal government ten months to bring the

19   case over from state court, but I don't think it's very much

20   mitigation against the federal sentence, but I have considered

21   that.

22          So on balance, given the need to -- the need for the

23   sentence to reflect the seriousness of the offense, to provide

24   for deterrence, both general and specific, at the same time

25   recognizing the mitigating facts as well, the appropriate

1    sentence is a sentence of 108 months' imprisonment.

2         With regard to supervised release, for now a

3    three-year term is needed given the criminal history and the

4    nature of this offense.  And the conditions will be as I

5    imposed earlier.  No fine will be imposed because there's no

6    ability to pay.

7         For the defense, is there any objection to the

8    forfeiture judgment?

9         MS. DOLGOSHEEVA:  No objection.

10         THE COURT:  We will enter the forfeiture -- well, the

11    forfeiture order first.

12         A $100 special assessment must be assessed for the

13    felony conviction.

14         I will recommend mental health treatment in the

15    facility as well as the RDAP program.  And I do recommend that

16    the BOP immediately review and assess the defendant's mental

17    health after the -- now that the sentence has been imposed.

18         With regard to the appeal rights, you have 14 days

19    from entry of judgment of the -- on the docket to file a notice

20    of appeal.  If you can't afford the fees or costs of appeal,

21    then you can ask to have them waived and you won't have to pay.

22    If you continue to not be able to afford an attorney for the

23    appeal, then ask to have an attorney appointed free of charge,

24    and one will be appointed free of charge.

25         THE DEFENDANT:  How do I do that?

1       THE COURT:  Ms. Dolgosheeva will help you through

2  that.

3       And if you want a notice of appeal prepared right now,

4  that, we can do.  Yes?

5       THE DEFENDANT:  Yes.

6       THE COURT:  Okay.  The clerk will prepare a notice of

7  appeal and enter a notice of appeal on the defendant's behalf.

8  But Ms. Dolgosheeva will walk you through the other parts in

9  terms of getting an appointment of counsel for the appeal.

10      Okay.  Is there anything else for the government?

11      MR. ARCE:  No, your Honor.  Thank you.

12      THE COURT:  Okay.  And from the probation office?

13      THE PROBATION OFFICER:  No, your Honor.

14      THE COURT:  And the defense?

15      MS. DOLGOSHEEVA:  No, your Honor.

16      THE COURT:  Okay.  Then we are adjourned.

17   (Proceedings adjourned at 4:27 p.m.)

18                    *   *   *   *   *

19      I certify that the foregoing is a correct transcript

20  from the record of proceedings in the above-entitled matter.

21  */s/Judith A. Walsh*                    *March 15, 2025*

22  Judith A. Walsh, CSR, RDR, F/CRR              Date

23  Official Court Reporter

24

25